# In The Matter Of:

*Clinton Henderson, et al. v.*
*1400 Northside Drive, Inc., et al.*

---

*Clinton Henderson*
*August 22, 2014*

---

*Thompson Reporting Services, Inc.*
*Georgia Certified Court Reporters*
*P.O. Box 680311*
*Marietta, Georgia  30068*
*(678) 483-0600*



Original File 082214CH.txt

Min-U-Script® with Word Index

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                         ATLANTA DIVISION

3

CLINTON HENDERSON and ANDREW    )
4  OLINDE, individually and on    )
behalf of all other similarly  )
5  situated individuals,          )
                                )   CIVIL ACTION FILE NO.:
6              Plaintiffs,        )   1:13-CV-3767-TWT
                                )
7         vs.                    )
                                )
8  1400 NORTHSIDE DRIVE, INC.    )
d/b/a SWINGING RICHARDS, AND   )
9  C.B. JONES,                   )
                                )
10             Defendants.        )
                                 - - -
11

12              Videotaped deposition of CLINTON

13        HENDERSON, taken on behalf of the Defendants,

14        pursuant to the stipulations agreed to herein,

15        before Alice S. Davis, Certified Court

16        Reporter and Notary Public, at Schulten, Ward

17        & Turner, LLP, 260 Peachtree Street, Suite

18        2700, Atlanta, Georgia, on the 22nd day of

19        August 2014, commencing at the hour of

20        9:00 a.m.

21

22            Thompson Reporting Services, Inc.
            Georgia Certified Court Reporters
23                  P.O. Box 680311
                Marietta, Georgia  30068
24            www.thompsonreportingservices.com
        scheduling@thompsonreportingservices.com
25
```

**Thompson Reporting Services, Inc.**
**(678) 483-0600**

1                     INDEX TO EXAMINATION

2                                                    Page

3

4    Examination by Mr. Schlanger .....................5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX TO EXHIBITS

2
     DEFENDANTS'
3    EXHIBIT              DESCRIPTION                    PAGE

4
       1          Table sign  ..........................16
5
       2          Wall Sign  ...........................18
6
       3          7/21/12 Agreement  ...................20
7

8

9
     *   Exhibits were marked prior to the deposition.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    APPEARANCES OF COUNSEL:

2   On behalf of the Plaintiffs:

3        PAUL J. LUKAS, ATTORNEY AT LAW
         TIM C. SELANDER, ATTORNEY AT LAW
4        Nichols Kaster
         4600 IDS Center
5        80 S. 8th Street
         Minneapolis, Minnesota  55402
6        (877) 448-0492
         Fax:  (612) 215-6870
7        E-mail: lukas@nka.com
                 selander@nka.com
8
    On behalf of the Defendants:
9
         HERBERT P. SCHLANGER, ATTORNEY AT LAW
10       Law Office of Herbert P. Schlanger
         230 Peachtree Street, N.W.
11       Suite 1890
         Atlanta, Georgia  30303
12       (404) 808-6659
         Fax:  (404) 745-0523
13       herb@schlanger.com

14       SUSAN KASTAN MURPHEY, ATTORNEY AT LAW
         Schulten, Ward & Turner, LLP
15       260 Peachtree Street, N.W.
         Suite 2700
16       Atlanta, Georgia  30303
         (404) 688-6800
17       Fax:  (404) 688-6840
         E-mail: skm@swtlaw.com
18
    Also Present:  Justin Stewart, Videographer
19
                          - - -
20

21           THE VIDEOGRAPHER:  We are on the video

22       record.

23           MR. SCHLANGER:  This is the deposition of

24       Clint Henderson.  It's taken pursuant to Notice

25       and agreement of counsel.
```

1          Would you, please, swear the witness.

2                    CLINTON HENDERSON,

3    having been first duly sworn, was examined and

4    testified as follows:

5                      EXAMINATION

6    BY MR. SCHLANGER:

7          Q     Please state your name.

8          A     Clinton Jack Henderson.

9          Q     Mr. Henderson, have you ever had your

10   deposition taken before?

11         A     No, sir.

12         Q     I'm presuming that your attorneys have

13   spoken to you about what a deposition is; right?

14         A     Yes.

15         Q     Let me just give you a couple ground rules

16   so we're all on the same page; all right?  First is

17   you have to answer orally so that the court reporter

18   can take it down; okay?

19         A     Okay.

20         Q     Second is this is just like courtroom

21   testimony.  You're under oath, except that there's no

22   judge here.  So your attorneys get a chance to object

23   to any questions that I ask, so pause before you

24   answer to give them a chance to interpose any

25   objection; okay?

1          A      Okay.

2          Q      Third, if for any reason you don't

3   understand what I've asked, either because I mumble or

4   speak too softly or what I ask is ambiguous or

5   unintelligible, let me know, and I will try to

6   rephrase it for you; okay?

7          A      Okay.

8          Q      Mr. Henderson, what is your educational

9   background?

10         A      I just graduated from college May of 2014.

11         Q      With a degree in what?

12         A      Integrative studies.

13         Q      What is integrative studies?

14         A      Integrative studies.

15         Q      What is that?

16         A      It's a fancy way of saying general studies.

17         Q      Where did you graduate from?

18         A      University of North Texas.

19         Q      And where did you grow up?

20         A      Dallas, Texas.

21         Q      Can you, please, give me from the time you,

22   let's say, graduated from high school, what your work

23   history has been.

24         A      Work history from high school has been

25   waiting tables off and on from different jobs.  I

1   worked at GNC for maybe a year and a half when I was

2   at school at Oklahoma University.   I then went back to

3   North Texas, or Dallas, Texas, where I started waiting

4   tables again or continued to wait tables, and then I

5   started dancing at about age 22.

6        Q     What year was that?

7        A     That was about 11 years ago, so 14 minus 11,

8   2003.

9        Q     Have you had any other work history?

10        A     Since then I go-go danced for maybe four or

11   five years there and also did a little bartending on

12   the side; and then, about age 26, 27, I moved to

13   Atlanta and started entertaining at Richards.

14        Q     Tell me so I don't have to do the

15   subtraction, what year did you start at Richards?

16        A     I want to say we're going up on eight years

17   this October, so ....

18        Q     About 2006?

19        A     2006 roughly, yeah.   I'm not sure on the

20   exact dates, but yeah.

21        Q     In the last ten years, have you had any work

22   experience outside of the adult-entertainment

23   industry?

24        A     Recently I started working at Ed Voyles

25   Honda as a car salesman.   Since January 15th was my

1    start date.

2          Q     And what other adult clubs have you worked

3    at?

4          A     Adult clubs, do you want me to list the

5    names?

6          Q     Yes, please, and tell me where they are.

7          A     Male Boxx, M-a-l-e B-o-x-x, was the first

8    one.

9          Q     Where is that?

10         A     In Dallas, Texas.  Then there was Zippers,

11   which was in Dallas, Texas, and then there was Crews

12   Inn, C-r-e-w-s I-n-n.  And then there, off and on I

13   would go to various clubs for a weekend.  I did a New

14   Orleans trip one time at a bar called Oz, O-z.  That

15   was before I came here.  That was maybe one weekend

16   for Southern Decadence, a celebration down there.

17              I went to Austin one time, did a weekend

18   there.  I think the bar was called -- I can't remember

19   the name.

20         Q     And in Atlanta, which clubs have you worked

21   at?

22         A     I have worked at Swinging Richards and a bar

23   called BJ Roosters.

24         Q     When did you work at BJ Roosters?

25         A     It was probably halfway through working at

1    Richards, maybe 2010, 2009 maybe.  Time goes by so

2    fast.  It could have been eight.  I don't remember the

3    exact dates.  It was a couple-month thing over there.

4         Q     What made you take up being an adult

5    entertainer?

6         A     Well, because of the easy money was the

7    initial reason.

8         Q     What's kept you in it?

9         A     The easy money.

10        Q     Any other reasons?

11        A     No.

12        Q     From your point of view, what's involved in

13   being an adult entertainer?

14        A     Being an adult entertainer involves getting

15   on stage or a box, depending on where you're at, and

16   dancing, moving around, and getting tips.

17        Q     That's it?

18        A     What else is involved?  Well, other than

19   dancing on stage, you walk around.  At other bars you

20   don't get to do what you can do at Richards.  You have

21   to stay on the box the whole time.  So at Richards you

22   get to walk around and mingle with the crowd and

23   perform lap dances.

24        Q     Table dances?

25        A     Table dances.

1     Q     And how do you get a table dance?

2     A     To get a table dance, there's numerous ways.

3     If you're on stage, somebody can come up to you and

4     ask you for a dance, Hey, I'd like a dance over here

5     when you get off, or my friend, it's their birthday,

6     can you come give them a dance, or they saw you last

7     time, can you come back and see us.  Or initially you

8     can say, Hey, would you like a dance.

9     Q     This is when you're walking around the club?

10    A     Sometimes it's done a little bit on stage,

11    but typically you don't get a lot of that.  That's

12    very minor, somebody asking you.  I get asked when I'm

13    on stage, can you do a dance for me.  Very rarely do

14    we ask for a dance on stage.

15          Now, what I do as a dancer is just try to

16    remember who comes and tips me and then walk around

17    the room, go up and introduce myself, thank you for

18    the tip.  It's an easier sales pitch for me to go up

19    to them and say thank you, where are you guys from, a

20    little small talk, would you like a dance.

21    Q     So the stage rotation that you do is kind of

22    like advertising you to see who is interested in doing

23    table dances; right?

24    A     In a sense.

25    Q     It puts you out there, let's people see you?

1      A      Yes.

2      Q      Now, your primary duty as an entertainer is

3  to entertain the customers; right?

4      A      Yes.

5      Q      But your primary goal is to make some money;

6  right?

7      A      That's the primary goal, yes.

8      Q      Even though you might make some tips on

9  stage, the real money is in the table dances and the

10  VIP rooms; right?

11      A      It depends.  Some dancers do very well on

12  stage, just stage performances.  Typically 20 to 40

13  bucks, it would be a good stage set.  Some people only

14  get five bucks, but yes, most of the money is table

15  dances.  Some people make more money in VIP, less

16  money on the stage.  It just depends, but the bulk of

17  the money comes from lap dances in VIP.  Yes.

18      Q      And most of my experience in terms of

19  talking to entertainers in the adult industry has come

20  from the clubs with girl performers.

21      A      Okay.

22      Q      I'm just going to try to explore how it may

23  be the same or different in Richards.  The primary

24  audience in Richards, the target audience, is gay

25  males; right?

1    A    That's the primary, yes.

2    Q    Is it important from your point of view as

3 an entertainer and with your goal of trying to make

4 some money to establish some kind of rapport with the

5 customers?

6    A    Rarely; it just depends.  Sometimes you

7 don't have to establish any rapport at all.  It's just

8 a, Hey, how are you doing, would you like a dance,

9 give them a dance and move on.

10        Sometimes, on a slower night, you have to

11 sit there and speak with them and get to know them,

12 because it's hard just to give a dance, especially if

13 they didn't come give you a tip.  The ones that give

14 you a tip, you know are interested.

15    Q    And when you sit and talk to a customer,

16 what do you talk about?

17    A    What do you talk about?  First time here?

18 What's your name?

19    Q    What do you do?

20    A    Usually what do you do.

21    Q    I guess what I'm saying is, do you try to

22 act interested in what they do and who they are?

23    A    Yes.  You wouldn't get a tip if you act

24 disinterested, so yes.  I call it being nice.

25    Q    All right.  And is it sometimes hard or

1  difficult to be interested, or be nice in your phrase,

2  to some of these customers?

3      A    I wouldn't say it's hard to be nice.  It

4  just depends on what they say.  If they want to skip

5  the nice conversation and move to other conversations,

6  it's a little harder.

7      Q    But you have to read each customer to figure

8  out, make sure what they want and how they are going

9  to react to what you're talking about and what you're

10  doing; right?

11      A    Yes.

12      Q    And each one wants something a little

13  different from you in terms of how you act and what

14  you present and all that?

15      A    I would say very few are different on that.

16  Most people just want a dance.  Some people try to get

17  to know you a little bit more and try to maybe

18  establish a relationship, but we try to keep it

19  simple.

20      Q    I'm trying to figure out, you know, I have

21  this image of a middle-aged, potbellied guy -- comes

22  from watching in the female clubs -- the middle-aged,

23  half-drunk, potbellied guy thinking that somehow he is

24  really fascinating to this 20-something-year-old

25  decent looking young lady who's sitting there with

1   him.  Is there an equivalent kind of thing that

2   happens in Richards?

3        A    I would say so.  I won't say how it could be

4   any different.  We have all shapes and sizes come in

5   there, so it's not always the potbelly.

6        Q    Yeah; I understand that.  But I guess my

7   question is:  Is the creation of a mood or a fantasy

8   or whatever you want to call it part of the experience

9   that you're trying to give them at Richards?

10       A    I just go there and dance.  I don't know

11  anything about fantasies.

12       Q    Okay.  How do you convince somebody to have

13  a session back in the VIP room?

14       A    How do you convince them?  Well, I don't

15  really do any convincing.  I'm a little different

16  breed when it comes to dancing, because I don't really

17  like to go back there.  They typically ask me what do

18  you do in VIP, and I tell them it's a little more

19  intimate dance, and then they can decide if they want

20  to go back there or not.  I don't try to convince

21  anybody to really go back there.

22            I do most of my money from lap dances, which

23  is required a little bit of talking.  I can't speak

24  for everybody, though.

25       Q    How many lap dances per night that you work

1    do you average?

2        A    It depends on the night.  Weekdays it could

3    be anywhere from as little as three to maximum fifteen

4    on a real good night.  Weekends, it's hard to judge.

5    How many lap dances could I do?  Twenty, twenty lap

6    dances, thirty lap dances.  It just depends.

7        Q    You're calling them lap dances, but they're

8    the table dances?

9        A    Table dances, yeah.  I apologize, table

10   dances.

11       Q    That's all right.  Just making sure we're

12   using the same vocabulary.

13       A    Yeah, table dances.

14       Q    A table dance lasts anywhere from three to

15   five minutes; right?

16       A    I would say three to four.  Five minutes

17   would be a little long.

18       Q    It's one song?

19       A    One song.  I think the DJ tries to keep the

20   songs around the same time so other table dances

21   aren't longer or shorter.  They just try to keep

22   them -- I don't know if he literally cuts out the

23   song, or most songs are probably three to four

24   minutes, could be five.

25       Q    When you go on stage, you do a set of three

1    songs; right?

2         A    Yes, sir.

3         Q    And how often per night do you do a stage

4    rotation?

5         A    I would say maybe five, five different times

6    up on stage.

7         Q    So a total of about an hour?

8         A    Yeah.  If you do 15 minutes, yeah, I would

9    say a good ....

10        Q    Let me show you what I've marked Defendants'

11   Exhibit 1.

12   BY MR. SCHLANGER:

13        Q    Do you recognize this from the tables at

14   Richards?

15        A    I do.

16        Q    Can you tell what it is?

17             MR. LUKAS:  Do you have a copy for me here?

18             MR. SCHLANGER:  Yes, as a matter of fact, I

19        do.

20             MR. LUKAS:  Excellent.  This is six?

21             MR. SCHLANGER:  One.

22             MR. LUKAS:  I thought we were going to go

23        consecutively.

24             MR. SCHLANGER:  Oh, because we used the

25        others?

1          MR. LUKAS:   Yeah.

2          MR. SCHLANGER:   No.   I was going to say

3     defendants are consecutive and plaintiffs are

4     consecutive.

5          MR. LUKAS:   Okay.   That's fine.

6   BY MR. SCHLANGER:

7     Q    Can you describe what that is then?

8     A    It is a sign that's on the wall.

9     Q    No.   This is the one from the table.

10    A    Oh, okay.   This would be one from the table.

11   They look very similar.   The one from the table looks

12   like a mini-sign that's on the tables, most or all the

13   tables around the club.

14    Q    What information does it convey to the

15   customer?

16    A    It conveys there's a VIP lounge and the

17   entrance fee is $10 to enter.   There's a VIP room

18   rental.   For 15 minutes, it's 40 bucks.   For 30

19   minutes it's 65.   For 60 minutes it's 125.   So that

20   looks likes a VIP rental fee.   And then table dances

21   in VIP lounge are $20.   Table dances on main floor are

22   $10.

23    Q    Okay.   Now, the $10 per dancer for table

24   dances on the main floor, that's a minimum fee; right?

25    A    Yes.

1        Q     You could ask for more than $10; right?

2        A     You can.

3        Q     And you can get more than $10.

4        A     Yes.

5        Q     And the VIP lounge, the minimum is $20;

6   right?

7        A     That's correct.

8        Q     And you can ask for more than 20; right?

9        A     Yes.

10        Q     And you could get more than 20?

11        A     You could.

12        Q     But you're not allowed to ask for less than

13   20; right?

14        A     You know, you're not allowed to.  I would

15   say no.  I would disagree with that.

16        Q     Okay.  Tell me what you ....

17        A     I've heard people saying, you know, Hey,

18   it's a slow night, I'll do one for five; very rarely.

19   Why would you want to take five when you can get ten,

20   but 99 percent of the time, this is accurate.

21        Q     And so it's $10 is the minimum set for table

22   dances on the main floor and 20 in the VIP room?

23        A     Yes, sir.

24   BY MR. SCHLANGER:

25        Q     Let me show you Exhibit 2.  Do you recognize

1    that?

2          A    I do.

3          Q    And what is it?

4          A    That looks like the sign on the wall.

5          Q    By the VIP room?

6          A    Yes, sir.

7          Q    That's it; okay.  And am I correct that this

8    describes the rates that are charged as minimums for

9    the VIP room?

10         A    Yes, sir.

11         Q    So for one session up to 15 minutes, it's

12   $40 is the room rental plus the dancer fee; right?

13         A    Yes, sir.

14         Q    And it indicates at the bottom that the

15   dancer charges a minimum of a hundred dollars per up

16   to 15 minutes; right?

17         A    Uh-huh (affirmative).

18         Q    And are those minimums adhered to?

19         A    Yes.

20         Q    Explain to me how the payments are made for

21   a VIP-room visit.

22         A    Well, now, people come up after you've

23   agreed on a VIP room, and we walk usually together to

24   the VIP door worker, and he asks how much time and

25   tells you the price, tells me or tells them, and then

1    says how much it is.

2         Q    And then how does it get paid for?

3         A    From the customer.

4         Q    And he pays it to the doorman, to the VIP

5    door?

6         A    Yes.  It's either to him or to us, and then

7    we give it to him.  It ends up in his hands.

8         Q    Now, I've heard that dancers often negotiate

9    for more than a hundred dollars per 15 minutes; is

10   that correct?

11        A    I can't speak for other dancers.

12        Q    Do you?

13        A    Do I, no.

14        Q    Do you do it for less than a hundred

15   dollars?

16        A    No.

17             MR. SELANDER:  Just one second.  Can we go

18        off the record for a minute?

19             MR. SCHLANGER:  Sure.

20             THE VIDEOGRAPHER:  We're off video.

21             (Brief off-the-record discussion.)

22             THE VIDEOGRAPHER:  We are back on video.

23   BY MR. SCHLANGER:

24        Q    Mr. Henderson, let me hand you Exhibit 3.

25   Do you recognize that?

1    A    Yes.

2    Q    Can you tell me what it is, please.

3    A    Well, I'm trying to look it over.

4    Q    Yeah; take your time.

5    A    I wouldn't know how to describe what this

6  is.  You probably know the technical term.

7    Q    Well, it's titled Agreement; right?

8    A    Okay.

9    Q    Did you sign this Agreement?  Did you agree

10  to the terms?

11    A    Yes.

12    Q    And you did that in July of 2012?

13    A    Yes, apparently.

14    Q    Each year you have been working at Richards,

15  have you gotten a form 1099 that shows some payments

16  to you?

17    A    Yes.

18    Q    What did you understand those payments ...?

19    A    Where they came from?

20    Q    Yeah.

21    A    I understood where those came from were for

22  VIP payments of credit cards.

23    Q    In other words, the hundred dollars per

24  session that were put on a credit card?

25    A    Allotted up over the year.

1      Q      Right.  And then were paid to you by check?

2             MR. SELANDER:  Let him finish his question.

3   BY MR. SCHLANGER:

4      Q      That was what was then paid to you by a

5   check each day?

6      A      Well, yes, that was paid to me the next week

7   after it got processed.

8      Q      Describe, walk me through how you get the

9   credit card charges paid to you or how you put in for

10  them and how they pay you for them.

11     A      How you put in for them?

12     Q      You go spend, let's say, one session in the

13  VIP room.

14     A      Uh-huh (affirmative).

15     Q      The customer puts it on his credit card.

16  You're expecting to get some money back for that?

17     A      Correct.

18     Q      How do you get that money?

19     A      Well, usually it's on the weekend typically

20  when I do a room.  The next week I get a check.  I

21  pick it up from the door.

22     Q      But how do you tell them:  Yeah, I've been

23  in the VIP room.  I want my money.

24     A      You don't tell them that.  When we do a VIP,

25  it's put into the computer.  If it's cash, they give

1  you the cash at the end of the night, you're paid by

2  the end of the night.  If it's a credit card, it's

3  just been known -- I don't know -- it's just been

4  known since I started working there that you get paid

5  in a check from that.  For the next week, you go in

6  and you say:  I did a VIP last week.  I want my check,

7  or where's my check.

8      Q    And it's waiting for you?

9      A    Typically, it's waiting for you.

10     Q    Something I forgot to ask you:  On

11  Exhibits 1 and 2, the two signs that are posted, one

12  on the table and one in the VIP room, have similar

13  signs conveying the same kind of information been in

14  the club since, let's say, 2010, the last three, four

15  years?

16     A    Yeah.

17     Q    Tell me what you understand the phrase

18  "tip-out" to mean.

19     A    Tip-out is a fee that we have to pay in

20  order to work there, tip out to different people.

21     Q    And tell me what the fees are that you can

22  recall.

23     A    The fees that I can recall are five bucks to

24  the doorman during the week, six on the weekends, I

25  believe.  On nights that it's busier, which would be

1    Tuesday, Friday, and Saturday, there would be a

2    security guard, so we would tip-out three bucks to

3    security, or the bouncer.   The rest of the money would

4    go to Matt, the manager/DJ.

5         Q    What do you mean the rest of the money?

6         A    The rest of the tip-out.

7         Q    How much was the tip-out?

8         A    The tip-out would vary.   There was a set

9    tip-out of $20 if you were late.   A late fee would

10   consist of before 8:00 o'clock is no late charge, no

11   late fee.   From 8:00 to 9:00 was $10, and from 9:00 to

12   10:00 was $20.   They said you couldn't work after

13   10:00 o'clock.   The other fee would be a $20 house

14   fee, which what I assume would go to the owner and

15   then 10 percent of what we made to the DJ.

16        Q    And since -- It sounds like the late fees

17   were to encourage people to show up earlier; right?

18        A    Yes.

19        Q    When a customer gets a table dance, that's

20   paid for in cash; right?

21        A    Yes.

22        Q    And at the end of the night when you're

23   reporting in your 10 percent to the DJ, do you report

24   the amounts you got on table dances?

25        A    Yes.

1      Q    And do you keep track of the amounts you

2  received in cash?

3      A    Would you know how much you made at the end

4  of the night?

5      Q    Yes.

6      A    Yes.

7      Q    Do you keep a record of that?

8      A    A record as in write it down?

9      Q    Yeah.

10     A    No.

11     Q    How do you know how much to report on your

12  tax return?

13     A    It's a guess.  It's a guesstimation.

14     Q    You don't have a diary or anything that you

15  keep any kind of running record on?

16     A    That's correct.

17     Q    How much do you estimate, how do you

18  estimate for, let's say, purposes of the tax return,

19  how much you made in cash?

20          MR. SELANDER:  Objection.  I'm wondering

21      where this is going in terms of the scope of

22      discovery in this case.

23          MR. SCHLANGER:  How much was earned from

24      table dances?

25          MR. SELANDER:  What does that have to do

1          with a creative professional defense or whether a

2          defendant's offset ...?

3                MR. SCHLANGER:  I think it's fairly obvious.

4          Please answer the question.

5                MR. SELANDER:  You can answer.

6          A     Okay.  Can you repeat it.

7                MR. SCHLANGER:  Would you, please, read it

8          back.

9                     (Readback by the court reporter.)

10         A     How do you estimate?

11    BY MR. SCHLANGER:

12         Q     Yeah.  How do you come up with your estimate

13    for tax returns?

14         A     A combination of the 1099 that we receive

15    and then an estimation of how much you make a week,

16    and that's how you come up with it.

17         Q     And is that in part based on how many table

18    dances you do, the estimate?

19         A     It's a combination of three things.

20         Q     Tell me.

21         A     Stage performances, lap dances, and VIP.

22         Q     Okay.  And most of the VIPs are on credit

23    cards; right?

24         A     Not at all.  A lot of them are cash as well.

25    It's half and half.  I mean, some people pay with cash

```
 1    to save money because there's a fee that the club
 2    charges to use a credit card.
 3         Q    And how do you estimate, in trying to figure
 4    out what numbers to use, how many table dances --
 5    What's your estimate of your table dances?
 6         A    What is my estimate of table dances?
 7         Q    Yeah.
 8              MR. SELANDER:  Objection; vague.  Go ahead.
 9         If you know what he is asking, go ahead.
10         A    For the year or for the week?
11    BY MR. SCHLANGER:
12         Q    Well, however you estimate them.  You're
13    saying you use them in part to estimate how much you
14    made.
15         A    I don't really keep up with that.  I don't
16    keep up with how I make the money.  I just take the
17    money and then move on with that.  You don't try to
18    depict -- I'm not worried about how many lap dances I
19    did, how many VIPs I did, what did I make on stage.
20    You just go in there, you work, you get tips for all
21    of it, and at the end of the night, you have what you
22    made for the night.  I don't keep up with how many lap
23    dances I did.
24         Q    A couple of minutes ago when I asked you a
25    question about how you come up at the end of the year
```

1    with a number to put on your tax returns, for

2    instance, you said you estimated, and you gave me

3    three factors that go into the estimate, one of which

4    was table dances.  What I'm asking is what that

5    estimate for table dances for the year is.  How do you

6    arrive at that?

7          MR. SELANDER:  Objection; asked and

8       answered.

9       A    If I were to have to think about it, I would

10   estimate that on an average night, I do ten dances a

11   night.  The thing about it is that every night is

12   different.  It's not a come in and work 40 hours a

13   week.

14          In car sales, you sell a car, you make a

15   commission on that car.  Each car is different, so

16   over a month's span, it can be different from month to

17   month, so over the year you have a monthly of what you

18   make.

19          In dancing, it's the same kind of thing.

20   There are so many ways to make money it's hard to keep

21   up with that.  So if I had to estimate, I would say

22   ten dances.

23       Q    Per night?

24       A    Yes.

25       Q    Now, at Richards, each dancer decides which

1    nights he wants to work; right?

2        A    Yes.

3        Q    You're not required to be there any certain

4    number of nights; correct?

5        A    Well, there used to be a requirement.  You'd

6    have to work one day during the week to work the

7    weekends.

8        Q    When was that a requirement?

9        A    That was for as long as I've known.  They

10   stopped enforcing that probably a year ago, but ever

11   since I've worked there, Matt, the manager, didn't

12   want you just working the weekends because then nobody

13   would work during the week.  So he would require you

14   to work one weekday to work on the weekend, at least

15   one week day to work a weekend night.

16       Q    Okay.  But it was your choice which one?

17       A    It was our choice which one, but he required

18   us to work at least three nights a week.

19       Q    And most of the dancers wanted to work

20   Friday and Saturday; right?

21       A    Most, yes, unless they had something else to

22   do.  That's typically more money.

23       Q    Those are the busy nights?

24       A    Yes, sir.

25       Q    And each entertainer decides the time at

1    which they're going to come to work; right?

2        A    Yes.

3        Q    Understanding that you have to pay more to

4    the house if you wind up coming in later?

5        A    Yes.

6           MR. SELANDER:  Objection; calls for

7        speculation.  You can answer as to yourself.

8        A    Yes.

9    BY MR. SCHLANGER:

10       Q    Other than the fact that the club says you

11   can't come to work after 10 o'clock, there's no

12   requirement that you be there by a certain time;

13   right?

14          MR. SELANDER:  Objection; vague, confusing.

15       Go ahead.

16       A    The requirement, you said there is no

17   requirement.  Can you repeat it one more time.

18    BY MR. SCHLANGER:

19       Q    Yeah.  You can come any time up until the

20   cutoff, up until 10:00 o'clock; right?

21       A    I think the club opens at 5:00 or 6:00, so

22   any time after opening to 10:00 o'clock.

23       Q    Yeah.  What I'm trying to get to is it's

24   your choice what time?

25       A    Yes.

```
 1          Q     Okay.   A couple of things on your background
 2    again I was reminded by my co-counsel.   Where are you
 3    living?
 4          A     I live in Vinings, Georgia.
 5          Q     And how long have you been living there?
 6          A     I want to say this December will be two
 7    years.
 8          Q     Before that you were where?
 9          A     Atlantic Station.
10          Q     Okay.   All right.   So you have been in
11    Atlanta for a while?
12          A     As long as I have worked at Richards, seven
13    and a half years approximately.
14          Q     Ever been arrested?
15          A     I have.
16          Q     When?
17          A     Maybe a year after I got here.
18          Q     For what?
19          A     It was a drug charge.
20          Q     Where?
21          A     Doraville, City of Doraville, DeKalb County.
22          Q     What was the resolution of that?
23          A     The resolution was expunged.
24          Q     Any other arrests?
25          A     No, sir.
```

1       Q     Mr. Henderson, what's your sexual
2   orientation?
3               MR. SELANDER:   Objection.   Where are you
4       going with this?
5               MR. SCHLANGER:   Background.
6               MR. SELANDER:   You can answer.   Go ahead;
7       it's okay.
8       A     Straight.
9   BY MR. SCHLANGER:
10      Q     Okay.   The minimum charges that are shown on
11  Exhibits 1 and 2 for the table dances and for the VIP
12  room and for the dancer time in the VIP room, those
13  are set by the club; right?
14      A     They are set by the club, yes.
15      Q     And I think you testified that you don't,
16  that you always try to get at least the minimum that's
17  set by the club; right?
18      A     For the VIP room, yes.   I won't go back
19  there for less than what ....   Most people will pay
20  that.   They don't have a problem with that.   It's not
21  like a fight to get the minimum.
22      Q     And you're told by the manager that the
23  table dances are those minimum amounts; right?
24      A     Yes.
25      Q     And you're supposed to charge at least that;

1   right?

2        A    Yes.

3        Q    Do you?

4        A    Yes.

5             MR. SCHLANGER:  Let's take a short break;

6      okay?

7             THE VIDEOGRAPHER:  We're off video.

8                (Break from 9:45 to 9:52.)

9             THE VIDEOGRAPHER:  We're back on video.

10  BY MR. SCHLANGER:

11       Q    Mr. Henderson, my co-counsel has asked me to

12  go through one subject that I thought we cleared up

13  but she wasn't certain.  So let me go through it just

14  one more time very quickly with you.  Payments in the

15  VIP room, for the VIP room sessions, you and the

16  customer walk up to the VIP-room entrance guy, the guy

17  who is standing there?

18       A    Yes.

19       Q    And let's go through a cash VIP-room

20  payment; okay.  He pays the room fee for however long

21  the session is going to be plus the amount that you've

22  agreed on for the dancer fee; right?  He gives that in

23  cash to the guy at the door; right?

24       A    Yes.

25       Q    And then later in the evening, the guy at

1    the door gives you back the dancer fee in cash; right?

2             MR. SELANDER:  Objection.  Go ahead.

3        A    The amount that he tipped me, yes.

4    BY MR. SCHLANGER:

5        Q    Well, whether it's a tip or not is one of

6    the arguments we're having in the case, but the fee

7    that the dancer earned that was agreed on, he then

8    gives you back in cash; right?

9             MR. SELANDER:  Objection.  Go ahead.

10       A    Yes.

11   BY MR. SCHLANGER:

12       Q    I tried to look through the daily sheets,

13   and it looks like you average maybe three to four days

14   a week; is that correct?  Would that square with your

15   recollection?

16       A    Since I've worked there, yes.  How far are

17   we going back?

18       Q    Let's talk about just since the last part of

19   2011.

20       A    Okay.

21       Q    So we're talking the last three and a half

22   years?

23       A    Yeah.  I would say three days a week.

24       Q    And it looks like you average maybe one VIP

25   room every one to two days.  Is that about right,

1  every one to two days that you work?

2       A    It's hard to tell.  It could be one to five.

3  Some months are better than others.  It could be two

4  in a night, and then you won't get one for two months.

5       Q    Have you ever gone for two months without

6  getting one?

7       A    Not that I can recall; maybe a month.

8       Q    While you were working?

9       A    Yeah.  There's times where you just don't

10 get any.  A lot of people don't want to pay 140 for 15

11 minutes.

12      Q    Can you recall when the last time you went

13 for a month without getting one was?

14      A    I can't recall the exact date.

15      Q    What's the club rule on leaving early?

16      A    I didn't know there really was a rule.  I

17 guess from what I recall you can't leave early.

18      Q    Okay.  You can't leave early?

19      A    From what I recall, you can't leave early.

20 That's the rule.  You're there from 9:00 o'clock to

21 2:30 or til when the club closes unless there's an

22 emergency.  Matt makes it clear that once you're

23 there, he doesn't want you leaving.

24      Q    And have you ever had an explanation for why

25 that is?

1      A     I don't know if it was him saying or me just

2   coming up with it on my own, but I would think that

3   it's better for the business if you don't want a bunch

4   of dancers coming and going.  So if I'm there and

5   somebody is asking for me, if somebody is saying, Hey,

6   where's Clint, and I've already left, there may be a

7   little confusion, upset customers.

8      Q     Is there a rule about leaving the club with

9   a customer?

10     A     There is a rule.

11     Q     What is the rule?

12     A     The rule is don't leave with a customer.

13     Q     Why is that?

14     A     Because it's looked at as prostitution, I

15  think.

16     Q     Think about it from the other way.  The rule

17  would discourage prostitution; right?

18     A     The rule of discovery of prostitution?

19     Q     No.  The rule of not leaving with a customer

20  discourages prostitution; right?

21     A     That's correct.

22     Q     And might the rule about not leaving early

23  serve the same purpose?

24         MR. SELANDER:  Objection; calls for

25         speculation.  Go ahead.

1        A     Yes.

2    BY MR. SCHLANGER:

3        Q     Are you allowed to drink at work?

4        A     We are.

5        Q     And does the bartender charge you for your

6    drinks?

7        A     He does.

8        Q     Full price?

9        A     Not always.

10        Q     How much of a discount do you get?

11        A     I don't drink very much, so sometimes you

12    pay full price.  Depends on the bartender.  Sometimes

13    you might just give them five bucks as a tip, and he

14    makes you a drink.  I think that's because I drink so

15    rarely.  I can't speak for other dancers.  I don't

16    know how other dancers are priced or charged.

17        Q     Why did you decide to sue C.B. Jones and the

18    club?

19        A     Because I felt that all the fees that we

20    were getting charged for, I could understand some of

21    the fees, but the late charge, you know, I've been

22    there seven and a half years.  I felt like after four

23    years, you put in the time.  I had made a comment to

24    Matt saying that I shouldn't, I don't think I should

25    have to pay late fees.  They continued to pay me and

1    said, you know, sorry.

2           Some of the fees, I could understand, maybe

3    the $25 house.  But all the fees, there's nights when

4    you go in there, and you only make 60 bucks, and you

5    tip out all your money.  You're working for free.  All

6    the money goes to the owner and Matt.

7           I felt like we were paying all of his fees.

8    He could have paid his security guard.  He could have

9    paid his doorman.  He could have paid Matt a salary.

10   Instead we were paying all of those people to work

11   there, and I felt like when I added it up over the

12   years, just late fees alone, 60 bucks a night, times

13   three nights a week, times 52 weeks, adds up to a lot

14   of money.  I wanted some of that money back.

15      Q    How much did you earn at Richards in 2013?

16      A    $38,000.

17      Q    And in '12?

18      A    Right around there, 37,000.

19      Q    And in 2011?

20      A    I can't recall '11 to give you an exact

21   figure.

22      Q    But it was about the same?

23      A    It was in the thirties, I think it was.  I'd

24   have to look at my taxes.

25           MR. SCHLANGER:  I've got nothing further at

1          the moment.

2               MR. SELANDER:   No questions.   We will read

3          and sign.

4               THE VIDEOGRAPHER:   We are off video.

5                    (Deposition concluded at 10:05 a.m.)

```
1                    C E R T I F I C A T E

2

3     G E O R G I A:

4     COBB COUNTY:

5

6              I hereby certify that the foregoing

7         deposition was taken down, as stated in the

8         caption, and the questions and the answers

9         thereto were reduced to typewriting under my

10        direction; that the foregoing pages 1 through

11        39 represent a true and correct transcript of

12        the evidence given upon said hearing, and I

13        further certify that I am not of kin or

14        counsel to the parties in the case; am not in

15        the regular employ of counsel for any of said

16        parties; nor am I in any way interested in the

17        result of said case.

18              This, the 8th day of September 2014.

19

20

21        _____

22        ALICE S. DAVIS, CCR, B-1593
          My Commission Expires:  3/31/15

23

24

25
```

1                          DISCLOSURE

2

3    STATE OF GEORGIA
     COUNTY OF COBB
4
     DEPONENT:  CLINTON HENDERSON
5    DATE OF DEPOSITION:  August 22, 2014

6            Pursuant to Article 10.0B of the Rules and
     Regulations of the Board of Court Reporting of the
7    Judicial Council of Georgia, I make the following
     disclosure:
8
             I am a Georgia Certified Court Reporter.
9
             I am not disqualified for a relationship of
10   interest under the provisions of O.C.G.A. Section
     9-11-28(c).
11
             I am here as a representative of THOMPSON
12   REPORTING SERVICES, INC.

13           THOMPSON REPORTING SERVICES, INC., was
     contacted by the offices of Schulten, Ward & Turner,
14   LLP, to provide court reporting services for this
     deposition.
15
             THOMPSON REPORTING SERVICES, INC., will not
16   be taking this deposition under any contract that is
     prohibited by Georgia law.

17

18

19

20                          _____
                            Alice S. Davis, CCR-B-1593
21                          Certified Court Reporter
                            Date:  September 8, 2014
22

23

24

25

**Thompson Reporting Services, Inc.**
**(678) 483-0600**