Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


CLINTON HENDERSON and )

ANDREW OLINDE,          )

individually and on    )

behalf of all other    )

similarly situated     )

individuals,           )

                       )

    Plaintiffs,        )    CIVIL ACTION NO.

                       )

vs.                    )    1:13-CV-3767-TWT

                       )

1400 NORTHSIDE DRIVE, )

INC. d/b/a SWINGING    )

RICHARDS, AND C.B.     )

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

## Page 2

JONES,                    )
                          )
        Defendants.       )

THIS DEPOSITION CONTAINS INFORMATION DESIGNATED
CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF DEMETRIOS "JIMMY" HARALAMBUS

(Taken by Plaintiffs)

September 18, 2014

10:00 a.m.

Suite 2700
260 Peachtree Street
Atlanta, Georgia

## Page 3

```
1            APPEARANCES OF COUNSEL
2   On behalf of the Plaintiffs:
3     PAUL J. LUKAS, Esq.
        Nichols Kaster
4       80 South 8th Street, Suite 4600
        Minneapolis, Minnesota  55402
5       (612) 256-3200
        lukas@nka.com
6
7   On behalf of the Defendants:
8     SUSAN KASTAN MURPHEY, Esq.
        HERB SCHLANGER, Esq.
9       Schulten, Ward & Turner
        260 Peachtree Street, Suite 2700
10      Atlanta, Georgia  30303
        (404) 688-6800
11      skm@swtlaw.com
12            --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1            INDEX TO EXAMINATION
2   Witness Name:               Page
3   DEMETRIOS "JIMMY" HARALAMBUS
4     By Mr. Lukas               4
5     By Ms. Murphey             89
6     By Mr. Lukas               92
7     By Ms. Murphey             94
8     By Mr. Lukas               97
9
10          INDEX TO PLAINTIFF'S EXHIBITS
11   No.        Description         Page
12   Exhibit 1   SR 2094 thru 2131, 12-31-13,     17
                 Income Statement re: 1400
13               Northside Drive, with
                 handwritten notations by
14               witness.
15   Exhibit 2   Listing of patron/waiter/dancer  99
                 line items, with handwritten
16               notations by witness.
17                  - - -
18
19          INDEX TO MARKED QUESTIONS
20     Page No.        Line
21       57             1
22       57             20
23       59             6
24       62             8
25       80             14
```

## Page 5

```
1            DEMETRIOS "JIMMY" HARALAMBUS,
2   having been first duly sworn, was examined and
3   testified as follows:
4            EXAMINATION
5   BY MR. LUKAS:
6     Q.  Will you please state your full name,
7   spelling it for the record?
8     A.  Haralambus, Jimmy Haralambus, J-I-M-M-Y,
9   H-A-R-A-L-A-M-B-U-S.
10      MR. LUKAS:  And Herb, you want to put
11   something on the record?
12      MR. SCHLANGER:  Yeah.  Mr. Haralambus is
13   a certified public accountant, and he -- one
14   of his clients is the defendant in this
15   action.
16      He has not been subpoenaed -- he has not
17   been noticed as a 30(b)(6) deposition
18   witness for the club, and attorn -- and
19   accountant-client communications are
20   privileged in Georgia.
21      Rather than doing it question by
22   question, I believe we've agreed that I will
23   not object on attorney-client privilege --
24      MS. MURPHEY:  Accountant-client
25   privilege.
```

2  (Pages 2 to 5)

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 6

1    MR. SCHLANGER: -- yes, I'm sorry,
2  accountant-client privilege on a
3  question-by-question basis but would permit
4  questioning about the set-off issue, and we
5  waive the privilege to that extent.
6     But I believe that the plaintiffs have
7  agreed not to argue that any waiver of the
8  privilege waives it beyond the particular
9  question and answer given.
10    MR. LUKAS: Okay. Let's go.
11    MS. MURPHEY: I'm sorry. One more. And
12  then pursuant to -- we're going to designate
13  this deposition confidential because of the
14  financial disclosure of club financial
15  records as part of it pursuant to a
16  protective order the parties are working on
17  to get filed with the court.
18  BY MR. LUKAS:
19    Q.  With that business aside, Mr. Haralambus,
20  have you had your deposition taken before?
21    A.  No.
22    Q.  As you can see, Debra here is taking this
23  down mechanically. So there's a few things we need
24  to make sure we do that you don't do in normal
25  conversation. Okay?

Page 7

1    A.  Sure.
2    Q.  Number one is I need you to answer
3  verbally. An "uh-huh" and "huh-uh," shrugging the
4  shoulders and shaking --
5    A.  Sure.
6    Q.  -- the head is difficult for her to get
7  down, so we need verbal responses.
8     Secondly, we can't speak over the top of
9  one another. In ordinary conversation you
10  anticipate what the person is going to say and you
11  start to answer before they finish.
12     In this setting you have to make sure
13  that, even if you know what I'm going to say, let
14  me spit it all out, and then you start your answer.
15  And if I cut you off and you weren't done
16  answering, you make sure I know that and we'll let
17  you finish.
18     Okay?
19    A.  Sure.
20    Q.  I don't anticipate we'll be here that long
21  today. But if for any reason you need a break,
22  I'll finish -- you let me know, I'll finish
23  whatever line of questioning I'm pursuing and then
24  I'll give you that break.
25     Okay?

Page 8

1    A.  Yes.  Sorry.
2    Q.  See there, that's good practice. That's
3  the other reason we do the instructions is so that
4  you get to practice on speaking out loud. It's a
5  little bit of an odd setting. But once we get
6  going, it'll be fairly normal.
7    A.  Sure.
8    Q.  Could you please describe for me your
9  educational background?
10    A.  I am a South African chartered accountant.
11  I've passed the exams in South Africa, and I've
12  passed the exams in the state of Georgia. I'm a
13  certified public accountant.
14    Q.  And how long have you been a certified
15  public accountant?
16    A.  In the United States?
17    Q.  Yes.
18    A.  2000.
19    Q.  And --
20    A.  That's 14 years.
21    Q.  And how long were you a C.P.A. in South
22  Africa?
23    A.  Oh, gosh. About five, six years.
24    Q.  And what educational degrees do you have?
25    A.  I have a bachelor in accounting science

Page 9

1  and a bachelor in accounting science honors.
2    Q.  And from where are those degrees?
3    A.  From South Africa.
4    Q.  What educational institution?
5    A.  The University of South Africa, commonly
6  known as Unisa.
7    Q.  And you came to the United States in 2000?
8    A.  In 1994.
9    Q.  1994. What did you do between 1994 and
10  when you --
11    A.  I was a light bulb specialist.
12    Q.  Again, you need to let me finish. I was
13  going to say between 1994 and when you became a
14  C.P.A. in 2000. You said you were a light bulb
15  specialist?
16    A.  Yeah.
17    Q.  What is a light bulb specialist?
18    A.  We had a store in Buckhead known as Light
19  Bulbs Unlimited from 1994 to 2000.
20    Q.  And was this a retail or a wholesale?
21    A.  It was retail.
22    Q.  You say "we." Who's "we"?
23    A.  I had partners in Florida who owned a
24  light bulb store, Light Bulbs Unlimited in Florida.
25    Q.  I assume you sold light bulbs?

3 (Pages 6 to 9)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 10

1    A.  That is correct.
2    Q.  Anything else besides light bulbs?
3    A.  It was light bulb fixtures as well.
4    Q.  I see.
5    A.  So that encompasses the whole lot.
6    Q.  When you say fixtures, are you talking
7  about like chandelier type fixtures or are you
8  talking about electrical boxes and whatnot?
9    A.  Both.
10   Q.  And it was both retail and wholesale?
11   A.  It was mainly retail.
12   Q.  Did you have store locations?
13   A.  We had one in Buckhead.
14   Q.  Is that now closed?
15   A.  It was sold, and then they closed it.
16   Q.  And when was that?
17   A.  I sold my -- well, I gave up my share in
18  2000.  When they closed it was about four years
19  after that.
20   Q.  And what did you do after that?
21   A.  After that I decided to go back into the
22  profession that I wanted to pursue and I joined
23  Seth Twum & Company then.
24   Q.  And you've been with them since 2000?
25   A.  I would say towards the end of 2000,

Page 11

1  beginning of 2001.
2    Q.  And what is your current title?
3    A.  Just a manager.
4    Q.  How many accountants does Seth Twum &
5  Company have?
6    A.  He's the partner, and we've got one more
7  bookkeeper/accountant.  But he's not qualified as a
8  C.P.A.
9    Q.  So there's two C.P.A.s, you and Seth?
10   A.  That is correct.
11   Q.  And you've been with Seth then ever since
12  you became a C.P.A. in the United States?
13   A.  That is correct.
14   Q.  And are you currently a partner?
15   A.  I am seen as a partner, but officially
16  not.
17   Q.  Do you have an ownership interest?
18   A.  I do not.
19   Q.  And what is the nature of your current
20  practice, your C.P.A. practice?
21   A.  We mainly do write-ups, financial
22  statements, and once in a while we'll do
23  compilation reports, but no auditing.
24   Q.  No aud --
25   A.  No. Due to the staff limitations. And

Page 12

1  audits are only required mainly by companies with
2  S.E.C. regulations which are on the Stock Exchange.
3  Private companies are not subjected to any audits.
4  Therefore we don't do any audits, only upon
5  request.
6    Q.  And what's a write-up?
7    A.  We get bank statements, bank stubs, and we
8  enter it into a software, whether it's into Excel
9  spreadsheet first, and then transfer that over onto
10  an accounting software via QuickBooks or Peachtree
11  Accounting, and then we can do reporting on that,
12  getting the financial statements out.
13        If it's a small company, I would only do a
14  spreadsheet.  I would not transfer it into -- it's
15  just not worth my while.
16   Q.  And financial statements I think I
17  understand.  What's a compilation report?
18   A.  A compilation report is where an auditor
19  expresses an opinion on the financial affairs of
20  the company.  But there are different types of
21  financial reports, but that's the gist of it.
22   Q.  And how many clients do you have
23  currently?
24   A.  I work with about -- personally I work
25  with about ten.

Page 13

1    Q.  And one of them is Swinging Richards; is
2  that right?
3    A.  That is correct.
4    Q.  And of those ten, are they all businesses
5  or individuals or what's they mix?
6    A.  I do apologize.  I've got clients that are
7  individuals.  They would range from zero to 25.
8  And I've got about ten businesses.
9    Q.  I see.
10   A.  I do apologize.
11   Q.  I see.  So when you're talking about
12  clients, ten, it's ten businesses?
13   A.  Exactly.
14   Q.  And on the Swinging Richards, how long
15  have you had Swinging Richards as a client -- or I
16  think it's 1400?
17   A.  Northside Drive.
18   Q.  Right.  How long have you had 1400
19  Northside Drive as a client?
20   A.  If my memory serves me correct, since
21  2000 -- late 2001, beginning of 2002.
22   Q.  And how was it that you came to get 1400
23  Northside Drive as a client?
24   A.  The owner was a client at the store on a
25  regular basis.  He'd buy his light bulbs and

4  (Pages 10 to 13)

DEMETRIOS  "JIMMY"  HARALAMBUS      9/18/2014

Page 14

1  fixtures from our store.  We got in conversation
2  that I was going to go into the accounting
3  profession.
4      He took note of that, and one day he
5  contacted me via the previous owner of the store.
6  And through him he -- that's how I got hold of him,
7  because he expressed interest for me to do his
8  books.
9  Q.  And that's Mr. Jones?
10  A.  That is correct.
11  Q.  So he actually phoned you?
12  A.  That is correct.
13  Q.  Describe for me your role in connection
14  with 1400 Northside Drive.  Tell me what you
15  typically do.
16  A.  Do you want it from the beginning how I
17  started to --
18  Q.  Yes.
19  A.  When I first got to Northside Drive, 1400
20  Northside Drive, they operated on a very primitive
21  accounting basis where no proper records were kept
22  of the income.
23      What they did was give the bank statement
24  to the accountant with the sales figures.  He then
25  took the sales figures, worked out the sales tax

Page 15

1  and liquor tax and produced financial statements
2  from the bank statements.
3      When I got there, I decided to have a look
4  at the income stream to make sure that all the
5  income was captured correctly.  They --
6  Q.  How did you go about doing that?
7  A.  I spoke to the bookkeeper there at the
8  time how she gathered her information.  She got
9  records of envelopes where money came in, added it
10  up, entered it on a piece of paper and threw away
11  the paperwork.
12      I wasn't sat --
13  Q.  Was that Karen Caudle at the time?
14  A.  No.
15  Q.  Who was it?
16  A.  Her name was Carol -- let me spell her
17  last name.  I think that's how you spell it.
18  L-O-W-E-N-H-A-U-P-H-T.  I think that's how you
19  spell it, but I could be wrong.
20  Q.  How do you say it?  You're just going to
21  leave that for us, huh?
22  A.  I shall leave that to you.
23  Q.  Fair enough.  So she was just recording
24  things on envelopes, depositing the money and
25  throwing away the envelopes?

Page 16

1  A.  That is correct.
2  Q.  And then was it a C.P.A. that was working
3  with her to do the taxes?
4  A.  No -- yes, it was a C.P.A.  It was Pechter
5  & Company.  He never came to the office.  They sent
6  everything to him.
7  Q.  And all they sent to him was the bank
8  statements and the --
9  A.  And a sales summary for the month.
10  Q.  And then how did you change that?  What
11  did you do to change that?
12  A.  I wasn't happy with that system.  I said
13  to them, you have opened yourself to liability.
14  First of all, you're not recording.  You don't have
15  an audit trail.  You've put yourself at risk.  You
16  are handling so much cash and, if money goes
17  missing, there's no way to trace it to anyone.  And
18  I said, we need to implement procedures.
19      So I started developing a spreadsheet
20  where we recorded -- we split up the revenue into
21  liquor, beer and wine, soda -- so do you want me to
22  slow down or can I just carry on speaking?
23  Q.  Well, why don't we -- let me do this.  So
24  you developed a spreadsheet to capture what you
25  felt needed to be captured?

Page 17

1  A.  That is correct.
2  Q.  And let's take -- and maybe I can show you
3  a spreadsheet that I have from them, and maybe
4  that's the spreadsheet you're talking about.
5  A.  That is correct.
6  Q.  Let's see.
7      MR. LUKAS:  So what I've done here,
8  Counsel, is I've basically taken all the
9  financials, which was the last batch of
10  documents you produced to me, which are
11  Bates stamped number SR 02094 through SR
12  002131.
13      Later on during the depo, if it becomes
14  necessary to split them out into separate
15  exhibits, we can.  But I thought we'd just
16  put them all in one exhibit and I'll just
17  refer to the page number.  If that becomes a
18  hassle, you let me know.
19      Go ahead and mark that.
20      (Whereupon, Plaintiff's
21      Exhibit 5 was marked.)
22  BY MR. LUKAS:
23  Q.  Mr. Haralambus, I'm showing you what's
24  been marked as Plaintiff's Deposition Exhibit
25  Number 5.  I'd like you to turn to Page 21005

5  (Pages 14 to 17)

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

## Page 18

1  (sic). It should be the whole back section of that
2  document, where it starts the whole back section of
3  that.
4      A.  I'm sorry. 21?
5      Q.  2105.
6      A.  Yes. I've got it.
7      Q.  Is this the spreadsheet you developed that
8  you were testifying to?
9      A.  That is correct.
10     Q.  So is this a spreadsheet you developed for
11 Karen to enter things into or for you to enter
12 things into?
13     A.  This was developed for the bookkeeper,
14 whether it was her or someone else, to enter the
15 information into.
16     Q.  Oh, that's right. Karen wasn't there at
17 the time?
18     A.  That is correct.
19     Q.  So you developed this spreadsheet so that
20 the bookkeeper would keep accurate records of
21 basically the flow of money?
22     A.  That is correct. For every day.
23     Q.  Do you know what this is called or what
24 the bookkeeper currently calls this?
25     A.  I call this a daily summary sheet.

## Page 19

1      Q.  Actually, this one appears to be a month's
2  worth; correct?
3      A.  That is correct.
4      Q.  But there's also a daily one that I
5  imagine gets added up to create the monthly one?
6      A.  The monthly one feeds into each day, and
7  that's a summary for 31 days.
8      Q.  You mean the daily one feeds into the
9  monthly one?
10     A.  That is correct.
11     Q.  So and what we're looking at here is the
12 monthly one, not the daily one?
13     A.  That is correct.
14     Q.  But the daily one has the same categories
15 naming the same thing?
16     A.  Exactly.
17     Q.  And what we're looking at here on 2105 is
18 a compilation of all of November 2011, it appears?
19     A.  That is correct.
20     Q.  And so maybe the best way to figure out
21 what you decided to do with respect to capturing
22 the money is to go through this document?
23     A.  That is correct.
24     Q.  Let's look at this document. Can you
25 explain to me what this upper portion is where

## Page 20

1  we're talking about liquor, beer, wine, soda, door
2  and total?
3      A.  That section over there refers to working
4  out sales tax and liquor tax. Liquor tax, beer,
5  wine, soda and door is subject to sales tax.
6  Liquor tax would be only for liquor and wine.
7      So if you look at the top number, the top
8  line, you'll see 73,062 and 75 cents. That is a
9  total of the 57,041 and 25 cents and 16,021.50. If
10 you add them together, it should come to that.
11     Q.  I'm sorry. I lost you. Where is the
12 number that that should come to?
13     A.  57,000 plus your 16,000 comes to 73,062
14 and 75 cents. Okay?
15     Q.  Okay.
16     A.  And I take out the -- then I work out the
17 liquor tax from that, which comes to 2,128 dollars
18 and four cents.
19     Q.  But there's liquor tax only on liquor.
20 You said liquor and wine?
21     A.  Beer and wine, yeah.
22     Q.  Oh, so there's liquor tax on liquor, beer
23 and wine?
24     A.  That is correct.
25     Q.  And if you add the 57,000 for liquor and

## Page 21

1  the 16 some thousand for beer and wine, that's
2  where we get the 73,062.75?
3      A.  That is correct.
4      Q.  But you don't apply the liquor tax to that
5  74,000 dollar number?
6      A.  I will bring -- what I do, I'll work out
7  the liquor tax at 3 percent, and then I'll take it
8  out.
9      Q.  And that's what the 2,128 dollars and four
10 cents is is the actual tax?
11     A.  That is the actual tax, yeah.
12     Q.  And when you back that out of the
13 liquor --
14     A.  Right.
15     Q.  -- it's --
16     A.  It's 54,000. Then you've got 16,000.
17 Right? And from these totals I will back out the
18 sales tax.
19     Q.  And that's where we get the
20 50,845 dollars --
21     A.  That is correct.
22     Q.  -- and 46 cents for liquor, and the 14,834
23 dollars and 72 cents for beer and wine?
24     A.  That is correct.
25     MR. SCHLANGER: Jimmy, let him finish

6 (Pages 18 to 21)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 22

1   his question. Pause after he asks the
2   question. Okay?
3       THE WITNESS: Sorry about that.
4       MR. SCHLANGER: That's okay.
5   BY MR. LUKAS:
6    Q.  And you do the same equation with soda,
7   because there's a sales tax on that; correct?
8    A.  There is not a sale -- yes, there is a
9   sales tax on soda.
10   Q.  And there's a sales tax on the door
11  charge?
12   A.  That is correct.
13   Q.  And after you back out the taxes for these
14  items, then you put them down in this other ledger
15  down below; is that correct? Or I'm sorry, the
16  bookkeeper does?
17   A.  That is correct.
18   Q.  And that's why the liquor number down
19  below here is -- first of all, what does DR and
20  what does CR stand for?
21   A.  Debit, credit.
22   Q.  So and that's why in the credit column we
23  have 50,845 dollars and 56 cents for liquor,
24  because that's the liquor after the sales tax is
25  paid?

Page 23

1    A.  That is correct.
2    Q.  And so on with the beer and wine, soda and
3   door; correct?
4    A.  That is correct.
5    Q.  What is this next item, V.I.P. cash?
6    A.  When I first started with the club as the
7   accountant, I didn't understand most of their
8   terminology that they used. So for me to
9   understand it, I created these terminologies that I
10  could understand.
11      Whether they are industry-related or not,
12  I don't know. But this is something that I could
13  understand and I could explain to anyone that was
14  coming in. This is how I see it.
15   Q.  So hopefully you'll be able to explain
16  them to me.
17   A.  That is correct.
18   Q.  But the goal is, if we took this whole
19  bottom section that starts with liquor and ends
20  with tip, we should be -- if we talk about each of
21  these columns, we should be capturing all of the
22  money that passes through 1400 Northside Drive?
23   A.  That is correct.
24   Q.  Great. So what is V.I.P. cash?
25   A.  V.I.P. cash is when the patron comes in

Page 24

1   and, from what I understand, he wants to have a
2   dancer there and the dancer -- so the patron pays
3   the club for that booth, from what the way I
4   understand it. So the patron pays for that time,
5   for the booth.
6    Q.  A private booth?
7    A.  I would presume so, yeah. It's a V.I.P.
8    Q.  V.I.P. room; is that --
9    A.  That is what they called it. So whether
10  they will pay cash or they'll pay on credit card,
11  you'll see at the bottom V.I.P. credit and V.I.P.
12  cash, they mean the same.
13   Q.  So in that 23,345, it doesn't matter
14  whether it's cash or credit --
15   A.  No.
16   Q.  -- but it's for the same thing?
17   A.  That is correct. The cash would be
18  23,000, and the credit would be 9,919 -- sorry,
19  9,900.
20   Q.  So if we want to -- and is this the
21  portion of the V.I.P. room that is paid for the
22  room rental or for the dancer or both?
23   A.  For the room rental.
24   Q.  So if we took those two line items, the
25  V.I.P. cash and the V.I.P. credit, that would be

Page 25

1   the sum total for November 2011 of the club's share
2   or the club's room rental for those V.I.P. rooms?
3    A.  That is correct.
4    Q.  Let's talk about the next one, fines.
5   What's that?
6    A.  I'm just -- the way it was explained to me
7   is the dancers had contracted saying that they
8   would be there at a specific time. And if they
9   were late, they paid monies to the club. I
10  terminated it fine. That was my terminology, fine.
11  I said, that's it, okay, it's a fine.
12   Q.  Well, they call it a fine in the agreement
13  with the employee, too, don't they?
14   A.  Yeah. Well, exactly. When they came to
15  me and they said this is a fine, I said, okay, we
16  will leave it "fine" then.
17   Q.  So that's not your phrase "fine," that's
18  their phrase "fine"?
19   A.  I'm just trying to recall. I would say
20  so, yes.
21   Q.  I mean, you didn't make up these -- I
22  mean, you labeled them, but they told you what
23  these monies were for; right?
24   A.  Yes.
25   Q.  They had to explain to you --

7  (Pages 22 to 25)

Page 26

1    A.  Yes.
2    Q.  -- where these streams of income were
3    coming from; correct?
4    A.  Yeah.  They just -- yes.  I would just say
5    yes.
6    Q.  And is it your understanding that the
7    dollar amount in that for fines was just for being
8    late or were there other fines that were included
9    in that, if you know?
10   A.  From what I understand, only for being
11   late.
12   Q.  So in November of 2011, there was
13   3,575 dollars collected from dancers for being
14   late?
15   A.  Yes.
16   Q.  And then the next one says food.  What's
17   that?
18   A.  I set up a system just in case they were
19   selling food, that would be a -- that would go in
20   that slot.
21   Q.  But they weren't selling food in November
22   of 2011; correct?
23   A.  They do not sell food.
24   Q.  They still don't?
25   A.  They still don't.

Page 27

1    Q.  That's sort of a placeholder for if they
2    put in a kitchen or they make some other
3    arrangements?
4    A.  That would save me time to go and
5    reconstruct everything again.
6    Q.  How about -- so was this -- you put this
7    together in around 2001, is that right, this sheet?
8    A.  I could presume that, yes, around -- well,
9    definitely it was in a work in progress, but yes.
10   I just wasn't happy with the way things were
11   recorded.  Their whole argument was, for tax
12   purposes, there's one line item, revenue, and they
13   were happy with that.  I was not happy with that.
14   Q.  And Pechter was apparently happy with
15   that, or fine with that?  I was not happy with that.
16   MS. MURPHEY:  Objection.  Calls for
17   speculation.
18   THE WITNESS:  I don't know.  I've never
19   spoken to him.
20   BY MR. LUKAS:
21   Q.  And was -- when you told Mr. Jones you
22   wanted to change it and track all this money, he
23   was okay with that?
24   A.  Yes.
25   Q.  Was there any other owners at the time or

Page 28

1    was it just Mr. Jones?
2    A.  Just Mr. Jones.
3    Q.  And was he the one that okayed this
4    system?
5    A.  He has looked at it, yes.  And I presume
6    he was happy with it.
7    Q.  You're still their C.P.A.; correct?
8    A.  Yes.
9    Q.  What about tip out, what does "tip out"
10   mean?
11   A.  I'm just going blank for a second.
12   Q.  Maybe I can help you.  Is that the house
13   fee that the dancers pay every night?
14   A.  That is correct.  That is correct.  That's
15   the dancers, yeah.
16   Q.  What's your understanding of what that
17   payment is for?
18   A.  For allowing to dance there.  That's the
19   way I understood it.
20   Q.  Gratuity, what is that line for?
21   A.  That's --
22   Q.  Now, that one, the previous ones we talked
23   about were all in the credit column, now we move
24   over to the debit column.  What is gratuity and why
25   is it in the debit column?

Page 29

1    A.  Like gratuity is in case -- this relates
2    to the patrons only, in case they come in and get a
3    free champagne or whatever.  But that is hardly
4    ever used.  That is hardly ever used.
5    Q.  Some people call it comping, like comping
6    drinks.  Is that what that is?
7    A.  It could mean that as well, yes.
8    Q.  So anything that the customer gets for
9    free that they would normally pay for?
10   A.  That is correct.
11   Q.  The next one is cash.  What is cash?  Why
12   is that column there?
13   A.  That is when the patrons want to take
14   their credit card and they need cash, where if the
15   A.T.M. is out, they'd go in and get -- so they
16   would run the card and get cash.
17   Q.  So for a circumstance where one of the
18   employees has to use the cash register as an
19   A.T.M.?
20   A.  That is correct.
21   Q.  And the --
22   MR. SCHLANGER:  Wait, wait, wait.
23   Customer or employee?
24   THE WITNESS:  Basically what happens
25   that a customer needs 20 dollars.  He'll go

8  (Pages 26 to 29)

DEMETRIOS  "JIMMY"  HARALAMBUS     9/18/2014

Page 30

1      and ask the --
2  BY MR. LUKAS:
3      Q.  Employee?
4      A.  -- the employee for 100.  They will run it
5  through for 100.  The customer will get 95, and
6  there will be a service fee of five.
7      Q.  So in that scenario, it's a 5 percent
8  service?
9      A.  I think.  It can change.  I'm not too
10  sure.  I think it's a 5 percent, yeah.
11     Q.  That obviously didn't happen in November.
12  The cash machine must have been full for -- or at
13  least have enough money in November of 2011 for
14  that not to have to happen?
15     A.  Yeah.
16     Q.  The next one is paid-out tips.  What's
17  paid-out tips?
18     A.  That is -- that refers to the bartenders
19  and the waiters.  When the patron pays and gives a
20  tip, it is recorded.
21     Q.  When they give a tip with -- that's all
22  tips or just credit cards?
23     A.  Just the credit cards.
24     Q.  So when a bartender --
25     A.  So yes.

Page 31

1      Q.  -- and waiter gets a tip with a credit
2  card, that's what that's reflecting?
3      A.  That is correct.
4      Q.  What is your understanding as to how the
5  bartender and waiter are paid for that money?  Is
6  that something that's a check cut for or do they
7  take cash from the till?
8      A.  They take cash straight from the register.
9      Q.  And P.O. other, what's P.O. other?
10     A.  Paid-outs or other.  That is if the
11  company needs supplies for that evening.  Or if the
12  A.T.M. runs out of money, they will take money out
13  of the cash register and fill up the A.T.M.s with
14  20 dollar bills.
15         These supplies are normally less than a
16  hundred dollars.  The A.T.M.s will normally be
17  filled up with their 20s.
18     Q.  This is a scenario where it's like, hey,
19  we're out of, you know, napkins, someone runs out
20  and goes and buys napkins for the night?
21     A.  That is correct.
22     Q.  And why are these columns -- why are the
23  ones in this column gratuities, cash, paid-out tips
24  and paid-out other, why are they in the debit
25  category?

Page 32

1      A.  Because we record them as an expense.
2  Your debit is normally an expense for this
3  spreadsheet, and your credits are for incomes.
4      Q.  Let's keep going.  Sales tax?
5      A.  Sales tax is recording the liability to
6  pay, as with liquor tax.
7      Q.  So that sales tax line actually according
8  to the math, I'm looking above, that sales tax line
9  includes liquor tax; correct?
10         MR. SCHLANGER:  No.
11         THE WITNESS:  No, it does not.
12  BY MR. LUKAS:
13     Q.  Oh, I see.  It's just the sales tax.  It
14  includes the sales tax on the liquor?
15     A.  That is correct.
16     Q.  I see.  And that 8,369 dollars and 94
17  cents that's in this bottom category, we see that
18  captured above when you go across the line for
19  sales tax?
20     A.  That is correct.
21     Q.  And then the liquor tax is captured just
22  below that?
23     A.  That is correct.
24     Q.  And then V.I.P. credit we already talked
25  about?

Page 33

1      A.  That is correct.
2      Q.  And room, what's room?
3      A.  Initially I got confused with room and
4  V.I.P. credit and V.I.P. cash, but they basically
5  mean the same thing.
6      Q.  So although that line item is still on
7  there, it says zero dollars, and frankly it's not
8  used at all?
9      A.  Sometimes there's an input error, and we
10  put it in, instead of room it's V.I.P. credit and
11  vice versa.  Yes, it will come up once in a while,
12  but they basically means the same thing.
13     Q.  If it comes up, it's a mistake?
14     A.  It is an input error.
15     Q.  Right.
16     A.  That's what I call it, yeah.
17     Q.  Because the money should be in either
18  V.I.P. cash or V.I.P. credit?
19     A.  That is correct.
20     Q.  What's the next column where it says ENT?
21     A.  ENT, this is where the -- this relates to
22  the dancer's IOU.  The dancer goes in, does his
23  dance, let's say he gets paid a hundred dollars,
24  that is what is recorded there.  So the company
25  sees that as income coming in.

9  (Pages 30 to 33)

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

Page 34

1    Q.  And that's just credit card V.I.P. room
2  payments; correct?
3    A.  That is correct.
4    Q.  So the cash paid to entertainers for their
5  services in the V.I.P. rooms is not captured
6  anywhere in your system; correct?
7    A.  No, it is not.
8    Q.  And in fact, the cash collected by the
9  employ -- or the dancers for dances they do outside
10  of the V.I.P. room, whether it be on the floor or
11  on the stage, is not captured anywhere in your
12  system either; correct?
13    A.  That is correct.
14    Q.  What's the next line, SVCH?
15    A.  Service charge.
16    Q.  And what is service charge?
17    A.  Service charge comprises of two items.
18  The first item is when the patron gets charged 5 or
19  10 percent for the monies he wants from the A.T.M.
20  that's not there, so the employee will give him
21  cash from the register.  That small percentage will
22  go in that column.
23      The other one is when the patron will be
24  charged an extra 10 percent for the room.
25    Q.  And that 10 percent the customer is

Page 35

1  charged for using a credit card, it's just when
2  they use a credit card; correct?
3    A.  That is correct.
4    Q.  And that 10 percent is reflected in -- oh,
5  I'm sorry.  The 2,807 dollars, that's what's
6  captured there in the SVCH line?
7    A.  That is correct.
8    Q.  And is it your understanding it's
9  10 percent for the room rental piece or for the
10  piece that the entertainer gets or both?
11    A.  From what I understand, only for the room.
12    Q.  And is it your understanding that, prior
13  to -- oh, going back to the entertainer money where
14  it's 28,135 --
15    A.  Yes.
16    Q.  -- what is your understanding of how the
17  entertainer receives that money, the credit card --
18    A.  The total amount gets captured in this
19  column here; right?
20    Q.  Right.
21    A.  At the end of the day, at the end of the
22  evening, an IOU slip is attached to the batch
23  report of the night.  A check will then be made out
24  to the entertainment to equalling 90 percent of
25  that amount.

Page 36

1    Q.  I see.  So there's 10 percent taken off of
2  that piece as well?
3    A.  It's only that 10 percent that -- yeah.
4    Q.  But that's not -- the customer is not
5  paying that, that's coming out of the --
6    A.  Dancers.
7    Q.  -- the dancers' money that they were
8  getting?
9    A.  That is correct.
10    Q.  So there's sort of two charges, there's a
11  10 percent service charge to the customer for the
12  room piece of the rental; correct?
13    A.  Yes.
14    Q.  And then the customer pays whatever the
15  entertainer amount is; correct?
16    A.  That is correct.
17    Q.  And then when the bookkeeper goes to cut
18  the check the next day, another 10 percent is
19  backed out because the customer paid the
20  entertainer with a credit card?
21    A.  That 10 percent is actually like a
22  processing fee, the way we see it.
23    Q.  I see.  So you're charging 10 percent just
24  for the room piece, and then you're charging
25  10 percent to the dancer on the V.I.P. amount -- or

Page 37

1  on the IOU amount as a processing fee?
2    A.  That processing fee involves a few steps
3  in terms of paying -- because when you pay by card,
4  there's a 3 percent charge that the -- that
5  American Express and they take.
6      Another thing is that there may be a
7  customer complaint and that that amount is
8  reversed.  If that amount is reversed, the dancer
9  keeps his money and the company will take the hit.
10    Q.  So it's the 10 percent to help cover
11  the credit card company's charge of 3 percent --
12    A.  Right.
13    Q.  -- and to cover the -- for the contingency
14  of that charge being reversed and the club getting
15  nothing and the dancers still getting paid?
16    A.  That is correct.
17    Q.  How often does that happen?
18    A.  It happens quite a bit.
19    Q.  How often is "quite a bit"?  How often
20  does a credit card charge get reversed in the
21  V.I.P. context?
22    A.  It may get reversed I'd say about five
23  times for every three months.
24    Q.  And where is that captured?  When that
25  event occurs, where is that captured in your

10 (Pages 34 to 37)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 38

1  system?
2      A.  It'll be under bank fees or credit card
3  fees.
4      Q.  It's not captured on this spreadsheet?
5      A.  No, it is not.
6      Q.  And we'll look at your other -- it is
7  captured elsewhere, though?
8      A.  It is captured elsewhere.
9      Q.  It's captured on the general ledger?
10     A.  That is correct.
11     Q.  We'll talk about those categories.
12         And then the last item on this particular
13  document, it says tips -- or tip, I'm sorry.  What
14  is that?  What's tip?
15     A.  That relates to the waiters and
16  bartenders' tip.  We record that as income coming
17  in.  As you see, it will accrue to the paid-out
18  tips.  It's basically a wash.  We show it as
19  income, and it gets taken out as an expense.
20     Q.  So those two other, same thing, it's just
21  one's in the debit category and one's in the credit
22  category, that being paid-out tips and tip?
23     A.  That is correct.  And it's just showing an
24  audit trail of how we account for income.
25     Q.  And tell me why you do that.

Page 39

1      A.  Because when you get your credit card
2  report, it will show a total amount, let's say it's
3  a hundred --
4      Q.  Let's say it's 10,449 dollars and 54
5  cents.
6      A.  Right.  But the thing about it is, when
7  the batch report comes in, right, we get a total
8  amount which will represent a higher amount, and we
9  still have to record that as income.  So we show
10  that as coming in.  But because the employees take
11  cash out, we've got to show it's been taken out as
12  well.
13     Q.  But you don't do the same with the
14  entertainers, you don't take out the 28,135 dollars
15  you have on the credit line you don't back out as a
16  debit anywhere on this?
17     A.  No.  We -- they will issue them a check.
18  Because then we've got an audit trail of the IOU
19  matches up with the check that they have received.
20     Q.  I see.  Because the reason you do this is
21  because the waiters and bartenders are walking away
22  with cash at night?
23     A.  That is correct.
24     Q.  I see.
25     A.  I would like them to --

Page 40

1      Q.  So -- I'm sorry.  Go ahead.
2      A.  I actually would like them to get a check.
3  But that's the way the system works.
4      Q.  And is?
5      A.  And it is.
6      Q.  So the reason you back it out as a -- the
7  reason you have it in both the credit and the debit
8  for waiters and bartenders is because they're
9  taking cash from the till that evening; correct?
10     A.  That is correct.
11     Q.  And there would otherwise be no audit
12  trail for that; right?
13     A.  That is correct.
14     Q.  And with the entertainers, you have a
15  trail because you have the IOU and you have the
16  check stubs and you know exactly how much you paid
17  them?
18     A.  That is correct.
19     Q.  Has there been any discussion about doing
20  the same with the bartenders and waiters as you do
21  with the entertainers with respect to cutting
22  checks instead of just letting them take the money
23  from the till?
24     A.  You know, based on this information and
25  this court case, I think we're going to have to

Page 41

1  revise a lot of what happens there.
2      Q.  So we slugged through this list, it looks
3  like.
4      A.  Can I just say something?
5      Q.  No.
6      A.  Sorry.
7      Q.  I'm asking questions and you answer them.
8      A.  Sorry.
9      Q.  The category where it says 10100, what is
10  that?  That's sort of just a number floating out
11  there to me.
12     A.  That's a balancing figure.
13     Q.  And that's a balancing figure representing
14  what?
15     A.  You've got income coming in, your debit,
16  comes to a total of 206,694.
17     Q.  Yes.
18     A.  Then you've got expenses totalling about
19  14,000.  You've got 565, 10,444 and 3,240.  You've
20  got your gratuity, cash, paid-in tips and paid-out
21  other.
22     Q.  So that the 10100 is basically the grand
23  total with the debits backed out?
24     A.  That is correct.
25     Q.  And what does 10100 mean?  What is that?

11 (Pages 38 to 41)

MERRILL CORPORATION

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 42

1     A.  This is just my suspense account.
2     Q.  What is it, suspense?
3     A.  Suspense.  Well, it's, yeah,
4  S-U-S-P-E-N-C-E (sic).
5     Q.  And what does that mean?
6     A.  It just means that we have 192,000 of
7  outstanding amount, you've got your income less
8  your expenses.  You've got that is your net amount.
9  Because when you do accounting, for every debit
10  there must be a credit; right?
11     Q.  So the 192,439 dollars and 59 cents is
12  basically the net income?
13     A.  That is correct.
14     Q.  And that's the net income for November
15  2011?
16     A.  Let's put it -- let's call it gross
17  income.  Because we have not taken other expenses.
18     Q.  Okay.  And then the rest of these
19  documents as you page through, they look pretty
20  much to all be the same, but just from different
21  months to different years.  Has there been -- so we
22  marched through one from November of 2011.
23        Have there been any changes to this
24  document or this process since then?
25     A.  No, there's not.

Page 43

1     Q.  And prior to this, how far back before
2  there were any changes made to it?  You said it was
3  a work in progress.  When did it stop being a work
4  in progress and start being actually what we're
5  looking at here for November of 2011?
6     A.  Maybe six months after that.
7     Q.  So if we go back six months into 2010?
8     A.  Sorry.  No, no, no.
9     Q.  No.
10     A.  For this period that we've covered, it's
11  not changed.  I'm saying a work in progress from
12  the time I started --
13     Q.  Yes.
14     A.  -- within six months, I said, okay, this
15  is going to be the standard one.
16     Q.  I see.
17     A.  Yeah.
18     Q.  So at least comfortably by the end of
19  2002, for example, this is how it was and this is
20  how it is?
21     A.  Yes.
22     Q.  There hasn't been new categories put in or
23  taken out?
24     A.  No.
25     Q.  And in fact, you put in some categories

Page 44

1  for the contingency so you wouldn't have to do
2  that; correct?
3     A.  That is correct.
4     Q.  For example, like food?
5     A.  That is correct.
6     Q.  There was one other document in this pile
7  that was different, and I wanted to go to that.
8  And that's on Page 2119.  What is 2119?
9     A.  2119 is a summary of January, February,
10  March, April, May, June, July, up to the end of
11  December for 2012.  So the report that you just
12  showed me --
13     Q.  The one on 2105?
14     A.  Right.
15     Q.  Yes.
16     A.  -- should correspond to these totals here.
17     Q.  I see.  So the one we went through piece
18  by piece was for one month?
19     A.  That is correct.
20     Q.  And as I understand --
21        MR. SCHLANGER:  Excuse me.  Let me just
22  correct them.  He's not looking at the right
23  year.
24        MR. LUKAS:  No, I get that.  I was going
25  to clean that up.

Page 45

1  BY MR. LUKAS:
2     Q.  So Karen enters the numbers into the
3  system so that it generates a daily report that
4  resembles this; correct?
5     A.  The spreadsheet has a big -- they've got
6  amounts.  They've got cash registers, bank one,
7  bank two, bank three, bank four.  They've got a
8  section for V.I.P. room, the cash.  They've got for
9  the door.  They've got for the fines and that.
10        Then what happens is the monthly will feed
11  into each of these cells and draw those amounts in.
12     Q.  Just like this monthly draws in the
13  dailies, this one we're looking at to 2119 draws in
14  all the monthlies in these same categories that we
15  discussed?
16     A.  That -- no.  That I created myself for
17  Susan to understand.
18     Q.  Oh, I see.
19     A.  Yeah.
20     Q.  So this document we're looking at, the SR
21  2119, that's something that you created special for
22  this lawsuit?
23     A.  That is correct.
24     Q.  I see.  In your normal system, you don't
25  have an annual summary?

12  (Pages 42 to 45)

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 46

1    A.  That is correct.
2    Q.  And this is something you did in
3  connection with the lawsuit?
4    A.  That is correct.
5    Q.  I see.  Not something that is normally
6  done?
7    A.  That is correct.
8    Q.  So going back to the cover again so we're
9  talking about the same thing, SR 2105 -- I'm sorry.
10  It's not the cover in the one you're looking at.
11    A.  That's okay.  Yeah.
12    Q.  Going back to that, Karen's spreadsheet
13  from which this pulls is different, it looks
14  different than this because it has drawers and so
15  forth; correct?
16    A.  That is correct.
17    Q.  I don't believe I have that.
18    MS. MURPHEY:  No.  I told you we had
19  daily for the last three years, but it's a
20  huge amount of documents, and I was going to
21  give you the monthly summaries and the
22  annual summaries.  And if you felt you
23  needed more than that --
24    MR. LUKAS:  I think I would like to see
25  the daily, just an example of a daily, maybe

Page 47

1  that matches with this one probably since we
2  talked about this one, sometime in November
3  of 2011, you give me a daily or two just so
4  that I know what they look like, Susan.
5    MS. MURPHEY:  Okay.
6    MR. LUKAS:  And then if I need more,
7  I'll come dig through your boxes, I guess.
8  BY MR. LUKAS:
9    Q.  Thank you.  I think I understand that.
10    And then as we page through the rest of
11  this document, it appears to be these monthly
12  summaries which are created in the normal course of
13  business?
14    A.  That is correct.
15    Q.  All right.  Let's stay on Exhibit 1 (sic).
16    MR. SCHLANGER:  Four (sic).
17    THE REPORTER:  Five, actually.
18    MR. LUKAS:  Oh, I'm sorry.  Five.  None
19  of us have it right.
20  BY MR. LUKAS:
21    Q.  Sorry.  I'm trying to find my copy where I
22  wrote all over them.  Ah, here we go.
23    Is your cover page or the top page on
24  Plaintiff Deposition Exhibit 5, is it SR 2094?
25    A.  Yes.

Page 48

1    Q.  Perfect.  Let's talk about that, then.
2  What is this document?
3    A.  This document is basically the income
4  statement for the year relating to 2013.
5    Q.  Now, is this something that is generated
6  at Northside Drive or is this something that's
7  generated by you?
8    A.  This is generated by me.
9    Q.  And I assume you take the numbers that you
10  have from the other document that we just looked at
11  to generate this document?
12    A.  That is correct.
13    Q.  Again, I want to do a march through these
14  line items.  And it seems that what we just did may
15  help us do that.  But the first set of line items
16  are for revenues; is that correct?
17    A.  Yes.
18    Q.  And the first four seem fairly
19  self-explanatory, liquor, beer, wine, beverage and
20  food, and cover charge?
21    A.  That is correct.
22    Q.  And those are all the ones we talked about
23  in connection with on Page 2105 where there were
24  taxes involved or taxes applied; correct?
25    A.  That is correct.

Page 49

1    Q.  Then the next is for sales V.I.P.  You
2  know what might be helpful -- well, let me ask you,
3  what is sales V.I.P.?
4    A.  That would be the cash and the credit card
5  V.I.P. on this statement here.
6    Q.  And that's, when we were looking at the
7  monthly summary --
8    A.  Right.
9    Q.  -- that was called V.I.P. cash and V.I.P.
10  credit?
11    A.  That is correct.
12    Q.  So if we took those monthly summaries
13  together or --
14    A.  Right.
15    Q.  -- if we add those together, this would be
16  the annual for sales V.I.P.?
17    A.  That is correct.
18    Q.  Next says sales tip-out.
19    A.  That would be the tip-out --
20    Q.  Would be that house fee we were talking
21  about?
22    A.  That is correct.
23    Q.  And the next says service charge.  What is
24  that?
25    A.  SVCH on that piece of paper there.

13 (Pages 46 to 49)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 50

1    Q.   Fines we talked about, and that's on that
2  previous spreadsheet; correct?
3    A.   Yes.
4    Q.   And then entertainers and waiters, what's
5  included in that one?
6    A.   I've added together the entertainers and
7  the waiters.  I just, at that stage I saw them as
8  one, as one and the same.  But obviously they're
9  not.  But I just included them as together.
10  Because the amounts were so small, I'd say, you
11  know, I'll just add them together.
12    Q.   So that line item on Page 1 of Exhibit 5,
13  or Page 2094 --
14    A.   Right.
15    Q.   -- if we went back to the summary, the
16  monthly summary that we went through, we would add
17  paid-out tips and entertainers to get that amount?
18    A.   That is correct.
19    Q.   And then when you add all those together,
20  you get this total revenue number of 2.2 million
21  and some change?
22    A.   Yes.
23    Q.   The next set of line items is cost of
24  sale.  And what do these three categories
25  represent?

Page 51

1    A.   They're basically checks written out to
2  alcohol companies that we buy alcohol from.  That
3  would relate to the beer, liquor and sodas and
4  that.  This is what C.B. wanted to see how much
5  beer and liquor and soda were sold, he just wanted
6  to have some idea.  And we just called it cost of
7  sale.
8    Q.   So above there in revenues, he's finding
9  out, that tells C.B. how much he's taking in for
10  those categories, and then this list tells him how
11  much he paid for them?
12    A.   That is correct.
13    Q.   And for 2013 at least, he paid 400 grand
14  and some change?
15    A.   Yes, sir.
16    Q.   And then we have gross profit line, I
17  assume that's the total revenues minus the total
18  cost of sales; right?
19    A.   That is correct.
20    Q.   The next batch of categories we have are
21  called expenses; correct?
22    A.   Yes.
23    Q.   And the first one is independent
24  contractor, 488,979 and 26 cents; right?
25    A.   That is correct.

Page 52

1    Q.   And what does that represent?
2    A.   That represents the checks that were
3  written out to the dancers.
4    Q.   And then the next -- so the
5  488,000 dollars that we see there, is that -- was
6  that also part of the entertainers and waiters line
7  we had above in the revenues?
8    A.   No.
9    Q.   What's the difference?
10    A.   I could have lumped them together, but I
11  did not.  And I've got them at the bottom, and if
12  you go down one, two, three, four -- the fifth
13  line --
14    Q.   Yes.
15    A.   -- you'll see paid out to waiters, the 75,
16  I've got them there.
17    Q.   Oh, I'm sorry.  Maybe you didn't
18  understand what I'm saying.  In the entertainers
19  and waiters above in the revenue line --
20    A.   Yes.
21    Q.   -- included in that total, the 580,000, is
22  this 488,000?
23    A.   That is correct.
24    Q.   And you're saying that also in there is
25  the 75,000 paid-out waiters; correct?

Page 53

1    A.   That is correct.
2    Q.   So if we added the independent contractor
3  number and the paid-out waiters number, it'll equal
4  the entertainers and waiters?
5    A.   Just repeat that, please.
6    Q.   Sure.  If we took -- does this
7  entertainers and waiters column up above in the
8  revenues, does it include anything other than
9  independent contractor and paid-out waiters?
10    A.   It should not.
11    Q.   Because when I did the math, I came up
12  about 16,000 dollars short.  I just assumed that
13  was it until I started doing the math and I saw
14  that it didn't line up.
15         Can you explain that?
16    A.   Let me take a calculator to that.
17         How did you come up to your figure?
18    Q.   I added independent contractor --
19    A.   Right.
20    Q.   -- and paid-out waiters.
21    A.   Okay.  So you took 580?
22    Q.   No, I didn't.  I took the 488,000 down
23  below --
24    A.   Yes.
25    Q.   -- I added the 75,450.97 --

14 (Pages 50 to 53)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 54

1     A.  Right.
2     Q.  -- and I subtracted that from the
3  entertainers and waiters number above, the 580, and
4  I came up 16,033 dollars and 55 cents short.
5     A.  Don't forget that this entertainers and
6  waiters equals 100 percent of their get, and the
7  balance -- the 488 is 90 percent of that figure.
8     Q.  So the 16,000 dollars that I'm missing
9  is --
10    A.  Yeah.
11    Q.  -- should be the 10 percent in there?
12    A.  Yeah.  But just don't forget we've got
13  timing differences as well at the beginning and at
14  the end of the year.  And what used to be -- at the
15  end of the year there were checks -- the dancers --
16  dancers dance until the end of the new year; right?
17    Q.  Right.
18    A.  And the checks were written in the
19  following year, and sometimes they got the dates
20  wrong.
21    Q.  So it may not line up to the penny?
22    A.  Exactly.
23    Q.  Because there's some --
24    A.  There's a --
25    Q.  -- events that occur at the year end that

Page 55

1  get paid in the new year?
2     A.  That is correct.
3     Q.  But generally speaking it should be very
4  close to --
5     A.  It should be close, yeah.
6     Q.  And is that amount, that 10 percent that's
7  not -- is that somewhere else in this expense line?
8     A.  It should not be, no.
9     Q.  Because it's just a straight revenue?
10    A.  Yeah.  Now, what I have found, when I was
11  inputting stuff into the system, sometimes I would
12  categorize things as contract wages when actually
13  it should have been some other event, and I found
14  that out later.  But just because the bottom line
15  does not change, I didn't bother with it.
16    Q.  I see.  So going back to this revenue
17  line, the entertainers and waiters should equal the
18  full IOU amount --
19    A.  Yes.
20    Q.  -- from which the checks were cut, which
21  we know is 10 percent less --
22    A.  Yes.
23    Q.  -- but it should include the full IOU
24  amount plus the credit card tips paid in cash to
25  bartenders and waiters?

Page 56

1     A.  Repeat that for one second, please.
2     Q.  Sure.  That this 580,000 dollar amount up
3  in revenues --
4     A.  Yes.
5     Q.  -- should equal the full IOU amounts --
6     A.  Yes.
7     Q.  -- plus the cash taken out by bartenders
8  and waiters for credit card tips?
9     A.  That is correct.
10       MR. SCHLANGER:  Excuse me.  I'm going to
11    object to the question.  It misstates what
12    he testified to earlier.  You may have used
13    the word equals when you meant includes.
14  BY MR. LUKAS:
15    Q.  Entertainers and waiters, the
16  580,000 dollars, that includes the full IOU amount
17  plus the cash that the bartenders and waiters take
18  out for credit card tips?
19    A.  Yes.
20       MR. SCHLANGER:  Yeah.  And off the
21    record for a second.
22       MR. LUKAS:  Sure.
23       (Whereupon, a discussion ensued off
24    the record.)
25  BY MR. LUKAS:

Page 57

1     Q.  And it may not, if we took those out just
2  on a strict calendar year, it may not be exactly to
3  the penny because we have this spill-over from the
4  previous year that spills over into the next year?
5     A.  That is correct.
6     Q.  And that's because they're working on the
7  31st, and the checks may not get cut till the 1st?
8     A.  That's correct.
9     Q.  Got it.  Let's keep going.  Advertising
10  expense, what's that?
11    A.  That's basically advertising what the
12  company does for promotions -- well, for the
13  advertising for the company.
14    Q.  And where do you get that number from?
15    A.  From the checks that have been written
16  out.
17    Q.  Bank charges, what's that?
18    A.  Bank charge is what the bank fees -- the
19  bank will charge the company for having bank
20  accounts, doing certain services.  And those, there
21  is as well all the fees that the bank will levy on
22  the company.
23    Q.  And this says 10,489.  Is there any kind
24  of itemization as to what those charges were?
25    A.  I can get them, yes.

15  (Pages 54 to 57)

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

Page 58

1        MR. LUKAS:  Will you mark this portion?
2   BY MR. LUKAS:
3        Q.  Included in there, are those the times
4   where -- would we find, is that the category we
5   would find where the credit card company reversed
6   the charges on the V.I.P. room?
7        A.  It could have it in there as well, yeah.
8   It could have it in there as well.
9        Q.  Where else would it be found?
10       A.  It could be under credit card processing
11  fee as well, or even -- yeah.
12       Q.  And that's an item we have down a little
13  further; right?
14       A.  Yeah.
15       Q.  So and I imagine for credit card
16  processing fee that we have there, the
17  17,000 dollars, you have that itemized as well, you
18  could get me that?
19       A.  Everything is itemized.
20       MR. LUKAS:  Mark this portion.
21  BY MR. LUKAS:
22       Q.  So either in one of those two categories,
23  or maybe in both, we would find these reverse
24  charges from credit card companies?
25       A.  Yeah.

Page 59

1        Q.  "Yes"?
2        A.  Yes.
3        Q.  What other charges -- I mean, of this
4   10,000 dollars, what's the primary charge?  Like,
5   what's the main charge there?  What is it?  What's
6   really running that number?
7        A.  I would have to have a look and see.
8        Q.  Can you give me some examples, other than
9   reverse credit card charges?
10       A.  It would be just basically the fees that
11  the bank will charge.
12       Q.  Like for having an account and --
13       A.  Yeah.  I mean, we do request -- well, not
14  me.  I mean, Karen does request certain information
15  and they charge us for that, and they expense us.
16       Q.  Casual labor, what's that?
17       A.  Just people doing temporary work for the
18  company.
19       Q.  Paid-out waiters we've discussed?
20       A.  Yeah.
21       Q.  Charitable contribution expense, that's
22  what?
23       A.  That's just giving donations to certain
24  organizations.
25       Q.  Commissions and fees expense, what's that?

Page 60

1        A.  Commission and fees?  Credit card
2   processing.  I would have to have a look at that.
3   I've got it itemized.  It could be -- let me have a
4   look at that.  I can get back to Susan with that
5   amount.
6        MR. LUKAS:  Will you mark this portion?
7   BY MR. LUKAS:
8        Q.  Every once in a while I turn to her and
9   say mark this portion so I can go back and remember
10  what it was I wanted to ask for.
11       A.  Fees and credit card.
12       Q.  Don't mumble or don't talk to yourself,
13  because she'll type it down like you're saying it
14  out loud.  I do the same thing and they always bust
15  me.  It looks really weird on the transcript.
16       But as you sit here, you don't know or
17  can't recall what the 22,000 dollars in commissions
18  and fees expense is about?
19       A.  I would have to go and have a look.
20       Q.  Fair enough.  Insurance expense?
21       A.  Just insurance paid, workman's comp
22  insurance, liability policies or whatever.
23       Q.  Internet expenses?
24       A.  This could relate to the Internet fee for
25  having the Internet or Web design or whatever.

Page 61

1        Q.  Laundry and cleaning expense?
2        A.  We've got people coming in to clean the
3   club, and they have got people bringing in the
4   tablecloths, the plastic mats.  That might be part
5   of that as well.
6        Q.  Legal expense?
7        A.  That's legal expenses.  That's
8   straightforward.  Accounting is straightforward as
9   well.
10       Q.  Legal expense, does that include this
11  lawsuit?
12       A.  At this stage?  Not at this stage.
13       Q.  Accounting expense, that's you?
14       A.  That's us, yes.
15       Q.  License expense?
16       A.  Licenses, we pay license fees for liquor
17  license.  You've got to have a registered licensee
18  for the company and other licenses, corporate
19  licenses.
20       Q.  Music and entertainment expense?
21       A.  That -- these are expenses paid to a
22  corporation for allowing to play music.
23       Q.  Office expense?
24       A.  Straight office expenses, Office Depot,
25  office supplies.

16 (Pages 58 to 61)

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 62

1    Q.  Payroll tax expense, what's that?
2    A.  Payroll tax expense are your W-2
3  employees, the portion of the tax expense, the
4  U.R.F., the -- that's the unemployment, federal,
5  state, the FICA taxes.
6    Q.  And the company -- or the Northside Drive
7  does not pay that on the dancers; correct?
8    A.  That is correct.
9    Q.  So this does not include the dancers?
10    A.  That is correct.
11    Q.  Does it include the general manager, Matt?
12    A.  If he's on the payroll, yes, it does.
13    Q.  Do you know whether that Matt's income is
14  even recorded, or compensation is even recorded in
15  the system anywhere?
16    A.  I don't do day-to-day operations as such.
17  I'm not that -- I don't go that deep into it, so I
18  would have to find out.
19        MR. SCHLANGER:  So the answer is you
20  don't know?
21        THE WITNESS:  I don't know.
22  BY MR. LUKAS:
23    Q.  So who's responsible for payroll?
24    A.  Now, Karen will call in the payroll with
25  A.D.P. (sic), and she will request X amount of

Page 63

1  hours for the waiters and the bartenders.
2    Q.  So --
3    A.  And she'll give the tip amounts as well.
4    Q.  So you don't know whether Matt, for
5  example, is a W-2 or a 1099 employee?
6    A.  I would have to go back and look.  I don't
7  know.
8        MR. LUKAS:  Can you mark this portion?
9  BY MR. LUKAS:
10    Q.  Payroll processing fee, what's that?
11    A.  That's the processing fee that A.D.P.
12  would charge the company.
13    Q.  When I looked in 2012's income
14  statement --
15    A.  Yeah.
16    Q.  -- there wasn't that charge.  Do you know
17  why?
18    A.  It could have been charged under
19  commission and fees.  It could be there.
20    Q.  It could be there, just in a different
21  category?
22    A.  Exactly.  Yeah.
23    Q.  Printing?
24    A.  Is when they have brochures, when they --
25  also certain fliers go under there.

Page 64

1    Q.  I noticed in 2012 that 1,000 dollar figure
2  was 15,000 for printing.  Do you know why that was
3  for printing?
4    A.  Sometimes they do a lot of printing.  I
5  mean, it's fliers and promotion stuff in that.
6    Q.  Promotional, 500 dollars, do you see that?
7    A.  Yeah.
8    Q.  What's that?
9    A.  Sometimes they would get people to come in
10  and do promotional stuff for Richards, for Swinging
11  Richards, and that would go under there.
12    Q.  How is that different from advertising?
13  How do you know to put 500 in that category instead
14  of, say, putting it up in advertising?
15    A.  I should have put it under advertising,
16  but I just said, you know, maybe it should go under
17  here.  But effectively it should go under
18  advertising.
19    Q.  Other taxes, that's property tax; right?
20    A.  That's the property taxes, yeah.
21    Q.  And that's all it is is property tax;
22  right?
23    A.  That is correct.
24    Q.  And then parking, what's that?
25    A.  Parking is the fee that Swinging Richards

Page 65

1  has to pay for using the facility to park on -- to
2  park next to the club.
3    Q.  Pest control, I think I understand that
4  one.
5    A.  Yeah.
6    Q.  And who does Richards use for pest
7  control?
8    A.  Who do they use for pest control?
9    Q.  Well, let me ask you this, do the
10  employees do it?
11    A.  No.  A company.
12    Q.  So some outside vendor comes in and does
13  it; is that correct?
14    A.  I think it's Paces Pest Control.
15    Q.  What is it?
16    A.  Paces Pest Control, I think it is.
17    Q.  Is that a routine payment or is that just
18  an as needed?
19    A.  I think they call it in.
20    Q.  Call it in as they need it?
21    A.  That is correct.  Again, I'm not too sure.
22    Q.  And again, that's a third-party vendor,
23  not a --
24    A.  These are --
25        MR. SCHLANGER:  I take it that

17 (Pages 62 to 65)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 66

1    cockroaches are inherently intertwined with
2    dancer compensation somehow?
3        MR. LUKAS: I'm trying to figure out how
4    he accounts for the money.
5        MR. SCHLANGER: Oh, come on.
6        MS. MURPHEY: He told you pest control.
7    I think that's responsive. I'm not sure
8    that any of this is particularly relevant.
9    BY MR. LUKAS:
10   Q.  Equipment rental, what's that?
11   A.  Rental of the equipment, whether it's for
12   the credit card machine or other equipment that
13   they need to rent.
14   Q.  Repairs and maintenance expense, how is
15   that different from laundry and cleaning expense?
16   A.  Clubs need a lot of repairs done. There's
17   a lot of leakage for roofs and that, and that needs
18   to be repaired.
19   Q.  And those are third-party vendors that are
20   used?
21   A.  These are third-party vendors.
22   Q.  And are they paid 1099s or are they just
23   paid by invoice?
24   A.  They're paid by invoice. Yeah, they're
25   paid by invoice.

Page 67

1    Q.  Supplies expense, what's that?
2    A.  That relates closely to the repairs and
3    maintenance going to Home Depot and expensing it.
4    Q.  What's security expense?
5    A.  Security is they have security guards.
6    Q.  Telephone and cable?
7    A.  The phone, cable, yeah.
8    Q.  Salaries and wages expense, what's that?
9    A.  The W-2 expenses.
10   Q.  Do you know which employees that includes?
11   Is that bartenders and waiters?
12   A.  As far as I understand, it is them.
13   Q.  The door people as well?
14   A.  I don't know. I don't know.
15   Q.  And you don't know about the managers or
16   assistant manager?
17   A.  I don't know.
18   Q.  And then utilities expense, just for
19   utilities?
20   A.  Straightforward.
21   Q.  And then you come up with a total expense
22   line of 1.257 and some change; right?
23   A.  That is correct.
24   Q.  And you subtract that from the gross
25   profit amount and you come up with net income?

Page 68

1    A.  That is correct.
2    Q.  If you look at the next page --
3        MS. MURPHEY: Would now be a good time
4    to take a break?
5        MR. LUKAS: Yes. It's a great time.
6        (Whereupon, a discussion ensued off
7    the record.)
8        (Whereupon, there was a brief
9    recess.)
10   BY MR. LUKAS:
11   Q.  Mr. Haralambus, back on the record. The
12   next page is an extension for filing a tax return.
13   So I take it 1400 Northside Drive hasn't filed
14   their 2013 tax?
15   A.  That is correct.
16   Q.  And why is that?
17   A.  I need to go back and --
18       MR. SCHLANGER: I'm going to object to
19   that question as privileged. It has nothing
20   to do with how he accounts for his money.
21       MR. LUKAS: Well, it might if the reason
22   is because he wants to change the way the
23   accounting practices are to make legal
24   arguments in this lawsuit.
25       MR. SCHLANGER: No.

Page 69

1    THE WITNESS: No.
2        MR. SCHLANGER: How he accounted for the
3    money is how he accounted for the money.
4    Why they have chosen to ask for an extension
5    is not relevant to anything that -- of this
6    issue.
7        MR. LUKAS: So you're asserting the
8    privilege on that question?
9        MR. LUKAS: Yes.
10       MR. LUKAS: Fair enough.
11   BY MR. LUKAS:
12   Q.  Let's go to the next page. The next page
13   is an income statement very similar to the one we
14   just went through, but this one's for the 12 months
15   ending December 31st, 2012; correct?
16   A.  That is correct.
17   Q.  I'm just going to ask you about a few
18   things that I spotted that were different. We're
19   not going to march through this again. There's an
20   other income line item in the revenues in this one.
21   Could you tell me what that is for?
22   A.  That is the sales tax. When you pay your
23   sales tax on time, the City will give you a break,
24   and that's the other income.
25   Q.  I also saw this accident expense and auto

18 (Pages 66 to 69)

MERRILL CORPORATION

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

Page 70

1   expense in this statement that wasn't in the
2   previous one.  Do you know what those are?
3       A.  Auto expenses would relate to -- okay.
4   The accident, where do you see accident?
5       Q.  In the expense column, four down.
6       A.  I believe one of the patrons when screens
7   got smashed, and the company paid for that.
8       Q.  I see.  How about auto expense?
9       A.  Auto expense, if -- this relates to '12,
10  would be company auto expenses for going to certain
11  places and that.
12      Q.  Well, it looks like maybe there was some
13  kind of a trip or something, because there's meal
14  expense and travel expense?
15      A.  This would be related -- that's why I'm
16  saying -- they've got a club in Florida, and they
17  were looking to open up there.  And that would be
18  the expenses for that.
19      Q.  I see.  Do you do the books for the
20  Florida club?
21      A.  No, I do not.
22      Q.  Let's see what else is different.  There's
23  a depreciation line, a depreciation expense line
24  item in 2012 that wasn't in 2013.  What's that?
25      A.  I have not finalized the tax return for

Page 71

1   2013.  Once that's done, I will actually add it in.
2       Q.  And then dues and subscription expense,
3   that wasn't in 2013.  What's that?
4       A.  Dues and -- I would have to -- that would
5   be maybe subscriptions to something or books or
6   something like that.
7       Q.  There's an interest expense on this that
8   wasn't on the other one.  Is that because the other
9   one's taxes aren't done, the taxes weren't done in
10  2013?
11      A.  That is correct.
12      Q.  So once the taxes are done, we'll see that
13  line item on the income statement for 2013?
14      A.  It should be, yeah.
15      Q.  This one has a 1,000 dollar other expense.
16  Do you know what that one is?
17      A.  I think that was an expense that I did not
18  know.  The check wasn't clear, and I don't know
19  what it was.
20      Q.  And again, you do the math the same way,
21  total expenses and net income?
22      A.  That is correct.
23      Q.  Let's go to the next page.  And this is
24  the first page of the tax return for 1400 Northside
25  Drive for 2012; correct?

Page 72

1       A.  That is correct.
2       Q.  And in the gross receipts column, you have
3   2,117,118 dollars; is that correct?
4       A.  That is correct.
5       Q.  And how do you arrive at that number?
6       A.  Let me have a look at this.  If you take
7   2,196,678 --
8       Q.  That's the total revenues column from the
9   income statement?
10      A.  If you go to the income statement, SR
11  2096 --
12      Q.  Yep.
13      A.  -- you've got entertainment and waiters of
14  479,000 -- sorry, you can go to your total revenue
15  of 2,196 --
16      Q.  Got it.
17      A.  -- similar, and you subtracted paid-out
18  waiters of 79,560.
19      Q.  And that's where you get the gross
20  receipts?
21      A.  That is correct.
22      Q.  And you don't do the same with the
23  independent contractors; right?
24      A.  That is correct.
25      Q.  And that's because they're 1099 employees,

Page 73

1   and you treat them as a deduction; correct?
2       A.  That is correct.
3       Q.  Whereas the paid-out waiters, those are
4   W-2 employees?
5       A.  That is correct.
6       Q.  And if we look on the next page, that's
7   where we see the independent contractors, the
8   380,000 dollars, that's where we see that captured
9   and backed out; correct?
10      A.  That is correct.
11      Q.  So between that line item and the expenses
12  and not including the paid-out waiters in the gross
13  receipts, we get to that entertainers and waiters
14  number?
15      A.  Yes.
16          MS. MURPHEY:  I'm going to object to the
17      form of the question.  It was confusing.
18  BY MR. LUKAS:
19      Q.  Plus the 10 percent.
20      A.  Why don't you just go through the process
21  again --
22      Q.  Sure.
23      A.  -- in that statement.
24      Q.  Sure.  We captured -- I'm trying to --
25  when you look at the revenue columns where it says

19 (Pages 70 to 73)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 74

1  entertainers and waiters for the 479,000 --
2      A.  Yes.
3      Q.  -- the 380,000 or so of that is for the
4  dancers' portion of the credit card V.I.P. room;
5  correct?
6      A.  That is correct.
7      Q.  And 79,000 and some change is -- captures
8  the credit card tips paid out in cash to waiters
9  and bartenders?
10     A.  That is correct.
11     Q.  And the paid-out to waiters is captured on
12 the tax form because it's backed out of the gross
13 receipts, it's not included; correct?
14     A.  That's what I've done.
15     Q.  And the independent contractors, 380,000
16 is captured as an additional expense that's
17 deducted; correct?
18     A.  That is recorded as an expense.
19     Q.  Yes.  On the tax form?
20     A.  That is correct.
21     Q.  And the paid out -- or the waiters and
22 bartenders are W-2 employees, and the independent
23 contractors are treated with a 1099; correct?
24     A.  That is correct.
25     Q.  And the 1099 is issued only for that

Page 75

1  amount, for the credit card payments to the V.I.P.
2  rooms; correct?
3      A.  The 1099 is issued for that purpose.
4      Q.  And not for any of the cash they receive
5  as compensation for their dancing?
6      A.  It is not recorded.
7      Q.  Why did you do it that way?
8      A.  Excuse me?  Why did I --
9      Q.  Why did you do it this way?  Why didn't
10 you just back out the 380,000 just like you backed
11 out the 79,000 when you're doing the gross
12 receipts?
13     A.  Because when the I.R.S. looks at this,
14 they're going to say you've got salaries and wages
15 and you've got 79,000.  So they will be asking me
16 for a 1099 for that as well and there won't be one.
17     Q.  I see.  Because it's paid in -- like we
18 talked about earlier, because it's paid in cash,
19 there's no audit trail and you couldn't approve to
20 the I.R.S. where that money went?
21     A.  I can prove to the extent where they've
22 taken it out, that amount.  To exactly who it went,
23 the bookkeeper would have a tough time trying to
24 find it, yeah.
25     Q.  Well, going back to why you do it this

Page 76

1  way, it's so that you can explain to the I.R.S. --
2  why do you do it this way?  Try me again.
3      A.  The I.R.S. will ask me for the 1099 for
4  that amount.
5      Q.  For the 79,000; right?
6      A.  Yeah.
7      Q.  And you can't show it?
8      A.  Yeah.  Exactly.  Because they're W-2
9  workers.  Yeah, because the salaries and wages has
10 an item in it for tips as well.  And A.D.P. will
11 back it out.
12     Q.  I see.
13     A.  Will include their tips in the payroll.
14     Q.  But with respect to the 380,000, you have
15 that captured with 1099s, so you don't have to
16 worry about that, you can treat that the way you
17 treat it?
18     A.  That is correct.
19     Q.  I get it.
20         Let's go to the next page, SR 2099.
21     A.  Yeah.
22     Q.  Again, this is an income statement from
23 2011, and it appears to be pretty much the same as
24 the one from 2012 and 2013; correct?
25     A.  That is correct.

Page 77

1      Q.  You're doing the -- you're accounting the
2  same way in 2011 as you did in 2012 and 2013?
3      A.  That is correct.
4      Q.  Same method as we go forward to the next
5  page, 2100, you're paying the taxes in the same
6  manner using the same method?
7      A.  That is correct.
8      Q.  The next page is an income statement from
9  December 2010.
10     A.  Yes.
11     Q.  Again, still doing your accounting the
12 same way in that year; correct?
13     A.  That is correct.  I'm trying to be
14 consistent, yes.
15     Q.  Right.  There's a couple of things I
16 wanted to ask you about on this December 31, 2010
17 income statement that's SR 2101.  There's a rent
18 column here that didn't appear in any of the
19 previous years in the expenses for 140,000.
20         Do you see that?
21     A.  Yes.
22     Q.  What's that?
23     A.  C.B. Jones owns the building.
24     Q.  Now he owns the building?
25     A.  No, no.  He always owned the building and

20  (Pages 74 to 77)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 78

1  the company paid rent.
2      Q.  But as of 2011, the company doesn't pay
3  rent?
4      A.  No.
5      Q.  Do you know why?
6      A.  I think they were struggling a bit with
7  cash flow here and there.  So I don't know, but he
8  did not -- he opted not to take rent.
9      Q.  So 2011, 2012, 2013 were rent-free years?
10     A.  '11 was rent-free.  '12 was rent-free.
11  And I presume '13 would be the same.  '13 was
12  5,000.  He took 5,000.
13     Q.  So there was a rent column in '13?
14     A.  Yeah.
15     Q.  Sorry.  I missed that.  Okay.
16         Another question I had for you on this
17  2010 one is, the salary and wage expense is
18  considerably larger in 2010 than it was in the
19  previous years.  The previous years we were in the
20  175 to 200 thousand dollar range.  Here it's almost
21  400,000.
22         Do you know why there's a difference
23  there?
24     A.  It looks to me that C.B. Jones took a
25  salary as well.

Page 79

1      Q.  And in the 2011, 2012 and 2013, he did
2  not?
3      A.  No.
4      Q.  In fact, I think if we look at the next
5  page, the tax return for 2010, it has compensation
6  of officers for 197,000.  Do you see that?
7      A.  Yes.
8      Q.  And that would be for C.B.'s payment, or
9  payment to C.B.?
10     A.  Yeah.
11     Q.  Going back one page, back to 2102, the
12  income statement for the months ending December --
13  12 months ending December 31, 2010, I see you still
14  have your calculator out, or phone, so I'd like
15  to -- you to check my math.  Here I came up with
16  something confusing.
17         When I take the entertainers and waiters,
18  327,000 and some change --
19     A.  Yeah.
20     Q.  -- and I subtract the independent
21  contractor expense from below --
22     A.  Uh-huh.
23     Q.  -- and I subtract the paid-out waiters
24  from below --
25     A.  Right.

Page 80

1      Q.  -- that amount is actually 33,000 more
2  than the entertainers and waiters.
3      A.  And your question is?
4      Q.  Well, before when we talked about what
5  entertainers and waiters included, we said it was
6  the independent contractor amount, the paid-out
7  waiters amount, plus the 10 percent captured by the
8  club on the IOU for the service -- or the
9  processing fee.
10         But when I add the independent contractor,
11  297,000, the paid-out waiter, 63,000 --
12     A.  297 plus --
13     Q.  63.
14     A.  -- 63 comes to 360.
15     Q.  Yes.  Entertainers and waiters revenue
16  only is 327,000.
17     A.  I would have to look into that.
18         MS. MURPHEY:  I'm going to object to the
19  form of the question to the extent it
20  mischaracterizes prior testimony, because he
21  discussed the year-end variations.
22         MR. LUKAS:  Sure.
23         MS. MURPHEY:  And this could just be the
24  variation the other way.
25         MR. SCHLANGER:  Off the record for a

Page 81

1  second.
2      MR. LUKAS:  Sure.
3      (Whereupon, a discussion ensued off
4  the record.)
5  BY MR. LUKAS:
6      Q.  The part that's confusing me isn't the
7  dollar amount difference.  The part that's
8  confusing me is that the independent contractor and
9  paid-out waiter expenses is higher than what was
10  taken in.
11         And that could be a year-end --
12     A.  I would --
13     Q.  -- scenario of 33,000 dollars?
14     A.  I would have to go in and just have a look
15  exactly what that is.
16         MR. LUKAS:  Will you mark this portion?
17         MS. MURPHEY:  I'm going to object also.
18  You didn't ask for --
19         MR. LUKAS:  Yes.  I'll --
20         MS. MURPHEY:  -- 2007 tax returns.
21  That's irrelevant because it's not the
22  opt-in period.  That only goes back to
23  November of 2011.  So I'm going to assert
24  that we inadvertently disclosed these and
25  this wasn't part of the request.

21 (Pages 78 to 81)

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

Page 82

1      MR. LUKAS: Well, I get that. But I
2  think I'm entitled to understand how he does
3  the math. And this is contrary to how he
4  explained it and how I understood it.
5      So I do believe, because we've gone down
6  this road and he explained how he did the
7  math, I don't know that there would ever be
8  a scenario in which it should be over.
9      MS. MURPHEY: If there was more money
10  paid out for the prior year's money, it
11  would make it a bigger amount than what was
12  taken in. So it can go either way how he
13  described it.
14      They can either --
15      MR. SCHLANGER: More or less.
16      MS. MURPHEY: More or less. So.
17      MR. LUKAS: But 33,000 bucks for one
18  night?
19      MS. MURPHEY: New Year's Eve, depending
20  where that money comes in, if it's one year
21  or the next.
22      MR. SCHLANGER: Anyway, what the --
23      MS. MURPHEY: It is what it is.
24      MR. SCHLANGER: Yeah.
25      MS. MURPHEY: But again, I'm not sure

Page 83

1  it's relevant at all, because it, again, was
2  inadvertently produced.
3      MR. LUKAS: Well, I'm going to ask for
4  that explanation. And I mean, obviously you
5  can object and we can discuss it if we have
6  to.
7      But I think I asked you to mark it, so
8  thank you, Debra.
9  BY MR. LUKAS:
10      Q.  The next page is the tax return for 2010.
11  And again, that was accomplished using the same
12  methodology you described for me previously.
13      A.  That is correct.
14      Q.  What role, if any, do you have in the
15  payroll of paying the employees?
16      A.  Nothing.
17      Q.  And do you know whether there's any effort
18  to track the money paid to the general manager
19  slash D.J.s?
20      A.  No. Nothing about that.
21      Q.  Do you know if there's any effort -- at
22  least in your system there isn't any way --
23      A.  No.
24      Q.  -- to track that?
25      A.  No.

Page 84

1      Q.  And in your system is there any effort to
2  track or any ability to track what the dancers paid
3  in tip-outs to the front door person or the V.I.P.
4  person?
5      A.  I don't get involved with day-to-day
6  operations. I don't know.
7      Q.  All I want to know is if your system of
8  accounting and bookkeeping that you set up includes
9  a way to capture those amounts.
10      A.  No, it does not.
11      Q.  Does 1400 Northside Drive utilize a tip
12  credit or seek a tip credit in connection with the
13  payment of its hourly employees?
14      A.  I don't understand your question.
15      Q.  Sure. Does the company try to take credit
16  for tips paid to the waiters and bartenders to
17  reduce the hourly minimum wage they pay those
18  employees?
19      A.  I don't account for anything of that, and
20  I don't know that answer.
21      Q.  It's certainly not, that sort of
22  arrangement isn't captured anywhere in your
23  bookkeeping or accounting system?
24      A.  No.
25      Q.  How often are you involved in working on

Page 85

1  1400 Northside Drive business as a C.P.A.?
2      A.  C.B. has had health issues for a while,
3  and he's asked me to go there every day to check up
4  on things. And I expressed to him I cannot do
5  that.
6      I said to him, the least I can do for you
7  is just call and see how things are going, and
8  that's what I do. I do him actually a favor by
9  doing that. I'm not -- I don't get paid for that
10  or whatever. I just do it just to make sure
11  everything is okay.
12      Q.  And so that's a daily call that you make?
13  And who do you make that call to?
14      A.  To Karen, yeah.
15      Q.  And how often do you actually go into the
16  club?
17      A.  Into the office?
18      Q.  Yes. Into the club, go into the club.
19      A.  I don't have any -- I've gone in the
20  daytime, in the morning to pick up the paperwork if
21  I have to, and that's it.
22      Q.  And how often do you pick up paperwork?
23      A.  Maybe once or twice a week.
24      Q.  And when you say "pick up paperwork," what
25  do you pick up?

22  (Pages 82 to 85)

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

Page 86

1    A.  Bank statements, letters from the I.R.S.,
2    that type of stuff.
3    Q.  Do you pick up the information that is
4    captured in these spreadsheets that we were looking
5    at?
6    A.  I would back it up.
7    Q.  You say "back it up," what do you mean
8    back it up?
9    A.  Back it up on a disk.
10   Q.  So when you come in, you back that
11   information up, but it's maintained at the club?
12   A.  That is correct.
13   Q.  And do you do that when you go in there
14   once or twice a week, do you do that every time or
15   do you just do it every week or --
16   A.  I'll do it once or twice a month.
17   Q.  And when you go in, other than back up
18   that information, what else do you -- that's where
19   you collect stuff, anything from the I.R.S. or
20   anything else that would pertain to you as a
21   C.P.A.?
22   A.  Yes.
23   Q.  Do you have any other role other than as a
24   C.P.A. and making -- and checking in every day like
25   you described for us?

Page 87

1    A.  The only time that I would be involved in
2    it, if Karen has a vacation, I would fill in her
3    shoes just accounting for the information.  But I
4    don't take care of the day-to-day operations.  I
5    don't get involved in that.
6    Q.  So --
7    A.  She'll make sure that the payroll gets
8    done.  I don't get involved with any of that.  I'll
9    just help out and just capture that information and
10   that's it.
11   Q.  When you say "capture the information," do
12   you mean physically going into the club and opening
13   the safe and all of that?
14   A.  That is correct.
15   Q.  How often in a year do you do that?
16   A.  I may do that about 20 days a year.
17   Q.  That's unusual, isn't it, for a C.P.A., or
18   at least for your practice?  Do you do that for any
19   other clients?
20   A.  No.  I don't do it for anyone else.
21   Q.  Same with the calling in every day and
22   checking in, that's not something you do?
23   A.  Not something I -- C.B., I've known C.B.
24   for a long time.  And I don't like to do these
25   things, but he's asked me to just call up and just

Page 88

1    check up and just see if everything is okay.
2    Q.  And you just do it as a favor to him?
3    A.  That is correct.
4    Q.  Do you actually see the IOUs or you just
5    see what's captured on the spreadsheet?
6    A.  I see the IOUs.  Because they're attached
7    to the check stub.  I don't necessarily open them
8    up.  They are attached to the check stub.
9    Q.  And that's part of what you pick up and
10   gather when you make your visits?
11   A.  That is correct.
12   Q.  And if we took a paycheck stub and we took
13   an IOU and compared them, the paycheck stub should
14   be for the amount on the IOU less 10 percent?
15       MR. SCHLANGER:  I object to the
16   characterization as a paycheck.
17       MR. LUKAS:  Paycheck stub, I said.  It's
18   a check stub.  Oh, I see.  I'm sorry.  I
19   meant check.  You're right.  I meant check
20   stub.
21   BY MR. LUKAS:
22   Q.  That's why you looked at me like that.
23   A.  Yes.
24   Q.  So if we took the check stub and compared
25   it to the IOU, the check stub should reflect an

Page 89

1    amount 10 percent less than what's on the IOU?
2    A.  Yes.
3    Q.  Thanks.
4        Did you have any role in the drafting or
5    signing of the rules and regulations at the club?
6    A.  No.
7    Q.  How about in connection with the
8    independent contractor agreements?
9    A.  No.
10   Q.  How about the covenant not to compete?
11   A.  No.
12   Q.  Did you have any role in the establishing
13   of rules or basically procedure for, say, the front
14   door people and the V.I.P. people and the
15   bartenders and how they should handle their drawers
16   or their bags?
17   A.  None.
18   Q.  Did you have any role in tracking the
19   total hours worked by dancers?
20   A.  None.
21   Q.  And in your system is there anywhere where
22   that's tracked or gathered, the hours worked?
23   A.  None.
24   Q.  Are you aware of anything that Swinging
25   Richards does to track those hours intentionally?

23 (Pages 86 to 89)

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 90

1    A.  I don't know.
2        MR. LUKAS:  I have no further questions
3    for him.
4        MS. MURPHEY:  I have a couple of
5    questions for him, but I just want to step
6    out and talk to Herb one second before we
7    ask him a few questions.
8        (Whereupon, a discussion ensued off
9    the record.)
10       (Whereupon, there was a brief
11   recess.)
12            EXAMINATION
13   BY MS. MURPHEY:
14   Q.  I just have a couple of questions.  One is
15   to clarify something that was said two different
16   ways earlier, and I just want to make sure it's
17   clear which way it is.
18       Jimmy, if you'll go ahead for purposes of
19   our discussion and turn back to the SR 2105 sheet,
20   which is the monthly summary for November of 2011?
21       MR. LUKAS:  First of all, I'm going to
22   object to the form of the question
23   suggesting that it was said two different
24   ways.  We'll figure out what she's asking
25   and whether it was said two different ways.

Page 91

1        I think the record will speak for itself.
2        But go ahead.
3    BY MS. MURPHEY:
4    Q.  So we talked about V.I.P. cash and V.I.P.
5    credit.
6    A.  Yes.
7    Q.  And those numbers represented the room
8    rental fee paid by a patron to the club; correct?
9    A.  That is correct.
10   Q.  And is that the 40 dollar figure or the 65
11   dollar figure depending on how long they're in a
12   room?
13   A.  I don't get involved in setting that fee,
14   so I don't know.
15   Q.  But it's your understanding it's a room --
16   a charge paid by the patron to the club?
17   A.  That is correct.
18   Q.  And then the entertainer expense that you
19   indicated was the, and you I think used the word,
20   the term hundred dollars payment for the dancer's
21   time in the room?
22   A.  That is correct.
23   Q.  And then the service charge number
24   underneath that represented the 10 percent charge?
25   A.  Represented what the patron pays the

Page 92

1    10 percent charge.
2    Q.  On the hundred dollars?
3    A.  On the hundred dollar, yes.
4    Q.  So that's -- and so like there, we have
5    28,135, and then the service charge looks like it's
6    approximately 10 percent of that 28,000 dollar
7    figure for 2,800 dollars?
8    A.  Yes.
9    Q.  So on the income statement, if you go back
10   to 2094, where the service charge is indicated on
11   the revenues line for 52,227.25, that's the
12   10 percent on the dancer's hundred dollars that is
13   charged to the patron?
14   A.  That is correct.
15   Q.  So it's not a 10 percent on the room, it's
16   a 10 percent on the dancer?
17   A.  No, no, no, no.  It is a 10 percent on the
18   room.  Or not.
19       MR. LUKAS:  Room and the dancer.
20       MR. SCHLANGER:  No.
21   BY MS. MURPHEY:
22   Q.  You just testified that it was 10 percent
23   on the hundred dollar fee paid for the dancer.
24   A.  Yes.  Yes.
25   Q.  And so that represents the 10 percent of

Page 93

1    the hundred dollars, not 10 percent --
2    A.  I stand corrected.  You're absolutely
3    right.  I do apologize.  I do apologize.  Yes.
4    Q.  You said it --
5        MR. LUKAS:  While we're on this, so
6    let's make sure that we're clear.  Because
7    all I want to do is understand it.
8        So the 10 percent -- and maybe the best
9    way is to call them processing charge to the
10   entertainer versus service charge to the
11   customer.
12       MR. SCHLANGER:  There's no -- well --
13       MR. LUKAS:  Or whatever charge,
14   surcharge or --
15       MR. SCHLANGER:  There's no surcharge on
16   the room rental.  There's a surcharge on
17   the --
18       THE WITNESS:  Can I just give an
19   example?
20           FURTHER EXAMINATION
21   BY MR. LUKAS:
22   Q.  Yes.  Why don't you give an example.
23       MS. MURPHEY:  And I just want to make
24   sure that you understand it.
25       MR. LUKAS:  Yes.  No, I get it.  Yes.

24  (Pages 90 to 93)

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

Page 94

1    THE WITNESS: Let's say that the room
2  costs 65, let's just use an example, and the
3  entertainer gets paid 220. Right?
4  BY MR. LUKAS:
5    Q. Okay.
6    A. The service fee, the service charge will
7  be 22, not on the room, but on the entertainer.
8    Q. Okay.
9    A. I'm sorry.
10    Q. And then the entertainer will have an IOU
11  for 220?
12    A. Less 10 percent.
13    Q. Well, no, the IOU will be 220?
14    A. That is correct.
15    Q. And then the check will be cut for 220
16  less 10 percent?
17    A. That is correct.
18    MR. LUKAS: Right? We're good?
19    MR. SCHLANGER: Right.
20  BY MR. LUKAS:
21    Q. And that's the way it goes?
22    A. That's the way it goes.
23    MR. SCHLANGER: It was --
24    MR. LUKAS: So the confusion was he was
25  putting the --

Page 95

1    MS. MURPHEY: At one point he said it
2  the right way. But then you asked is it
3  10 percent on the room, and he said yes.
4    THE WITNESS: I'm sorry.
5    MS. MURPHEY: And it's not the room
6  charge, it's the entertainer charge.
7  BY MR. LUKAS:
8    Q. And it's not the two of them combined that
9  they're charging 10 percent?
10    A. No.
11    MS. MURPHEY: They don't charge the
12  percentage on the room charge.
13    MR. LUKAS: Got it.
14    MS. MURPHEY: And again, I'm just trying
15  to make sure you understand what the records
16  are.
17    THE WITNESS: I'm sorry.
18    MR. LUKAS: That's fine.
19    MS. MURPHEY: Because he did say it one
20  way correctly. And then when you asked it,
21  he said it another way. So I just want to
22  make sure you understand what those numbers
23  represent.
24    FURTHER EXAMINATION
25  BY MS. MURPHEY:

Page 96

1    Q. And then I have a few other questions.
2  There was one other clean-up question. And I think
3  it was when you were talking about -- you were
4  talking about revenue items, and you said that it
5  was -- I think the -- let's see where you were
6  talking about it.
7    You were talking about the revenue for
8  entertainers and waiters, and then you talked about
9  the paid-out to waiters -- no. Sorry. It's the
10  wrong form. Sorry. Let's go back to the 2105.
11    A question was asked by Mr. Lukas about
12  revenue items, and I think it was that the waiters
13  and -- entertainers and waiters number included
14  from this sheet the tip number and the entertainer
15  number, and at one point you said it was the
16  entertainer number and the paid-out tips.
17    But a paid-out tip is an expense item, not
18  a revenue item; correct?
19    A. The paid-out tip is an expense.
20    Q. So it's really the entertainer number and
21  the tip number represent that entertainer and
22  waiters line on your income statement?
23    A. That is correct.
24    MS. MURPHEY: He just said the debit
25  instead of the credit earlier, so I just

Page 97

1  wanted to make sure we were all on the same
2  page.
3  BY MS. MURPHEY:
4    Q. Now, a few more questions, Jimmy. Is
5  there any difference from an accounting standpoint
6  between the credit card payments for that hundred
7  dollar fee for a dancer's time versus cash payments
8  of the hundred dollar fee for credit card time -- I
9  mean, sorry, for entertainer time?
10    A. Could you just rephrase it for me, please?
11    Q. Yes. Is there any difference between the
12  cash payment to -- for 15 minutes of dancer time
13  for a hundred dollars versus a credit card payment
14  of 15 minutes of a dancer's time for a hundred
15  dollars from an accounting standpoint?
16    MR. SCHLANGER: Or should they be
17  treated the same?
18    THE WITNESS: They should be treated the
19  same. They should be treated the same.
20  BY MS. MURPHEY:
21    Q. And is it your understanding that that has
22  been done in the past at Swinging Richards?
23    A. The credit card charge has been recorded.
24  The cash has not.
25    Q. And is there something that's going to be

25  (Pages 94 to 97)

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

|  | Page 98 |
|---|---|
| 1 | done to rectify that? |
| 2 | A.  Well, looking at the amount, it is a |
| 3 | material amount.  What I think, just off the top, I |
| 4 | don't know.  I would have to go back and have a |
| 5 | look.  If it's a material amount, it's not going to |
| 6 | affect the bottom line, but it's a material amount |
| 7 | that needs to be reported.  Then I would have to go |
| 8 | back and amend my tax returns and the 1099s. |
| 9 | Q.  And is it -- |
| 10 | A.  I would be obligated to do that, yes. |
| 11 | Q.  And is that your intention to do so? |
| 12 | A.  Yeah. |
| 13 | FURTHER EXAMINATION |
| 14 | BY MR. LUKAS: |
| 15 | Q.  Is it your intention to go back and |
| 16 | reconstruct the cash payments made by customers to |
| 17 | dancers for the same services they give on the |
| 18 | floor and on the stage? |
| 19 | MS. MURPHEY:  Object to the form of the |
| 20 | question. |
| 21 | BY MR. LUKAS: |
| 22 | Q.  Go ahead. |
| 23 | A.  I don't -- I mean, if I can get that |
| 24 | information, I would have to do it. |
| 25 | Q.  Because it would be material; correct? |

|  | Page 99 |
|---|---|
| 1 | A.  Yes. |
| 2 | MR. LUKAS:  Do you have anything, Susan? |
| 3 | MR. SCHLANGER:  That's fine. |
| 4 | MS. MURPHEY:  No. |
| 5 | MR. LUKAS:  I think now we are done. |
| 6 | (Whereupon, a discussion ensued off |
| 7 | the record.) |
| 8 | (Whereupon, the reading and signing |
| 9 | of the deposition by the witness was |
| 10 | reserved.) |
| 11 | BY MR. LUKAS: |
| 12 | Q.  We're going back on the record to mark as |
| 13 | Plaintiff Deposition Exhibit Number 6 a form that |
| 14 | you had that you brought along with you, sir; is |
| 15 | that right? |
| 16 | A.  That is correct. |
| 17 | Q.  And describe for us what that form is. |
| 18 | A.  Basically, I was just differentiating |
| 19 | between what the patrons revenue is versus the |
| 20 | dancers and the waiters and suppliers.  That's all |
| 21 | what I was doing. |
| 22 | Q.  Let me take a look at this before we close |
| 23 | out. |
| 24 | A.  Yeah.  That's all what I was doing. |
| 25 | Basically you see liquor, the patron revenue. |

|  | Page 100 |
|---|---|
| 1 | That's what the patron pays.  That's all. |
| 2 | Q.  I see.  On this sheet you're just, it's a |
| 3 | reminder to you of who's paying that amount for |
| 4 | each of those categories? |
| 5 | A.  That is correct. |
| 6 | Q.  And then you have some scribbles just that |
| 7 | you were making as we went along? |
| 8 | A.  That is correct. |
| 9 | Q.  Great.  Thank you, sir.  You can leave |
| 10 | that on top of that.  She'll put a sticker on it. |
| 11 | (Whereupon, Plaintiff's |
| 12 | Exhibit 6 was marked.) |
| 13 | MR. LUKAS:  Now we're done. |
| 14 | (Deposition concluded at 11:55 a.m.) |
| 15 | --oOo-- |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 101 |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | DISTRICT COURT   ) |
|  | NORTHERN DISTRICT ) |
| 3 | ATLANTA DIVISION ) |
| 4 | I, Debra M. Druzisky, a Certified Court |
|  | Reporter in and for the State of Georgia, do hereby |
| 5 | certify: |
|  | That prior to being examined, the witness |
| 6 | named in the foregoing deposition was by me duly |
|  | sworn to testify to the truth, the whole truth, and |
| 7 | nothing but the truth; |
|  | That said deposition was taken before me |
| 8 | at the time and place set forth and was taken down |
|  | by me in shorthand and thereafter reduced to |
| 9 | computerized transcription under my direction and |
|  | supervision.  And I hereby certify the foregoing |
| 10 | deposition is a full, true and correct transcript |
|  | of my shorthand notes as taken. |
| 11 | I further certify that I am not of kin or |
|  | counsel to the parties in the case, and I am not in |
| 12 | the regular employ of counsel for any of the said |
|  | parties, nor am I in any way financially interested |
| 13 | in the result of said case. |
|  | IN WITNESS WHEREOF, I have hereunto |
| 14 | subscribed my name this 2nd day of October, 2014. |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 | Debra M. Druzisky |
|  | Georgia CCR-B-1848 |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

26 (Pages 98 to 101)