KAREN R. CAUDLE     9/18/2014

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION


CLINTON HENDERSON and )

ANDREW OLINDE,        )

individually and on   )

behalf of all other   )

similarly situated    )

individuals,          )

                      )

    Plaintiffs,       )   CIVIL ACTION NO.

                      )

vs.                   )   1:13-CV-3767-TWT

                      )

1400 NORTHSIDE DRIVE, )

INC. d/b/a SWINGING   )

RICHARDS, AND C.B.    )

KAREN R. CAUDLE    9/18/2014

JONES,                    )

                             )

     Defendants.          )

DEPOSITION OF KAREN A. CAUDLE

(Taken by Plaintiffs)

September 18, 2014

12:00 p.m.

Suite 2700

260 Peachtree Street

Atlanta, Georgia

KAREN R. CAUDLE    9/18/2014

Page 3

1                  APPEARANCES OF COUNSEL

2   On behalf of the Plaintiffs:

3       PAUL J. LUKAS, Esq.
        Nichols Kaster
4       80 South 8th Street, Suite 4600
        Minneapolis, Minnesota  55402
5       (612) 256-3200
        lukas@nka.com

6

7   On behalf of the Defendants:

8       SUSAN KASTAN MURPHEY, Esq.
        HERB SCHLANGER, Esq.
9       Schulten, Ward & Turner
        260 Peachtree Street, Suite 2700
10      Atlanta, Georgia  30303
        (404) 688-6800
11      skm@swtlaw.com

12                          --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

KAREN R. CAUDLE    9/18/2014

Page 4

1                      INDEX TO EXAMINATION

2    Witness Name:                                        Page

3    KAREN A. CAUDLE

4       By Mr. Lukas                                       6

5

6            INDEX TO PLAINTIFF'S EXHIBITS

7       No.                 Description                   Page

8    Exhibit 7      SR 188, 1-22-13, Swinging              4
                    Richards Sign-In/Out sheet.
9
     Exhibit 8      SR 421, Front Door rules.              6
10
     Exhibit 9      SR 440, 11-3-13, Guest Check and      12
11                  EMS Restaurant credit card
                    receipt re: New Year's Eve
12                  tickets.

13   Exhibit 10     SR 529 thru 531, 1-1-11,              14
                    Spreadsheet re: VIP room
14                  charges.

15   Exhibit 11     SR 966, 10-21-11, Photocopy of        18
                    envelope re: Richards: House,
16                  Matt C.

17   Exhibit 12     SR 2037, 4-4-14, Timecard re:         19
                    Mike Crowley.
18
     Exhibit 13     SR 2038, Swinging Richards            21
19                  Weekly Sign-In/Out sheet re:
                    Mike Crowley.
20
                            - - -
21

22            INDEX TO MARKED QUESTIONS

23        Page No.                      Line

24           9                           18

25          11                            6

KAREN R. CAUDLE    9/18/2014

1              KAREN A. CAUDLE,

2    having been first duly sworn, was examined and

3    testified as follows:

4                   EXAMINATION

5    BY MR. LUKAS:

6       Q.   Will you please state your full name,

7    spelling your last name for the record?

8       A.   Karen A. Caudle, C-A-U-D-L-E.

9       Q.   Ms. Caudle, we were here a couple weeks

10   back, so you already get the joke on how all this

11   work.  Okay?

12      A.   Uh-huh.

13      Q.   I just have a couple questions.  Now that

14   I have some documents and exhibits, I just want to

15   clarify and confirm some things that we talked

16   about last time and make sure that I understand the

17   documents.

18           Okay?

19      A.   Okay.

20                   (Whereupon, Deposition Exhibit

21                    7 was marked.)

22   BY MR. LUKAS:

23      Q.   I'm showing you what has been marked as

24   Plaintiff's Deposition Exhibit Number 7.  Could you

25   tell me what this document is?

KAREN R. CAUDLE    9/18/2014

Page 6

1      A.    It's a sign-in and sign-out sheet.

2      Q.    And how long has the club been using a

3    sign-in and sign-out sheet for the entertainers?

4      A.    I don't know.

5      Q.    For as long as you've been there?

6      A.    As long as I've been aware.  I don't know

7    if they were doing it when I came back.  But

8    sometime during the period, I noticed that these

9    were at the front desk.  They're not turned in to

10   me.

11     Q.    These are not turned in to you?

12     A.    No.

13     Q.    So they're not part of the bookkeeping and

14   accounting system?

15     A.    No.

16     Q.    Who are they turned in to?

17     A.    They're kept in a binder.  And I don't

18   know that they're turned in to anyone.

19     Q.    Who keeps them in a binder?

20     A.    The door person.

21     Q.    Why are they kept at all?

22     A.    I don't know.

23     Q.    They're certainly not used for payroll or

24   any accounting or bookkeeping; correct?

25     A.    That's correct.

KAREN R. CAUDLE    9/18/2014

Page 7

1      Q.   And you don't know how long they've been

2   maintained or how far back they go?

3      A.   I don't.

4      Q.   You don't know if they're used every day

5   or not?

6      A.   I believe they're used every day.

7      Q.   For example, when we see this document

8   with all the handwriting all over it, that's

9   probably the door person's handwriting?

10      A.   I would say that's the individual person

11   that signs in.

12      Q.   And this is kept at the front door?

13      A.   Yes.

14      Q.   But it's not used in your job as

15   bookkeeper or to help Jimmy do the accounting or to

16   track anything --

17      A.   No.

18      Q.   -- for payroll?

19      A.   No.

20                      (Whereupon, Deposition Exhibit

21                       8 was marked.)

22   BY MR. LUKAS:

23      Q.   Ms. Caudle, showing you what has been

24   marked as Plaintiff's Exhibit 8.  Could you tell me

25   what this document is?

KAREN R. CAUDLE    9/18/2014

Page 8

1      MR. SCHLANGER:  I'm going to -- let me

2      just interpose one comment.  This is not

3      noticed as a 30(b)(6) deposition, so she's

4      not testifying on behalf of the corporation.

5  BY MR. LUKAS:

6      Q.    Could you tell me what Exhibit 8 is?

7      A.    It looks like rules for the front door.

8      Q.    Is this something that you had a role in

9  drafting?

10     A.    No.

11     Q.    Do you know who did?

12     A.    No.

13     Q.    Do you know whether these rules are

14 followed?

15     A.    Can I read them?

16     Q.    Sure.  Take your time.

17           (Whereupon, the document was

18       reviewed by the witness.)

19           THE WITNESS:  Okay.  I'm ready.

20 BY MR. LUKAS:

21     Q.    Let's go to Paragraph 2.  It talks about

22 handing out the checks to the dancers.  Those are

23 the checks that you write out for the dancers;

24 correct?

25     A.    Yes.

KAREN R. CAUDLE    9/18/2014

Page 9

1      Q.   And that's what you put in the blue bag

2    that the doorman gets when they start their shift?

3      A.   Yes.

4      Q.   And the third paragraph there talks about

5    this sign-in sheet, Plaintiff's Exhibit 7 we talked

6    about; correct?

7      A.   Yes.

8      Q.   And then the fourth paragraph talks about

9    two envelopes, one that has Swinging Richards'

10   house on it?

11     A.   Yes.

12     Q.   And a second one that says Swinging

13   Richards' late house.  Do you see that?

14     A.   Uh-huh.

15     Q.   Are those envelopes that you actually

16   ultimately receive, then?

17     A.   Yes.

18     Q.   And that's back in the blue bag that you

19   get at the end of the night, or that's in the safe

20   when you get in?

21     A.   In the safe, yes.

22     Q.   And then it says on a third envelope

23   "write Swinging Richards total."  Is that something

24   that you get in the bag?

25     A.   Yes.  In the blue bag.

KAREN R. CAUDLE    9/18/2014

1      Q.   The ninth paragraph talks about a tally

2   sheet of free entries.  Is that something you get?

3      A.   This -- excuse me just a minute.  On the

4   third envelope where it says write Richards totals,

5   date, management name and all that sort of thing,

6   they have, instead of writing it on the envelope,

7   they have it printed now on a piece of paper that

8   they tape to the envelope, or staple, whatever the

9   case is.

10          And all that is a part of the same

11   envelope, the envelope that they put the door money

12   in.

13      Q.   I see.  So instead of --

14      A.   So all that information is on one piece of

15   paper now.

16      Q.   So instead of a third envelope, there's a

17   piece of paper that goes with the other envelopes?

18      A.   Yes.

19          MR. LUKAS:  Will you mark this portion?

20   BY MR. LUKAS:

21      Q.   Going back now to Paragraph 9, it talks

22   about a tally sheet.  Is a tally sheet something

23   that you receive in the blue bag at the end -- the

24   next day?

25      A.   Yes.  There is a sheet, but I don't think

KAREN R. CAUDLE    9/18/2014

Page 11

1    that the tally sheet that I started putting in

2    there that just asks them to record -- it does

3    record how many free people come in, but they also

4    have that on the outside of the envelope that we

5    were just discussing also.

6         Q.    Paragraph 11 talks about tip-out.  There's

7    no record kept by the --

8             MR. SCHLANGER:  Keep going.

9             (Whereupon, there was a telephonic

10        interruption.)

11   BY MR. LUKAS:

12        Q.    There's no record kept of how much dancers

13   tip out to the front door person; correct?

14        A.    That's correct.  Not that I know of.

15        Q.    And there's no record kept of how much the

16   dancers tip out the general manager slash D.J.;

17   correct?

18        A.    That's correct.

19        Q.    And there's no record kept of how much the

20   dancers tip out the V.I.P. person; correct?

21        A.    That's correct.

22        Q.    And then the --

23        A.    Excuse me.  I'm sorry.

24        Q.    That's all right.

25        A.    My son kept track of it for a few months

KAREN R. CAUDLE    9/18/2014

Page 12

1    last summer when I asked him to.  I think we talked

2    about that the first time.

3        Q.   Yes.

4        A.   But he didn't -- he kept it for his own

5    personal record, so it wasn't kept, like, for

6    accounting purposes or anything.

7            MR. LUKAS:  Will you mark this portion?

8    BY MR. LUKAS:

9        Q.   And then it says there's an extra dollar

10   on the weekends or Friday and Saturday that you are

11   supposed to receive; right, Karen?

12       A.   Yes.

13       Q.   And that's for those Breathalyzer tubes?

14       A.   Yes.

15       Q.   Do you know who wrote this?

16       A.   I do not.

17       Q.   Do you know how old it is?

18       A.   It says Karen/Amy, and Amy worked with me

19   for I think a little over a year and she's been

20   gone a year, so it had to be at least two years

21   old.

22       Q.   So I see up in Paragraph 2 where it talks

23   about Karen/Amy?

24       A.   Uh-huh.

25       Q.   So it's at least two years old?

KAREN R. CAUDLE    9/18/2014

Page 13

1      A.    I would think so, yes.

2      Q.    But you can't be any more specific for me

3  than that?

4      A.    No.

5                        (Whereupon, Deposition Exhibit

6                         9 was marked.)

7  BY MR. LUKAS:

8      Q.    Ms. Caudle, showing you Plaintiff's

9  Exhibit 9.  Could you tell me what this is?

10     A.    This gentleman bought two New Year's Eve

11 tickets.

12     Q.    How can you tell that?

13     A.    It says New Year's Eve tix two on it.  And

14 the price for the New Year's Eve tickets are 55

15 dollars.  So he bought two, 110 dollars, gave

16 whoever sold -- I guess whoever sold them the

17 tickets a ten dollar tip to make a grand total of

18 120.

19     Q.    What is E.M.S. Restaurant?

20     A.    That's what they put on the credit card

21 charges rather than Swinging Richards.

22     Q.    I see.  Is that true for the V.I.P. room

23 charges used -- where they use a credit card, so it

24 says E.M.S. Restaurant on it?

25     A.    As far -- yes.  I don't believe any of

KAREN R. CAUDLE     9/18/2014

Page 14

1    them say Swinging Richards, yes.

2        Q.    So when the customer gets their credit

3    card charges back, it just says E.M.S. Restaurant?

4        A.    I've never made a charge.

5        Q.    Well, sure.

6        A.    Yeah.  So I'm assuming it would.

7        Q.    That's for privacy reasons, I assume?

8        A.    Yes.

9        Q.    Does this have anything to do with this

10   lawsuit that you're aware of?

11       A.    The purchase of the New Year's Eve

12   tickets?

13       Q.    Yes.  Is that something dancers were

14   selling?

15       A.    No.

16           MS. MURPHEY:  I think this was one of

17       the samples I gave you of documents that we

18       weren't producing but were in the 35 boxes.

19       This one has New Year's Eve tickets.  But if

20       they bought liquor or drinks, it would have

21       the tab and then the credit card receipt.

22           And that's what I was showing you we

23       weren't producing.  This is just an odd one

24       because it has the New Year's Eve tickets.

25       But it's something that a waitress fills out

1          for a customer and a customer charge ticket

2          that's in each transaction for the 35 boxes

3          that you weren't getting.

4               MR. LUKAS:  I see.

5               MS. MURPHEY:  So it was a sample.  But

6          it's just, again, to show you what we have

7          if you wanted to look in the 35 boxes but

8          that's not being -- you know, wasn't

9          produced globally to you because it's 35

10         boxes.

11    BY MR. LUKAS:

12         Q.  Ms. Caudle, so it's just coincidental it

13    says New Year's Eve tickets?

14         A.  Yes.

15         Q.  This could be any charge that the customer

16    makes for beverages at the club; correct?

17         A.  Yes.

18         Q.  And the guest check and the receipt are

19    maintained?

20         A.  Yes.

21              MR. LUKAS:  Thank you for that

22          clarification.

23                        (Whereupon, Deposition Exhibit

24                         10 was marked.)

25    BY MR. LUKAS:

KAREN R. CAUDLE    9/18/2014

Page 16

1      Q.    Ms. Caudle, showing you Plaintiff's

2  Exhibit 10.  Could you tell me what that document

3  is?

4      A.    It's the list of V.I.P.

5      Q.    What does this tell us?  Let's go to the

6  very top line and go across, and you can explain to

7  us what this tells us.

8      A.    The first column is the number of rooms.

9  And then the second column is the room number

10  itself, so they can -- I can't even say the word.

11  Then we have time in, what time they came into the

12  room, what time they left, entertainer's stage

13  name, the amount of cash the customer paid or the

14  amount of credit the customer paid for use of the

15  room.

16      Q.    And these dollar amounts that we see here

17  are just for the room rental charge; correct?

18      A.    That's correct.

19      Q.    And that's the room rental charge that's

20  paid to the club; correct?

21      A.    A room rental what, I'm sorry?

22      Q.    The room rental charge that's paid to the

23  club.

24      A.    Yes.

25      Q.    This doesn't reflect the amount paid to

KAREN R. CAUDLE    9/18/2014

Page 17

1  the entertainer?

2      A.   No.

3      Q.   And what, if anything, do you do with

4  these sheets?

5      A.   I file them with the rest of the day's

6  paperwork.

7      Q.   Is it something that goes to Jimmy or is

8  it just filed?

9      A.   It's just filed.

10      Q.   It's not something that's used in your

11  accounting or bookkeeping?

12      A.   No.

13      Q.   And let's look at the third page of this

14  document.  What is the third page?

15      A.   It's just -- breaks down the amount of

16  currency, how many wrist bands are sold.

17      Q.   Do you use this for anything in your job

18  as bookkeeper?

19      A.   Yes.

20      Q.   What do you use this for?

21      A.   To make sure that the totals match with

22  the money that I have in the back.

23      Q.   All right.  So you're looking for any

24  discrepancies?

25      A.   Yes.

KAREN R. CAUDLE   9/18/2014

Page 18

1    Q.   And if there are no discrepancies, what,

2    if anything, do you do with this document?

3    A.   It goes in the folder with the rest of the

4    day's work.

5    Q.   Is that something that goes to Jimmy?

6    A.   No.

7    Q.   Where, if anywhere, is a tip paid to the

8    door person, the V.I.P. door person with a credit

9    card charge from a customer?

10   A.   It would be on the credit card charge.

11   Q.   But it wouldn't be reflected on this

12   document, Plaintiff's Exhibit 10?

13   A.   No.

14   Q.   And how do you know as the bookkeeper that

15   that credit card charge includes a tip to the

16   V.I.P. door person?

17   A.   Because a customer would have written the

18   tip on the credit card charge, on the slip itself.

19   Like right there, tip.

20   Q.   And you're showing me Plaintiff's Exhibit

21   9, it would be on the tip line?

22   A.   Yes.

23   Q.   And you'd know that wasn't for the

24   entertainer why?

25   A.   Because the entertainer's money would be

KAREN R. CAUDLE   9/18/2014

Page 19

1    on an IOU slip.

2                        (Whereupon, Deposition Exhibit

3                        11 was marked.)

4    BY MR. LUKAS:

5        Q.    Showing you Plaintiff's Exhibit 11.  Do

6    you know what that document is?

7        A.    It's a copy of the house envelope.

8        Q.    When you say "of the house envelope," what

9    does that mean?  What's in the envelope?

10       A.    Money that the entertainers pay at the end

11   of -- or I'm going to assume at the end of the

12   night that they pay to work there.

13       Q.    That's the house fee?

14       A.    Uh-huh.

15       Q.    I need you to answer verbally.

16       A.    Yes.

17       Q.    The envelope isn't something that's

18   normally maintained --

19       A.    Yes.

20       Q.    -- is it?

21       A.    Yes, it is.

22       Q.    Where do you keep the envelopes?

23       A.    In the folder with the rest of that day's

24   work.

25       Q.    And why is that kept?

KAREN R. CAUDLE    9/18/2014

Page 20

1    A.    I have no idea.

2    Q.    You don't do anything with it, do you?

3    A.    Other than keep it, no.

4    Q.    You don't use it to audit or to make sure

5    that there's no discrepancies or anything?

6    A.    Oh, yes.  If I feel that the money is

7    short, then yes, I can count the number of people

8    that worked and use that as a, I don't know how to

9    explain it, as a way of making sure that all the

10   money's there.

11   Q.    As I understand it, some dancers pay --

12   don't have to pay if they're the first one there

13   and there are certain rules like that; right?

14   A.    I know the first one there does not pay.

15   I know that they don't -- if they have to leave for

16   an emergency, they pay.  But I'm not certain of the

17   particulars.

18   Q.    So it wouldn't be something you'd be able

19   to use for precision, but you could look at it

20   generally to see if it lines up with what you're

21   holding in your hand for house fees?

22   A.    Yes.

23                    (Whereupon, Deposition Exhibit

24                     12 was marked.)

25   BY MR. LUKAS:

KAREN R. CAUDLE    9/18/2014

Page 21

1        Q.    Ms. Caudle, showing you exhibit --

2    Plaintiff's Exhibit 12.  Can you tell me what this

3    document is?

4        A.    This is a timecard.

5        Q.    And how long was this -- or is this

6    currently in use?

7        A.    No.

8        Q.    When was it in use?

9        A.    April the 4th.

10       Q.    Of 2014?

11       A.    Yes.

12       Q.    For how long?

13            MR. SCHLANGER:  She may have

14       misunderstood the question.

15            MR. LUKAS:  Sure.

16            MR. SCHLANGER:  She was answering

17       specifically about this document, which is

18       April 4th.  The question is how long has

19       this form been used.

20            MR. LUKAS:  Oh.  Yes.

21            THE WITNESS:  We used it for about a

22       month.  They used timecards for about a

23       month.

24    BY MR. LUKAS:

25       Q.    And apparently that timecard period was

KAREN R. CAUDLE    9/18/2014

Page 22

1    around April of 2014?

2        A.    Apparently.

3        Q.    And we know that because the four slash

4    four means April 4th; right?

5        A.    Yes.

6        Q.    And we know it's 2014 because that's your

7    memory?

8        A.    Yes.   2014.

9        Q.    And you used it for about a month?

10       A.    Yes.   Timecards for about a month.

11       Q.    And why was it instituted?   Why did you

12   start using it?

13       A.    So we could keep track of when they

14   worked.

15       Q.    Why?

16       A.    I don't know.

17       Q.    And why was it discontinued?

18       A.    We started timesheets.

19       Q.    And why do you use timesheets instead of

20   these sheets?

21       A.    They were more thorough.

22                         (Whereupon, Deposition Exhibit

23                         13 was marked.)

24   BY MR. LUKAS:

25       Q.    Showing you Plaintiff's 13.   Are these the

KAREN R. CAUDLE    9/18/2014

Page 23

1    timesheets you started using in place of the

2    Exhibit 12?

3        A.    Yes.

4        Q.    And I believe we talked about these in

5    your last deposition; correct?

6        A.    Yes, we did.

7        Q.    We were kind of guessing what was on them

8    and wasn't on them?

9        A.    Right.

10       Q.    And these have been in use since now we

11   know probably April, sometime around April or May

12   of 2014?

13       A.    Yes.

14       Q.    And are they still currently being used?

15       A.    Yes.

16       Q.    And what, if anything, do you do with

17   the -- well, first of all, who collects these?

18       A.    I do.

19       Q.    And how do you collect them?

20       A.    They put them underneath the desk at the

21   door.

22       Q.    This is what we were talking about that

23   goes under the desk.  And what do you do with them?

24       A.    I file them.

25       Q.    And that's all you do is file them;

KAREN R. CAUDLE    9/18/2014

Page 24

1    correct?

2        A.    Correct.

3        Q.    You don't use them for any bookkeeping or

4    pass it on to Jimmy or anything else like that?

5        A.    No.

6        Q.    Does Swinging Richards collect money for

7    fines for anything other than being late, from

8    entertainers, I should be more precise?

9        A.    They have on a rare occasion, so rare that

10    I could not tell you what it was for.

11        Q.    But the vast, vast majority of these fines

12    are for being late?

13        A.    Yes.

14        Q.    How are the waiters and bartenders paid?

15        A.    On payroll wage, an hourly wage.

16        Q.    And they get to keep their tips?

17        A.    Yes.

18        Q.    Is there any attempt by the club to use a

19    tip credit to reduce their hourly wage paid, or is

20    there no such effort?

21        A.    There's no such effort.

22        Q.    How much are the waiters paid hourly?

23        A.    Waiters are 4.34 an hour.

24        Q.    And how about bartenders?

25        A.    4.37 an hour.

KAREN R. CAUDLE    9/18/2014

Page 26

1     Q.    And that's why you have to report to

2     Paychex what they report for their -- they

3     individually report as their tips?

4     A.    Right.  Yes.

5          MS. MURPHEY:  I think she didn't

6       understand your --

7          MR. LUKAS:  Yes.

8          MS. MURPHEY:  -- earlier question about

9       the tip wage.

10          MR. LUKAS:  Yes.

11          MS. MURPHEY:  Obviously they do tip

12       wage.

13          MR. LUKAS:  I get it.

14          THE WITNESS:  I thought there was

15       something more to it.

16    BY MR. LUKAS:

17     Q.    No.  And the general manager slash D.J.,

18    in other words, Matt and August, they're not

19    included in the payroll; correct?

20     A.    Correct.

21     Q.    Are they issued 1099s?

22     A.    No.

23     Q.    They're paid exclusively by the

24    entertainers tipping them out at the end of the

25    night; correct?

KAREN R. CAUDLE    9/18/2014

Page 27

1      A.    Yes.

2      Q.    And there's no record kept, again,

3  formally of how much they make?

4      A.    No.   Although August does work V.I.P.

5  door, too.   So he gets an hourly wage and tips --

6      Q.    I see.

7      A.    -- when he does that position.

8      Q.    I should -- that's a good point.   The

9  front door and the V.I.P. door people are also paid

10  hourly?

11      A.    Yes.

12      Q.    And what's their hourly wage?

13      A.    12 dollars.

14      Q.    And they're allowed to keep their tips as

15  well; right?

16      A.    Yes.

17      Q.    But you don't track those tips?

18      A.    No.

19      Q.    If a V.I.P. door, I think I remember this

20  from last time, if a V.I.P. door person receives a

21  tip on a credit card, that gets paid out through

22  the bartenders' drawer, and that's where that could

23  be captured; right?

24      A.    Yes.

25          MR. LUKAS:   Thank you, ma'am.

KAREN R. CAUDLE    9/18/2014

Page 28

1          (Whereupon, a discussion ensued off

2     the record.)

3          (Whereupon, the reading and signing

4     of the deposition by the witness was

5     reserved.)

6          (Deposition concluded at 12:30 p.m.)

7                    --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KAREN R. CAUDLE    9/18/2014

Page 29

1                    C E R T I F I C A T E

2     DISTRICT COURT     )
      NORTHERN DISTRICT )
3     ATLANTA DIVISION  )

4              I, Debra M. Druzisky, a Certified Court
      Reporter in and for the State of Georgia, do hereby
5     certify:
               That prior to being examined, the witness
6     named in the foregoing deposition was by me duly
      sworn to testify to the truth, the whole truth, and
7     nothing but the truth;
               That said deposition was taken before me
8     at the time and place set forth and was taken down
      by me in shorthand and thereafter reduced to
9     computerized transcription under my direction and
      supervision.  And I hereby certify the foregoing
10    deposition is a full, true and correct transcript
      of my shorthand notes so taken.
11             I further certify that I am not of kin or
      counsel to the parties in the case, and I am not in
12    the regular employ of counsel for any of the said
      parties, nor am I in any way financially interested
13    in the result of said case.
               IN WITNESS WHEREOF, I have hereunto
14    subscribed my name this 2nd day of October, 2014.

15

16

17

18

19                    _____
                            Debra M. Druzisky
                            Georgia CCR-B-1848
20

21

22

23

24

25