# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

_____

CLINTON HENDERSON and
ANDREW OLINDE, individually and
on behalf of all other similarly situated
individuals,

                        Civil Action No.: 1:13-cv-3767-TWT

        Plaintiffs,

v.

1400 NORTHSIDE DRIVE, INC. d/b/a
SWINGING RICHARDS and C.B.
JONES,

        Defendants.

_____

## PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF THEIR MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' CREATIVE PROFESSIONAL EXEMPTION DEFENSE AND DEFENDANTS' OFFSET AFFIRMATIVE DEFENSE[1]

_____

---

[1] Plaintiffs submit these facts in support of their motions for partial summary judgment pursuant to LR 56.1(B)(1) NDGa. Plaintiffs also submit these facts as their statement of additional facts, filed in support of both of their oppositions to Defendants' motions for summary judgment pursuant to LR 56.1(B)(2)(b) NDGa. Rather than re-filing this exact document repeatedly, Plaintiffs have filed place holders referencing this document in each respective filing.

**The Parties and The Club**

1.      Defendant 1400 Northside Drive, Inc. does business as "Swinging Richards."  (ECF No. 70.)  Swinging Richards ("the Club") is a strip club that has been open in its current format since approximately 1997.  (Ex. B, Rule 30(b)(6) Deposition of Karen Caudle ("Caudle 30(b)(6) Dep.") 5:2-3, 7:6-12, 10:21-7.)[2]

2.      Since approximately 1997, the Club has catered exclusively to a male gay clientele, employing[3] only male strippers ("entertainers")[4] to perform there. (Caudle 30(b)(6) Dep. 5:8-12.)

3.      The Club has been at its current location at 1400 Northside Drive, Atlanta, GA, since at least 2002.  (Caudle 30(b)(6) Dep. 7:9-12, 10:21-25.)

4.      Defendant C.B. Jones is the owner of the Club.  (Caudle 30(b)(6) Dep. 16:6-7.)

_____

[2] Karen Caudle is Defendants' bookkeeper.  (Caudle 30(b)(6) Dep. 4:14-18.)  She was designated and produced by Defendants to testify on Defendants' behalf as a corporate representative in response to Plaintiffs' Rule 30(b)(6) deposition notice. (Id. 82:4-16.)
[3] Defendants have abandoned their "independent contractor" defense, stipulating that they "shall not rely on the 'independent contractor' defense during any portion of this litigation," thereby admitting that the Plaintiffs were "employees" under the Fair Labor Standards Act ("FLSA").  (Ex. O, ECF No. 66.)
[4] The term "entertainer" is the preferred term for Plaintiffs' job title and in Plaintiffs' motion papers it is used synonymously with other terms commonly used to describe their work, such as "exotic dancer," "adult entertainer," and "stripper."

5.      Plaintiffs are a collective group of 39 current and former entertainers who worked at the Club.  (ECF Nos. 1-1, 1-2, 3, 8, 13-17, 19, 22, 23, 28, 30, 31, 35-37, 40-48, 50.)

6.      The Club consists of a main stage, on which entertainers strip their clothes off ("dance"), customer seating around that stage called the "main floor," a bar, and a separate, more private "VIP lounge" area adjacent to the main floor containing a "VIP stage," couch, and seven (7) additional private "VIP rooms." (Ex. A, Rule 30(b)(6) Deposition of James Matthew Colunga ("Colunga 30(b)(6) Dep.") 10:18-12:8, 42:7-12.)[5]

7.      The Club employs entertainers, bartenders, waiters, "shooter boys," a front door person, a VIP room door person, an additional security employee, and a bathroom valet.  (Colunga 30(b)(6) Dep. 8:4-9:2.)  The number of employees working in each position varies based on the night of the week, with Saturday night the busiest night, during which approximately 35 to 45 entertainers are on duty. (Id. 23:19-21, 25:8-10.)

---

[5] James Matthew Colunga is Defendants' general manager.  (Colunga 30(b)(6) Dep. 6:20-24.)  He was designated and produced by Defendants to testify on Defendants' behalf as a corporate representative in response to Plaintiffs' Rule 30(b)(6) deposition notice.  (Id. 6:8-18.)

8.     The manager in charge, either General Manager Matt Colunga ("Colunga") or Assistant Manager August Caudle, also performs the D.J. duties. (Colunga 30(b)(6) Dep. 8:1-4, 25:1-7.)

9.     The Club is open Monday through Saturday, from 6:30 pm to last call at 2:45 am.  (Colunga 30(b)(6) Dep. 13:16-24.)

## **Entertainers' Job Duties**

10.     The job duty of an entertainer is to entertain Defendants' customers. They do this by stripping ("dancing") on the main stage or VIP lounge stage, stripping for individual customers on the main floor or in the VIP lounge (performing table "dances"), and stripping in a more private setting for individuals in the VIP rooms (performing VIP room "dances").  (*Infra*, ¶¶ 11-17.)

11.     Entertainers start on the main stage or VIP lounge stage for a "three song set." (Colunga 30(b)(6) Dep. 32:20-33:6, 42:23-25.)  During this set, they are required to take their shirt off during the first song, their pants off during the second, and go completely nude by taking off their underwear during the last song. (Id. 35:23-36:9.)

12.     Entertainers are required to perform on the main stage and VIP lounge stage periodically during the night, based on a "dance rotation" list maintained in the dressing room.  (Colunga 30(b)(6) Dep. 32:20-33:6, 42:13-15.)  There are up to

six entertainers on the main stage at any given time.  (Id. 13:2-9.)  Each rotation of entertainers is on stage for a three song set; when the set is over, another rotation of entertainers takes their place on stage.  (Id. 33:7-13.)

13.    After their set on the main stage, the entertainers come off the stage and are required to put their underwear back on and are free to work the floor in search of "table dances."  (Colunga 30(b)(6) Dep. 33:10-17, 39:8-14, 41:14-22, 43:1-4.)

14.    Table "dances," regardless of whether on the main floor, in the VIP lounge, or in a VIP room, involve the entertainer "getting naked" and "dancing" outside of the knees of the customer without physical contact.  (Colunga 30(b)(6) Dep. 40:18-41:10.)

15.    The "dances" performed by the entertainers are the same regardless of whether they occur on the main stage, the VIP stage, on the main floor, in the VIP lounge, or in a VIP room; the only difference is that the level of privacy between the entertainer and the customer increases with each progression.   (Colunga 30(b)(6) Dep. 56:11-19.)

16.    Table "dances" on the main floor or in the VIP lounge last the length of one song. (Colunga 30(b)(6) Dep. 41:11-13.)  VIP room "dances" last for the

length of time the VIP room is rented by the customer.  (Ex. K, VIP Lounge and Room Charges Posted Placard ("VIP Placard").)

17.     Entertainers are expected to perform these dances all night long, over and over.  (Colunga 30(b)(6) Dep. 57:5-10.)

### Necessary Qualifications for Entertainers

18.     Although "it would be nice" if an entertainer knew how to actually dance, "most of them don't," and knowing how to dance is not necessary to perform the job.  (Colunga 30(b)(6) Dep. 26:4-11, 79:11-13.)

19.     Entertainers can be very successful at the job without original dance moves or choreography, without original costumes, or inventing either.  (Colunga 30(b)(6) Dep. 36:10-24.)

20.     Entertainers are not required to put on skits, wear any costumes, or have any acting experience to perform the job.  (Colunga 30(b)(6) Dep. 34:22-35:8, 79:14-16.)

21.     Entertainers do not perform any choreographed, coordinated, planned, or organized performances or skits.  (Colunga 30(b)(6) Dep. 34:22-35:8, 37:12-15.)

22.     Defendants do not provide the services of a dance coordinator or choreographer, and do not teach dance or choreography other than an effort by the

D.J. to "play a little slower music for the first couple of times" an entertainer takes the stage.  (Colunga 30(b)(6) Dep. 33:25-34:17.)

23.    It is more important for the entertainer to be very attractive than to know how to dance.  (Colunga 30(b)(6) Dep. 36:25-37:3.)

24.    Performing the job of an entertainer does not require any special training or education or a particular level of intelligence, it is just "something that you have to learn." (Colunga 30(b)(6) Dep. 25:17-23, 28:5-21, 29:24-30:9, 79:17-18.)

25.    Defendants hire entertainers exclusively on looks, applying "specific and strict physical appearance requirements." (Colunga 30(b)(6) Dep. 76:8-78:12, Ex. G, "Swinging Richards Entertainer Rules and Regulations" ("Entertainer Rules and Regs.") ¶ 12.)

26.    General Manager Colunga is responsible for hiring, and his procedure for screening potential dance candidates is to "make them take all their clothes off in the dressing room or pull their shirt up."  (Colunga 30(b)(6) Dep. 76:9-17.)

27.    In order to maintain a wide variety of entertainers to fit the customers' preferences, Colunga's hiring decisions are influenced by the particular physical "niche" he needs to fill, such as race, skin color, hair color, and size. (Colunga 30(b)(6) Dep. 76:8-78:12.)

28.     Colunga does nothing other than look at the entertainer candidates physically and consider what "niches" he needs to fill before he makes a hiring decision.  (Colunga 30(b)(6) Dep. 78:8-12.)

29.     Once hired, an entertainer is required to keep up his physical appearance "at or better than date of hire."  (Entertainer Rules and Regs. ¶ 12.)

30.     Colunga suspends entertainers if they "get too fat," because "[n]obody comes to see a fat stripper."  (Colunga 30(b)(6) Dep. 70:10-13, 71:5-12.)

31.     Defendants' marketing efforts are not specific to any individual entertainer.  (Colunga 30(b)(6) Dep. 85:17-19.)

**Defendants' Misclassification of Entertainers as "Independent Contractors"**

32.     Defendants abandoned their "independent contractor" defense, stipulating that they "shall not rely on the 'independent contractor' defense during any portion of this litigation," thereby admitting that the Plaintiffs were "employees" under the Fair Labor Standards Act ("FLSA").  (Ex. O, ECF No. 66.)

33.     Defendants require entertainers to sign an "Independent Contractor Agreement."  (Ex. E, Deposition of Plaintiff Clint Henderson ("Henderson Dep.") 21:7-13; Ex. H, Henderson Independent Contractor Agreement ("Henderson I.C. Agreem.").)

34.     The agreement states that "The Entertainer acknowledges that the Club will not be responsible for compensating him in any way for the performances which he presents at the Club and that his compensation will be provided directly by customers of the Club."  (Henderson I.C. Agreem. ¶ 4.)

35.     As a result, Defendants pay the entertainers nothing, and it is the entertainer's responsibility to obtain his compensation directly from the customer. (Colunga 30(b)(6) Dep. 58:7-10; Entertainer Rules and Regs. ¶ 7.)   In other words, but for customers giving entertainers money, entertainers would earn nothing for their work at Defendants' club.  (Id.)

36.     Entertainers obtain their compensation in the form of tips[6] from customers in three ways: 1) tips given to them while "dancing" on stage; 2) a minimum of a $10 tip for a table "dance" (a minimum $20 tip for a table "dance" in the VIP lounge); and 3) a minimum of $100 tip per fifteen minutes in a VIP room.[7]  (Colunga 30(b)(6) Dep. 88:6-89:9; VIP Placard.)

37.     Once a customer pays the cover charge to enter the Club, they have the option to choose an entertainer and pay for a table "dance" on the main floor or

---

[6]  As discussed below, Defendants consider all money paid by customers to entertainers to be "tips" and describe the payments as such to the customers. (*Infra*, ¶¶ 58-65.)

[7]  On occasion, customers will also hand entertainers money just for talking with them, or in recognition of their attractiveness, without receiving a table dance. (Colunga 30(b)(6) Dep. 92:1-24.)

in the VIP lounge, and/or pay for a private dance in a VIP room. (Colunga 30(b)(6) Dep. 44:2-10, 89:10-91:20.) Defendants do not assign entertainers to customers. (Id.) But customers are not obligated to do so, and some customers simply sit and watch. (Id. 30:15-25.) Thus, because entertainers are paid solely by customers, and customers are under no obligation to pay them, there is no guarantee that entertainers are paid anything. (Id.)

38.    Entertainers are free to demand more than the minimum tips set by Defendants, and free to accept less, although they rarely accept less. (Henderson Dep. 17:23-18:23; Ex. F, Deposition of Plaintiff Andrew Olinde ("Olinde Dep.") 14:23-15:8.)

39.    To obtain a VIP Room "dance," the customer is charged a "VIP room rental" charge of $40 for 15 minutes, $65 for 30 minutes, and $125 for 60 minutes, and a tip to the entertainer of at least $100 per 15 minutes. (VIP Placard; Ex. L, Main Room Tabletop Fee Placard ("Tabletop Placard").)

40.    The only occasion in which a customer can use a credit card to pay the entertainers is for a VIP room "dance." (Colunga 30(b)(6) Dep. 90:18-22.) All other tips must be paid in cash and given directly to the entertainer. (Id. 52:18-53:10.)

41.   When a customer pays for a VIP room "dance" in cash, the VIP door person holds the cash for the entertainer until the end of the night, when the entertainer collects it.  (Colunga 30(b)(6) Dep. 45:23-46:18.)

42.   If the customer uses a credit card, the VIP door person has the entertainer and customer sign a carbon paper form called an "IOU," which states the entertainer's name, stage name, social security number, and portion of the credit card charges.  (Caudle 30(b)(6) Dep. 46:3-47:3.)  Defendants cut a check to the entertainer the next day for that amount minus a 10% "service charge" (also described as a "surcharge") for "processing" the credit card payment.  (Id. 45:23-46:18; Caudle 30(b)(6) Dep. 43:11-44:21, 49:16-50:5; Ex. C, Deposition of Defendants' Accountant, Demetrios "Jimmy" Haralambus ("Haralambus Dep.") 34:14- 36:22, 91:18-92:14; VIP Placard.)

43.   From January 2011 through December 2013, Defendants collected ██████████ from the entertainers in "service charges."  (Ex. I, Defendants' Financial Statements ("Financials"), at SR2094 (line 8), SR2096 (line 8), SR2099 (line 8).)[8]

---

[8] Portions of paragraphs 43, 47, and 49 are redacted to prevent public disclosure of information produced by Defendants as "Confidential Attorneys' Eyes Only," consistent with Plaintiffs' pending Unopposed Motion to File Under Seal (ECF No. 83), which also seeks to seal Exhibit I.  Should the Court permit Plaintiffs to file under seal, Plaintiffs will promptly file an unredacted version of this document,

44.    Defendants issue a 1099 to some entertainers for credit card payments for VIP room "dances," but never for cash payments for "dances" in VIP rooms or anywhere else in the Club.  (Haralambus Dep. 74:25-75:6; Olinde Dep. 16:4-6.)

45.    Defendants do not pay payroll taxes on any of the compensation collected by the entertainer from the customer regardless of whether the tips to the entertainers are paid with cash or credit.  (Haralambus Dep. 62:1-10.)

46.    Defendants require entertainers to pay $25 per night as "house fees" "for allowing them to dance there."  (Entertainer Rules and Regs. ¶ 10(a); Colunga 30(b)(6) Dep. 86:2-24; Haralambus Dep. 28:9-19.)

47.    From January 2011 through December 2013, Defendants collected ████████ from the entertainers in "house fees."   (Financials at SR2094, SR2096, SR2099.)

48.    As "independent contractors," entertainers are also subject to fines (imposed and collected by Defendants' agents) of $10 to $20 for showing up late for their shift.  (Entertainer Rules and Regs. ¶10(b); Colunga 30(b)(6) Dep. 75:13-

---

as well as Exhibit I, manually with the Court.  Should the Court deny the motion, Plaintiffs will re-file an unredacted version of this document, as well as Exhibit I, electronically via CM/ECF.

76:7, 105:7-14; Ex. D, Deposition of Karen R. Caudle as an Individual ("Caudle Dep.") 24:6-13.)[9]

49.  From January 2011 through December 2013, Defendants collected ███████ from the entertainers in fines.   (Financials at SR2094, SR2096, SR2099.)

50.  Defendants do not pay their managers under their illegal independent contract pay scheme.  Instead, they shift that burden and responsibility to the entertainers by requiring each entertainer to "tip out" "10% of all money earned" (and no less than $10) to the manager (who also acts as the Club's DJ) at the end of every evening.  (Entertainer Rules and Regs. ¶ 10(a); Colunga 30(b)(6) Dep. 87:15-24.)

51.  The manager/DJs' entire compensation comes exclusively from this 10% charge to the entertainers, and it is paid entirely in cash.  (Colunga 30(b)(6) Dep. 61:23-62:18; Caudle Dep. 26:23-27:1.)

52.  Because Defendants do not track the amount of money collected under this system, there is no record of how much entertainers pay managers. (Caudle 30(b)(6) Dep. 20:6-15; Caudle Dep. 11:12-21.)

---

[9] One month after her Rule 30(b)(6) deposition, Plaintiffs deposed Ms. Caudle in her individual capacity under Rule 30(b)(1).  (Affidavit of Timothy C. Selander, ¶ 3.)

53.    Defendants do not pay any payroll tax on the amounts collected by the managers/DJ, and they do not issue them W-2s or 1099s.  (Caudle Dep. 26:17-23.)

54.    Entertainers are also required to pay the front door person at least $5, and any security personnel at least $3, per night.  (Entertainer Rules and Regs. ¶10(a); Colunga 30(b)(6) Dep. 68:11-23, 73:19-74:3.)

55.    Security personnel are paid a maximum of $150 per night.  (Colunga 30(b)(6) Dep. 68:11-23.)   After entertainers tip them out, Defendants pay the difference.  (Id.)   So, if a security guard received $90 from entertainers (30 entertainers at $3 each), Defendants pay an additional $60 to bring his total compensation to $150.  (Id.)

56.    Defendants' pay their front door person $12 per hour, plus payments from entertainers.  (Caudle Dep. 27:8-18.)

57.    Like the money the entertainers pay to the manager/DJ, Defendants keep no record of the amounts the entertainers pay to the door men and security personnel, and Defendant pays no payroll tax on that income.  (Caudle Dep. 27:8-18.)

### Nature of the Compensation Paid by the Customer to the Entertainers

58.    Defendants' documents, corporate representative testimony, and practices confirm that the compensation obtained by entertainers from customers

are "tips" and are the entertainers' property.  (*Infra*, ¶¶ 59-65; Henderson Dep. 9:12-16, 33:19-34:3.)

59.    On the Club's website, Defendants repeatedly identify the money paid to entertainers by customers as entertainers' "tips."  (Ex. J, Club Rules, The Stages, VIP Rooms, and Auditions pages from www.swingingrichards.com ("Website").)

60.    For example, Defendants repeatedly tell both their customers and potential entertainer candidates that "dancers work for tips only."  (Website, p. 2-4.)

61.    Regarding the VIP room payments specifically, Defendants advise customers that after paying the Club for the "room rental," the entertainers are paid a "tip," and that the customer "can pay [the] entertainer with Cash, on [sic] Credit Cards."  (Website, p. 3.)

62.    Defendants' rules and regulations for entertainers also identify the payments made by customers, including in connection with the VIP Room, as a "tip," stating, "It is the entertainer's responsibility to collect all tip money for table dances and VIP rooms up front." (Entertainer Rules and Regs. ¶ 7.)

63.    Defendants' Rule 30(b)(6) representatives testified that the entertainer's portion of the VIP room payment is a "tip" and is "his money." (Colunga 30(b)(6) Dep. 55:4-13 ("Yes, and at the end of the, night the dancer

comes back and gets **his** money" (emphasis added)); Caudle 30(b)(6) Dep. 24:7-19 (Defendants' timesheets "asked them what tips they have made.  It doesn't -- it doesn't ask from where they got the tips" and they are supposed to include "all the money they made for the whole evening"), 26:7-9 (entertainers are supposed to report "all tips claimed" on Defendants' timesheets), 49:19-50:5 ("Q. The club owes the entertainer their portion of what was charged on the credit card?  A. The club -- yes."); <u>see also</u>, Caudle 8:6-9:2; Ex. M, Front Door Rules ("Front Door Rules") ¶ 2 ("the entertainer is waiting for **his** money") (emphasis added).)

64.    The only appearance of the term "service charge" is found in a line item in Defendants' financial documents created by Defendants' accountant. (Financials, SR2094 (line 8), SR2105 (line 24).)

65.    The accountant uses the term "service charge" to describe the 10% "credit card surcharge" collected and retained by Defendants from entertainers when customers use credit cards, rather than cash, to pay for a VIP room "dance." (Haralambus Dep. 91:18-92:14; Ex. K, VIP Lounge and Room Charges Posted Placard ("VIP Placard"); <u>see also</u>, *supra* ¶¶ 39-40.)

## Defendants' Recordkeeping and Accounting Methods

66.    For tax purposes, tips paid by the customer with a credit card to waiters, bartenders and entertainers are included in the same "Revenue" category

on Defendants' Income Statement, which is entitled "Entertainers and Waiters." (Haralambus Dep. 50:4-11; Financials SR2094 (line 10).)  Other items included in "Revenue" are liquor, beer, wine, beverage, and cover charges.  (Haralambus Dep. 48:13-20.)

67.    In the "Expense" categories of the Income Statement, the credit card tips paid to entertainers are accounted for on an expense line entitled "Independent Contractors," and the credit card tips to waiters and bartenders is entitled "Paid Outs – Waiters."  (Haralambus Dep. 51:20-53:1; e.g., Financials SR2094 (line 19, 23).)

68.    In calculating the "Gross Receipts" for Tax Form 1120S (i.e., Defendants' corporate tax return), the accountant includes the credit card tips for entertainers, but does not include the credit card tips to waiters and bartenders. (Haralumbus Dep. 72:2-21; see, e.g., Financials SR2097).   The accountant excludes the bartenders' and waiters' credit card receipts from gross receipts because they are W-2 employees who take their tips in cash directly from the cash register at the end of each night, while the entertainers are "Independent Contractors" who are written checks and issued 1099s for their credit card tips. (Haralumbus Dep. 38:11-40:18, 72:2-76:18; Caudle 30(b)(6) Dep. 51:20-52:2.)

69.     It appears that by excluding the bartender and waiters credit card tips from gross receipts, and not including them on line 8 of Form 1120S, Defendants have failed to report these sums to the IRS or pay payroll tax on them.  (Financials SR2096-2097; Haralumbus Dep. 75:25-76:13.)

70.     Contrary to Defendants' statement that the amounts paid by "customers to purchase table dances or for time spent in [Defendants'] VIP lounge are taken into its gross receipts" (see ECF No. 82-1, p. 1), only sums paid to entertainers by customers for VIP room by credit card (as opposed to cash) and for which Defendants cut the entertainers a check the next day, are recorded and counted in Defendants' gross receipts.   (Colunga 30(b)(6) Dep. 64:4-66:1; Haralumbus Dep. 34:4-13.)

71.     Cash paid by the customer for "dances," regardless of the location (stage, main floor, VIP lounge, or VIP room), are not recorded by Defendants and are not included in Defendants' gross receipts in any way whatsoever.  (Colunga 30(b)(6) Dep. 64:4-66:1; Haralumbus Dep. 34:4-13.)

72.     As a result of Defendants' failure to record any cash transactions between the customers and entertainers, not only are these amounts not included in gross receipts, but Defendants additionally have no record of total income earned by the entertainers for their work at Defendants' club in total, let alone on a weekly

or hourly basis.   (Colunga 30(b)(6) Dep. 64:4-6; Caudle 30(b)(6) Dep. 40:25-41:18.)

73.     Defendants issue a 1099 to the entertainers only for the credit card payments for the VIP room "dances," not cash payments for the same. (Haralambus Dep. 74:25-75:6.)

74.     Entertainers paid solely by cash were never issued 1099s.  (Olinde Dep, 16:4-19.)

75.     Defendants' accountant agrees that there is no logical reason for treating cash payments for these VIP room "dances" differently from credit card payments:

> Q:     Is there any difference between the cash payment to – for 15 minutes of dancer time for a hundred dollars versus a credit card payment of 15 minutes of a dancer's time for a hundred dollars from an accounting standpoint?
>
> A:     They should be treated the same.  They should be treated the same.
>
> Q:     And is it your understanding that that has been done in the past at Swinging Richards?
>
> A:     The credit card charge has been recorded.  The cash has not.

(Haralambus Dep. 97:11-24.)

76.     Defendants' General Manger and Rule 30(b)(6) corporate representative confirmed that not only is there no difference between the "dances"

19

conducted in the VIP room for cash, and those paid by credit card, there is no difference between a VIP room "dances", stage "dances," and floor "dances" for which cash is the only payment method available.  (Colunga 30(b)(6) Dep. 52:18-53:10, 56:11-19, 90:18-22.)

77.     Defendants' accountant testified that he intended to amend Defendants' tax returns, but Defendants have not done so, and there is no evidence they have attempted to change the treatment of the cash payments or that they have sufficient records to do so.  (Haralambus Dep. 97:11-99:1.)

## December 27, 1993 U.S. Department of Labor Letter

78.     In discovery, Defendants produced a letter from the United States Department of Labor, dated December 27, 1993.  (Selander Aff. ¶ 4; Ex. N, Dec. 27, 1993 Letter from the United States Department of Labor ("DOL Letter").)

79.     The letter is addressed to Scott Lawson of Pechter & Associates. (DOL Letter.)   Although Pechter & Associates were Defendants' accountants before Mr. Haralumbus, the letter makes no indication that its content applies to Defendants or the Club.  (Haralumbus Dep. 16:2-6; DOL Letter.)

80.     When the letter was issued, the Club did not exist in its current state. (Caudle 30(b)(6) Dep. 6:10-7:21, 10:3-11:8.)   Rather, it was a female strip club

where apparently (based on the content of the letter), entertainers were classified as W-2 employees.  (<u>Id.</u> 5:2-22; DOL Letter.)

81.    The letter presumes that entertainers are "employees" and thus that the minimum wage and overtime requirements of the Fair Labor Standards Act apply. (DOL Letter, ¶¶ 1-2.)  There is no mention in the letter regarding any attempt to treat entertainers as "independent contractors."  (DOL Letter.)

82.    The letter states that the employer's records must accurately reflect the number of hours worked by the employee and the compensation received. (DOL Letter.)

83.    Defendants made no effort to record the number of hours worked or income earned by their entertainers until implementing a "timesheet" in March 2014, after this lawsuit was filed.  (Colunga 30(b)(6) Dep. 64:4-19, 108:2-23; Caudle 30(b)(6) Dep. 21:3-8, 21:25-22:8, 29:24-30:7.)

84.    Defendants describe the timesheets as incomplete and inaccurate, but do not discipline entertainers for not filling them out.  (Caudle 30(b)(6) Dep. 21:3-8, 28:11-29:13.)

85.    The DOL Letter states that "the program for compliance which you presented to me on November 10, 1993 is acceptable for demonstrating compliance with the record keeping, minimum wage and overtime provisions of

the Fair Labor Standards Act." (DOL Letter ¶ 4.) Defendants have produced no evidence of this "program for compliance." (Selander Aff. ¶ 4.)

Dated: October 17, 2014          **NICHOLS KASTER, PLLP**

/s/ Timothy C. Selander
Paul J. Lukas, MN Bar No. 22084X*
Timothy C. Selander, MN Bar No. 0387016*
Anna Prakash, MN Bar No. 0351362*
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
lukas@nka.com
selander@nka.com
aprakash@nka.com
*admitted pro hac vice*

**MAYS & KERR, LLC**

Jeff Kerr, GA Bar No. 634260
John Mays, GA Bar No. 986574
235 Peachtree St. NE #202
Atlanta, GA  30303
Telephone: (404) 410-7998
Fax: (404) 855-4066
jeff@maysandkerr.com
john@maysandkerr.com

**ATTORNEYS FOR PLAINTIFFS AND THE COLLECTIVE**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**CERTIFICATE OF SERVICE**
*Henderson et al. v. 1400 Northside Drive, Inc. d/b/a Swinging Richards*
**Court File No.: 1:1:13-cv-3767-TWT**

I hereby certify that on October 17, 2014, I caused the following documents to be served:

**PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS IN SUPPORT
OF THEIR MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON
DEFENDANTS' CREATIVE PROFESSIONAL EXEMPTION DEFENSE
AND DEFENDANTS' OFFSET AFFIRMATIVE DEFENSE**

I caused the above-listed document(s) to be served by electronic mail with consent to the following persons at the following address(es):

| | |
|---|---|
| Herbert P. Schlanger<br>Ga. Bar Number 629330<br>hschlanger@bellsouth.net<br>herb@schlanger.com<br>Law Office of Herbert P. Schlanger<br>Suite 1890<br>230 Peachtree Street, N.W.<br>Atlanta, GA  30303<br>404-808-6659 | WM Scott Schulten<br>Ga. Bar Number 630272<br>wss@swtlaw.com<br>Susan K. Murphey<br>Ga. Bar Number 408498<br>skm@swtlaw.com<br>Dean R Fuchs<br>Ga. Bar Number 279170<br>drf@swtlaw.com<br>Schulten Ward & Turner, LLP<br>260 Peachtree Street NW<br>Suite 2700<br>Atlanta, GA  30303<br>404-688-6800 |

Attorneys for 1400 Northside Drive, Inc. d/b/a Swinging Richards

Dated:  October 17, 2014          /s/ Timothy C. Selander
                                                 Timothy C. Selander

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel for Plaintiffs certifies that this document has been prepared in Times New Roman, 14-point font, which is one of the fonts and point selections approved by the Court in Local Rule 5.1(B).

Dated: October 17, 2014            **NICHOLS KASTER, PLLP**

<u>/s/ Timothy C. Selander</u>
Paul J. Lukas, MN Bar No. 22084X*
Timothy C. Selander, MN Bar No. 0387016*
Anna Prakash, MN Bar No. 0351362*
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
lukas@nka.com
selander@nka.com
aprakash@nka.com
*admitted pro hac vice*

**MAYS & KERR, LLC**

Jeff Kerr, GA Bar No. 634260
John Mays, GA Bar No. 986574
235 Peachtree St. NE #202
Atlanta, GA  30303
Telephone: (404) 410-7998
Fax: (404) 855-4066
jeff@maysandkerr.com
john@maysandkerr.com

**ATTORNEYS FOR PLAINTIFFS AND THE COLLECTIVE**