## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CLINTON HENDERSON and
ANDREW OLINDE, individually and
on behalf of all other similarly situated
individuals,

Civil Action No.: 1:13-cv-3767-TWT

        Plaintiffs,

v.

1400 NORTHSIDE DRIVE, INC. d/b/a
SWINGING RICHARDS and C.B.
JONES,

        Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' OFFSET AFFIRMATIVE DEFENSE

### <u>INTRODUCTION</u>

Having abandoned their independent contractor defense, and presuming the

inevitable finding that Defendants cannot meet their burden of proving the creative

professional exemption, Defendants are left with "offset" as their only remaining

defense.  In pleading this affirmative defense, Defendants claim:

> To the extent that any or all of the Plaintiffs are found to be entitled to be paid the minimum wage . . . [Defendants are] entitled to an offset against any amount determined to be owed in the amount of the service charges imposed by [Defendants] on its customers and paid to (or retained by) Plaintiffs.

(Defendants' Answers, ECF Nos. 70 (Fourth Affirmative Defense), 71 (Third Affirmative Defense).)  In short, Defendants—a strip club and its owner—want the Court to rule that they do not owe the adult entertainers who worked at their club any wages because the entertainers received money, not from Defendants, but from Defendants' customers. This "offset" defense turns on the interpretation of the Department of Labor's ("DOL") regulations regarding "tips" versus "service charges," and a number of factors weighed in light of the totality of the circumstances surrounding the compensation of employees under the Fair Labor Standards Act ("FLSA").  See Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 926-35 (S.D.N.Y. 2013).

In this case, the interpretation of those regulations and the consideration of the totality of the circumstances are colored almost exclusively by the illegal "independent contractor" pay scheme that Defendants have abandoned as a defense in this case.  As described below, the circumstances caused by Defendants' ongoing (and now admitted) misclassification of their employees as "independent contractors" and the resultant scheme make it impossible for Defendants to obtain

offset under the FLSA.  Those circumstances include a compensation scheme in which:

- Entertainers' sole income for their work at Defendants' club is money from Defendants' customers, not Defendants (<u>Facts</u> at ¶¶ 33-45);

- Defendants pay the entertainers nothing and attempt to contractually exonerate themselves from any responsibility for doing so (<u>Facts</u> at ¶¶ 33-45);

- Entertainers pay Defendants to work ("house fees") (<u>Facts</u> at ¶¶ 46-47);

- Entertainers pay fines to Defendants if they arrive to work late (<u>Facts</u> at ¶¶ 48-49);

- Entertainers pay 10% of their credit card tips from customers to Defendants as a "processing fee" ("10% service charge") (<u>Facts</u> at ¶¶ 42, 65);

- Defendants' managers are paid solely by entertainers through a mandatory nightly 10% tip out ("manager tip-out") (<u>Facts</u> at ¶¶ 50-51);

- Entertainers supplement the wages of some of Defendants' other employees (door person and security personnel "tip-out") (<u>Facts</u> at ¶¶ 55-57);

- Defendants demand that customers pay entertainers directly, declaring it the entertainers' sole responsibility for collecting their compensation (<u>Facts</u> at ¶¶ 33-35);

- Defendants pay no payroll tax on compensation earned by the entertainers (<u>Facts</u> at ¶ 45); and

- Defendants do not record or pay any payroll tax on their managers' compensation, the tips paid to the door person by the entertainers, or the tips paid to security personnel by the entertainers, and pay no payroll tax on credit card tips paid to bartenders and waiters with credit cards (<u>Facts</u> at ¶¶ 53, 57, 69).

For purposes of its offset defense, Defendants would have the Court pretend that they are tax-paying, FLSA-compliant employers of entertainers classified as W-2 employees.  But that is not the reality, because even though Defendants concede that the entertainers are employees entitled to protection under the FLSA, they **<u>never</u>** gave entertainers any of the protections employers are required to give employees, such as employer-side contributions to social security, the right to work without being charged or monetarily penalized, and a guaranteed minimum wage not dependent on the generosity of Defendants' customers.   Worse still, Defendants have no plans to give their entertainers these benefits.  Rather, they seek judicial endorsement of their illegal pay scheme, asking the Court to find that payment from an employer's customers to employees can, despite all of the circumstances listed above, constitute wages and absolve the employer from any wage liability.  Applying the relevant regulations and factors to the circumstances described above can lead to only one conclusion:  Defendants are not entitled to take credit for payments they never made.  The Court should grant summary judgment in favor of Plaintiffs on Defendants' offset affirmative defense.

# ARGUMENT

## I.   LEGAL STANDARD FOR SUMMARY JUDGMENT.

Plaintiffs incorporate by reference the legal standard for summary judgment as articulated in their Memorandum of Law in Support of Their Motion for Partial Summary Judgment on Defendants' Creative Professional Exemption Defense, filed concurrently with this Motion.[1]

## II.   DEFENDANTS ARE NOT ENTITLED TO OFFSET THE WAGES THEY OWE PLAINTIFFS.

The offset defense Defendants attempt to advance here derives from the FLSA regulations, which define both "tips" and "service charges," 29 C.F.R. §§ 531.52, 531.55, and provide that where sums such as "service charges" are "distributed by the employer to its employees… they may be used in their entirety to satisfy the monetary requirements of the Act."  29 C.F.R. § 531.55(b).  These regulations, the definitions contained therein, and attendant case law foreclose any offset defense here.  The money entertainers received from Defendants' customers

---

[1] Per the parties' stipulation, Plaintiffs are moving affirmatively on both the creative professional exemption and on offset and are filing two separate motions so as to parallel Defendants' affirmative motion practice—specifically, the filing of two separate motions on these same issues.  (ECF Nos. 81-82.)  Also filed concurrently are Plaintiffs' briefs and supporting papers responding in opposition to Defendants' two pending motions for summary judgment on the creative professional exemption and on offset (referred to by Defendants as "set-off").

are tips, not service charges, and regardless, are not fully or properly recorded in gross receipts or in any way paid by Defendants to the entertainers.

A.     **Customers' Payments to Entertainers Are "Tips" Not "Service Charges."**

Under the FLSA regulations, tips are defined as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52.   Further, the customer is in control of which employee receives a tip, whether the employee receives a tip at all, and the amount of the tip. Id.   A "service charge" on the other hand is defined as a "compulsory charge for service . . . imposed on a customer by an employer's establishment."   29 C.F.R. § 531.55(a).  Service charges that can be eligible to offset wages must also become part of the employer's gross receipts and be distributed by the employer to the employees.  29 C.F.R. § 531.55(b).

Notably, courts frequently hold that "compulsory charge[s]" like minimum tip amounts at strip clubs **are not** service charges and are tips.  See, e.g., Reich v. ABC/York-Estes Corp.,  No. 91 C 6265, 1997 WL 264379, at *6 (N.D. Ill. May 12, 1997) (noting, "It is true that the table dances are advertised as costing five dollars per song and are therefore apparently not discretionary payments by customers as contemplated by the regulations," but going on to analyze the totality of the circumstances and tip characteristics identified in the regulations and

holding that "the table dance fees are more closely related to a tip than a service charge and, as a result, plaintiff's motion for partial summary judgment should be granted."); <u>Hart</u>, 967 F. Supp. 2d at 933 ("[T]he performance fees charged by Rick's NY were not service charges.  They were, instead, tips. Accordingly, the fees cannot be used to satisfy [the club's] statutory wage obligations."); <u>Reich v. Priba Corp.</u>, 890 F. Supp. 586, 595 (N.D. Tex. 1995) ("[T]he fees the entertainers receive for table and stage dances are appropriately classified as tips."); <u>see also</u> <u>Thornton v. Crazy Horse, Inc.</u>, No. 3:06-cv-00251-TMB, 2012 WL 2175753, at *9-10 (D. Alaska June 14, 2012) ("[T]he table dance fees and the VIP dance fees retained by Plaintiffs cannot be used to off-set the Defendants' obligations under the minimum wage laws."); <u>Harrell v. Diamond A Entm't, Inc.</u>, 992 F. Supp. 1343, 1358 (M.D. Fla. 1997) ("monies that dancers receive from customers are tips, not wages, which cannot be applied to offset completely an employer's obligation to pay a minimum wage.").  Here, as in the cases cited above, the overwhelming undisputed evidence shows that the amounts customers pay entertainers, regardless of location within the club, are tips and not service charges.

        1.      <u>Defendants and Their Entertainers Describe the Amounts Customers Pay Entertainers as "Tips."</u>

Tellingly, the record demonstrates that, aside from the position they now take in the litigation, Defendants have never thought of or referred to the money

from customers as "service charges."  (See <u>Facts</u> at ¶¶ 58-63.)  This is important because one factor courts apply when determining whether payments from customers to employees are tips or service charges is how the employer and employee refer to the payments.  See <u>Thornton</u>, 2012 WL 2175753, at *10; <u>Hart</u>, 967 F. Supp. 2d at 933 (citing <u>Thornton</u>).  Here, Defendants explicitly describe the payments from customers to entertainers as "tips" on their website (<u>Facts</u> at ¶ 59-61 ("dancers work for **tips** only"), and in the Rules and Regulations they require entertainers to sign in order to work (<u>Facts</u> at ¶ 62 ("It is the entertainer's responsibility to collect all **tip** money for table dances and VIP rooms up front." (emphasis added)).)  Even after the litigation began, Defendants continued to refer to these amounts as tips.  (<u>Facts</u> at ¶ 63 (describing timesheets created by Defendants after this case was filed that required entertainers to report "all tips claimed," which meant "all the money they made for the whole evening."); <u>see also</u> ¶ 58 (Plaintiff Henderson describing the amounts he received from customers as "tips.").)  In sum, Defendants described customers' payments to entertainers as "tips" before this litigation to both customers and entertainers and continue to do so.  These undisputed admissions are irrefutable evidence that payments by customers to entertainers are tips and not service charges.

2.     Customers Pay Entertainers in Recognition of Their Services.

Similarly devastating to Defendants is the fact that the money at issue is given by the customer "in recognition of some service performed for him." 29 C.F.R. § 531.52(a).   That these are payments for a personal service (i.e., a lap dance), rather than payments for a general service provided to the customer by the employer, is critical under the regulation and relevant case law.  Id.; Thornton, 2012 WL 2175753, at *10; Hart, 967 F. Supp. 2d at 933 (citing Thornton).  In this case, the undisputed facts are that customers pay the entertainer(s) of their choice for a lap dance, whether on the main floor, in the VIP lounge, or in a VIP room. (Facts at ¶ 37.)  Customers are not obligated to choose any entertainer to perform any service, and some do not.  (Id.)  Defendants do not assign entertainers to customers.  (Id.)  And, when a customer pays an entertainer, it is for the personal service the entertainer provided.   (Id.)   This practice is consistent with the definition of "tip" in the FLSA regulations.  See 29 C.F.R. § 531.52(a) (tips are "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him.").

3.     Customers Decide Whether to Tip, How Much to Tip, and Who to Tip.

Consistent with the definition of "tip" and "service charge," courts also consider the amount of control that the customer has over the transaction,

specifically, whether the customer chooses the entertainer, and whether the customer can pay more than the minimum amount set by the club.  Thornton, 2012 WL 2175753, at *10; Hart, 967 F. Supp. 2d at 933 (citing Thornton).  This factor also weighs in Plaintiffs' favor because Defendants' customers select the entertainer, if any, from whom they want a lap dance (Facts at ¶ 37), and importantly, customers choose how much to give the entertainer – which has been less than, exactly, or more than the minimum amount set by Defendants.  (Facts at ¶ 38.)  These undisputed facts weigh strongly in favor of finding that Plaintiffs' earnings are tips, not service charges.

4.   Defendants Treat Tips as if They are Entertainers' Property.

Due to Defendants' illegal independent contractor scheme, their policies, practices, and communications to customers specifically, repeatedly, and without qualification state that all amounts paid by customers to entertainers belong to entertainers.  (Facts at ¶¶ 36, 40-42, 59-63.)   Specifically, the "Rules and Regulations" which Defendants created and require entertainers to follow state, "It is the entertainer's responsibility to collect all **tip** money for table dances and VIP rooms up front."  (Facts at ¶ 62 (emphasis added).)  Defendants' communications with its customers on its website are similarly explicit: "our dancers work for **tips** only."  (Facts at ¶ 60 (emphasis added).)  Defendants' placards in the VIP lounge

area express the same notion for VIP room dances: customers pay a rental fee for the room, but the rest ("+ Dancer") belongs to the entertainer.  (Facts at ¶ 39.)  Not surprisingly, Defendants' practices are consistent with their policies.   To wit, almost all customer payments are made directly to entertainers; the sole exception being payments for VIP room "dances," which are temporarily held by Defendants until either the end of the evening (for cash payments) or the next day (for credit card payments).  (Facts at ¶¶ 36, 40-42.)[2]  And perhaps most astonishingly given Defendants' representations in this litigation, Defendants have created documents and policies since this case was filed that refer to **all amounts** earned by entertainers as "**tips**."  (Facts at ¶ 63 (Defendants' bookkeeper and Rule 30(b)(6) corporate representative describing timesheets created by Defendants after this case was filed that require entertainers to report "all tips claimed," which means "all the money they made for the whole evening.").)   All of these policies, practices, and communications reveal just how unsubstantiated this "offset" defense is and, again, weigh strongly in favor of finding that Plaintiffs' earnings are tips, not service charges.

---

[2] Defendants' temporary possession of these payments does not change their nature.  Hart, 967 F. Supp. 2d at 933; Melton v. Round Table Rests., Inc., No. 14112, 1971 WL 900, at *4 (N.D. Ga. Nov. 8, 1971).

**B.**    **Customers' Payments to Entertainers Are Not Service Charges.**

      1.    The Minimum Tip Amount is Not Analogous to Compulsory Charges in Other Employment Settings.

Courts have repeatedly held that strip clubs with policies setting minimum tip amounts are not entitled to an offset because those amounts are tips, not service charges.  Hart, 967 F. Supp. 2d at 930-32; Thornton, 2012 WL 2175753, at *10; Reich v. ABC/York-Estes Corp., 1997 WL 264379, at *7; Reich v. Priba Corp., 890 F. Supp. at 595.  One factor in this analysis is whether the strip club charges customers a cover charge and whether those amounts are recorded on the club's books as revenue.  Those are exactly the facts of this case.  (Facts at ¶ 66.)  The cover charge is the price to enter the Club, which allows customers to be in an environment filled with entertainers and to view entertainers, whether on stage or walking around the floor.  (Facts at ¶ 37.)  Once they pay the cover charge to the Club, customers can then choose to give an entertainer money for a personal dance. (Id.)  This makes it obvious to customers that amounts they give an entertainer are for the entertainer himself, as compensation for the sole service he provides (again, a lap dance).  Moreover, while the club sets the minimum amount customers are to give entertainers for table and VIP room "dances," the amounts are given directly to the entertainer without any involvement by Defendants (id. at ¶ 35), and, with respect to all cash payments from customers, are not recorded as Defendants'

revenue, unlike the cover charge.  (See id. at ¶¶ 37, 66-72.)[3]  In this circumstance, the set minimum amount given to the entertainer is a gratuity.  Even if the Court were to weigh this factor in favor of Defendants, which it should not, this one factor does not overwhelm the rest of the factors that weigh heavily in favor of finding that payments from customers to entertainers are tips under a totality of the circumstances approach. See Hart, 967 F. Supp. 2d at 933.

2.    Defendants Never Claimed the Money as Their Own.

Ironically, Defendants never referred to the money from customers as service charges or as anything that was Defendants' to claim.  In fact, unlike a hotel that rents banquet facilities to a customer and includes a mandatory amount payable by the customer that is distributed to the employees of the hotel, see 29 C.F.R. § 531.55(a), there are no instances in Defendants' documents where the amounts payable to entertainers are described as "service charges."  (Facts at ¶¶ 64-65.)   Rather, the only time where that phrase is used is in accounting documents, which use the phrase to describe the 10% credit card surcharge that Defendants collect and retain by charging entertainers when customers use credit

---

[3] As discussed herein, only tips paid to entertainers via credit card in the VIP room are recorded as revenue to Defendants.  (See infra § II.C.1.)

cards, rather than cash, to pay for a VIP room "dance."  (<u>Id.</u>)[4]  Defendants' total failure to ever describe payments from customers to entertainers as a service charge, coupled with Defendants' historical and continual reference to these amounts as tips, is telling.  <u>See Thornton</u>, 2012 WL 2175753, at *10 (looking at how the parties referred to and treated the money); <u>Hart</u>, 967 F. Supp. 2d at 933 (citing <u>Thornton</u>).

### C.   <u>Recording Tips Paid to Entertainers by Customers with Credit Cards in Gross Receipts Does Not Entitle Defendants to an Offset.</u>

In support of Defendants' motion for partial summary judgment on their offset defense, Defendants state that: "[1] the minimum service charges [the club] establishes for customers to purchase table dances or for time spent in its VIP Lounge are taken into its gross receipts, and [2] therefore, as a matter of law, are available as a set-off against any alleged minimum wage liability to Plaintiffs." (ECF No. 82-1 p. 1.)  Defendants are wrong on both counts.  First, Defendants take only credit card payments, which can only be made for VIP Room dances, into gross receipts.  (<u>Facts</u> at ¶¶ 70-71.)  Second, including some payments in gross

---

[4]  Moreover, Defendants repeatedly disclaimed any responsibility to collect any of the money or pay entertainers with it. (<u>See, e.g.</u>, <u>Facts</u> at ¶ 34 (Defendants' independent contractor agreement provides, "The Entertainer acknowledges that the Club will not be responsible for compensating him in any way for the performances which he presents at the Club and that his compensation will be provided directly by customers of the Club.").)

receipts does not automatically mean an offset is warranted.  Rather, failure to include money in gross receipts is fatal to an employers' request for offset, but inclusion does not carry the same determinative weight.[5]  Under the law, inclusion of money in gross receipts is only one of many factors to be considered when determining offset.  Hart, 967 F. Supp. 2d at 930; Thornton, 2012 WL 2175753, at *10; Reich v. Priba Corp., 890 F. Supp. at 595.

     1.    Defendants Do Not Include Any Cash Payments Made By Their Customers to Entertainers in Gross Receipts and are, Therefore, Not Entitled to an Offset on Those Amounts.

Defendants do not take money paid by the customers for table "dances" and time spent in its VIP lounge into gross receipts.  (Facts at ¶¶ 70-71.)  In fact, Defendants do not take **any** cash payments made by customers to entertainers into gross receipts, and all "dances" on the stage, main floor, and in the VIP lounge are paid only in cash.  (Facts at ¶¶ 40, 70-71.)  Customers are only allowed to pay for VIP room "dances" with a credit card, and only when they do so are the amounts paid by the customers to the entertainer taken into gross receipts.  (Facts at ¶¶ 40, 70-71.)  Cash payments for VIP room dances, like all the other dances, are not taken into gross receipts and are not eligible for an offset as a matter of law.  29

---

[5] Some courts treat the "gross receipts" factor as a "prerequisite" defendant must prove before it is even heard on the other factors bearing on the availability of an offset.  Hart, 967 F. Supp. 2d at 930; ABC/York-Estes Corp., 1997 WL 264379, at *5-6.

C.F.R. § 531.55(b) ("[S]ervice charges and other similar sums **which become part of the employer's gross receipts** are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act") (emphasis added); Hart, 967 F. Supp. 2d at 929-930 ("Implicit in these two requirements is the expectation that such service charges are to be distributed by the employer out of its gross receipts.").

> 2.     Defendants are Not Entitled to Summary Judgment on the VIP Room Credit Card Charges They Take Into Gross Receipts.

Having corrected Defendants' misstatement, the only remaining issue is what weight should be given to Defendants' inclusion of VIP room credit card payments in their gross receipts. For two reasons, the answer is "very little." First, there is no legitimate or logical reason for treating credit card payments for dances any differently than cash payments for the same service. Defendants' accountant, under questioning from his own lawyer, admitted the same:

> Q:    Is there any difference between the cash payment to – for 15 minutes of dancer time for a hundred dollars versus a credit card payment of 15 minutes of a dancer's time for a hundred dollars from an accounting standpoint?
>
> A:    They should be treated the same. They should be treated the same.

> Q:     And is it your understanding that that has been done in the past at Swinging Richards?
>
> A:     The credit card charge has been recorded.  The cash has not.

(Facts at ¶ 75.)[6]  This concession is fatal to Defendants' claim for offset, especially considering the most recent and thorough pronouncement by a court on this issue:

> [T]he performance fees included direct cash payments by customers to the dancers, which were of varying size and were completely unrecorded by Rick's NY in any form. These undeniably were tips. The accident that a subset of the performance fees happened to have been paid by credit card and took the form of vouchers, and therefore that these fees temporarily passed from the dancer to Rick's NY before being converted to cash, does not alter their essential character. That Rick's NY maintained incomplete records of the total performance fees paid, with partial records being generated only by the happenstance that some customers chose to pay by credit card, does not make the recorded payments qualitatively different from the non-recorded ones.

Hart, 967 F. Supp. 2d at 932; ; see also Reich v. Priba, 890 F. Supp. at 595 ("The fact that **all** of the table dance fees are not reported as gross receipts is **fatal** to Cabaret Royale's claim that the tips are more properly classified as wages.") (citing

---

[6] Defendants attempt to recover from this testimony by claiming that Defendants are "in the process of issuing amended IRS Form 1099s" to include cash payments in the VIP rooms.  (ECF No. 82-1 p. 5.)  But as addressed in Plaintiffs' concurrently filed Response to Defendants' Statement of Facts, the testimony from the accountant they cite in connection with this claim does not support it. Regardless, the ultimate question is whether the payments made to the entertainers were "tips" or "service charges," not whether Defendants improperly included revenue that was never theirs in their gross receipts on their tax forms.  (See supra.)

ABC/York–Estes, 157 F.R.D. at 679-680) (emphasis added).  As in Hart and Reich v. Priba, the fact that a customer has the option of paying with a credit card makes credit card payments no less a tip than the cash payments that Defendants do not include in gross receipts.  Indeed, Defendants concede that the personal services provided by the entertainer and for which the customer pays are the same regardless of whether it is done on the main stage, in the main lounge, in the VIP lounge, or in a VIP room.  (Facts at ¶ 15.)   It makes no sense that location or method of payment would transform the "essential character" of the money from a tip to a service charge.  See Hart, 967 F. Supp. 2d at 932.

Second, Defendants provide the Court with no explanation for why these credit card charges are included in gross receipts that compels a finding that these sums are a "service charge."  Indeed, Defendants have no claim that these sums are their property, particularly in light of the following circumstances: (1) Defendants' written renunciation of any responsibility for paying entertainers (Facts at ¶ 34); (2) Defendants' requirement that entertainers are responsible for obtaining their compensation directly from customers (Id.); (3) Defendants' policy to immediately issue IOUs (signed by both the customer and the entertainer) to entertainers at the time customers purchase VIP room "dances" by credit card (Facts at ¶ 42) (clearly establishing that the money is the entertainer's money, not Defendants'); (4)

Defendants' signage clearly announcing the Club's portion of the VIP Room charge is for "Room Rental," and the rest is for the entertainer (<u>Facts</u> at ¶ 39) ("+ DANCER" and "DANCER - $100 PER 15 MIN"); and (5) Defendants' repeated declarations on their website declaring that the entertainers "work for tips only" and that for VIP room dances "you can pay your dancer with Cash on (sic) Credit Card." (<u>Facts</u> at ¶¶ 59-61.)

This utter lack of explanation leaves the Court speculating as to why Defendants would include revenue that is clearly not theirs in their gross receipts for tax purposes. Although it is possible that Defendants included these sums in gross receipts in error,[7] believing such an inclusion is necessary because they cut checks to "independent contractors" in this manner,[8] or in a blatant attempt to avoid the consequences of the FLSA minimum wage requirements, neither reason compels a finding that this money is still anything other than a tip.

---

[7] This possibility is bolstered by the other mistakes Defendants have made in their tax treatment of payments to their other employees, such as failing to record or pay payroll taxes on managers' pay (<u>Facts</u> at ¶¶ 51-53), failing to record or pay payroll taxes on tips paid to the door person and security personnel (<u>Facts</u> at ¶¶ 54-57), and failing to pay payroll tax on waiters' and bartenders' credit card tips (<u>Facts</u> at ¶¶ 68-69).

[8] This possibility is supported by Defendants' accountant's confusing testimony regarding why credit card tips for the "independent contractor" entertainers are included in gross receipts and listed as a deduction, while  credit card tips for waiters and bartenders (W-2 employees), are not included anywhere in the tax reporting. (<u>Facts</u> at ¶¶ 66-69.)

Nor does the most likely scenario—that the inclusion of credit card payments to entertainers for VIP room dances is a historical remnant of a once FLSA-compliant pay plan that predated the current illegal "independent contractor" scheme—give Defendants' "gross receipts" argument any more weight. In discovery, Defendants produced a 1993 letter from the DOL outlining a method by which a strip club could take credit for tips paid to entertainers as an offset to their minimum wage and overtime obligations. (<u>Facts</u> at ¶¶ 78-85.) Setting aside for the purpose of argument only the evidentiary issues with this document, and taking Defendants' unsubstantiated word that the letter applied to Defendants in some manner,[9] the letter clearly describes a scenario in which payments to entertainers for table "dances" could be offset against the club's minimum wage and overtime obligations, **<u>but only if</u>** the entertainers were treated as "employees" under the FLSA. (<u>Id.</u>) This eliminates its application to the facts in this case, where Defendants' illegally classify entertainers as "independent contractors." Despite this fundamental difference, Defendants have clung to the inclusion in gross receipts argument even though they are not eligible for an offset under the analysis of the DOL's letter.

---

[9] This letter is inadmissible for purposes of Defendants' summary judgment motion. (<u>See</u> <u>Facts</u> at ¶¶ 78-85; Plaintiffs' concurrently filed Response to Defendants' Statement of Undisputed Facts at ¶ 19.)

In the end, Defendants' inclusion of some of the entertainers' tips in gross receipts is not as sweeping as they represent to the Court, is far from being as dispositive on the issue as they claim, and does not change the ultimate conclusion that the mere inclusion of some money in gross receipts does not entitle Defendants to an offset on any of the money paid by customers to entertainers.

   **D.    Public Policy Considerations Support a Finding That Customers'
          Payments to Entertainers Are Tips Not Service Charges.**

From a public policy perspective, and in light of the goals behind the FLSA and remedial nature of the Act, the gross receipts requirement makes sense because it makes it impossible for employers to claim an offset for money paid that was never the employer's money to begin with and on which the employer has not paid necessary taxes and social contributions.

For example, requiring employers to use their own money (i.e., money recorded in gross receipts) to pay employees the minimum wage and thus taxes, furthers the policy goals of the FLSA by creating an even playing field for businesses.  See Walling v. Helmerich & Payne, 323 U.S. 37, 40 (1944). Vanskike v. Peters, 974 F.2d 806, 810 (7th Cir. 1992) ("[T]he FLSA was intended to prevent unfair competition in commerce from the use of underpaid labor.").

Moreover, when employers use their own money to pay employees, it passes through payroll and furthers the FLSA's goal of assuring that employers pay

employees the minimum wage with appropriate deductions for Social Security and Medicare.   Such deductions are obviously in employees' long-term interest, particularly so in the context of strip clubs where entertainers generally do not work into old age.  Hart, 967 F. Supp. 2d at 929 (citing Helvering v. Davis, 301 U.S. 619, 641 (1937); Bowman v. Stumbo, 735 F.2d 192, 196 (6th Cir. 1984); Greenwald v. United States, No. 98 Civ. 3439 (DC), 2000 WL 16939, at *2 (S.D.N.Y. Jan. 10, 2000))  By requiring service charges to be included in gross receipts, the FLSA forces employers to "take[] responsibility for [their] employees' wages, and effectively guarantees that such mandatory deductions are taken.  Hart, 967 F. Supp. 2d at 929-30.   The alternative, where customers pay employees' wages directly without any involvement from the employer, fails to assure that employers will make appropriate deductions.  Id. at 930.

Additionally, requiring employers to include service charges in their gross receipts and to actually distribute those amounts to employees requires employers to keep records: without such requirements, it is difficult, if not impossible, to "reconstruct whether the [Plaintiffs] actually received performance fees from customers equaling or exceeding the statutory minimum wage during each week they worked."  Id.  Requiring employers to include service charges in their gross

receipts, and to actually pay those amounts to employees guarantees a record of payment and "avoids that practical problem."  Id.

Here, all of these sound and important policy reasons would be defeated if Defendants were allowed to claim an offset – either on the cash or the credit card money.  The cash undisputedly went untracked and never touched Defendants' books.  (See Facts at ¶ 75.)  And the credit card money, although recorded in gross receipts – apparently through happenstance (see supra text at n.7-8) – was never part of payroll and, accordingly, was never accompanied by the typical and required social benefits that accompany wages.  The money customers paid to entertainers in this case cannot count as a wage – it was a tip.

## CONCLUSION

For all of the reasons stated above, Plaintiffs respectfully request that the Court grant their Motion for Partial Summary Judgment on Defendants' Offset Affirmative Defense.

Dated: October 17, 2014        **NICHOLS KASTER, PLLP**

/s/ Timothy C. Selander
Paul J. Lukas, MN Bar No. 22084X*
Timothy C. Selander, MN Bar No. 0387016*
Anna Prakash, MN Bar No. 0351362*
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870

lukas@nka.com
selander@nka.com
aprakash@nka.com
*admitted pro hac vice*

**MAYS & KERR, LLC**
Jeff Kerr, GA Bar No. 634260
John Mays, GA Bar No. 986574
235 Peachtree St. NE #202
Atlanta, GA  30303
Telephone: (404) 410-7998
Fax: (404) 855-4066
jeff@maysandkerr.com
john@maysandkerr.com

**ATTORNEYS FOR PLAINTIFFS AND THE COLLECTIVE**

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel for Plaintiffs certifies that this document has been prepared in Times New Roman, 14-point font, which is one of the fonts and point selections approved by the Court in Local Rule 5.1(B).

Dated: October 17, 2014          **NICHOLS KASTER, PLLP**

                                 /s/ Timothy C. Selander
                                 Timothy C. Selander, MN Bar No. 0387016*

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

## CERTIFICATE OF SERVICE
### *Henderson et al. v. 1400 Northside Drive, Inc. d/b/a Swinging Richards*
### Court File No.: 1:1:13-cv-3767-TWT

I hereby certify that on October 17, 2014, I caused the following documents to be served:

**Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment on Defendants' Offset Affirmative Defense**

I caused the above-listed document(s) to be served by electronic mail with consent to the following persons at the following address(es):

| | |
|---|---|
| Herbert P. Schlanger<br>Ga. Bar Number 629330<br>hschlanger@bellsouth.net<br>herb@schlanger.com<br>Law Office of Herbert P. Schlanger<br>Suite 1890<br>230 Peachtree Street, N.W.<br>Atlanta, GA 30303<br>404-808-6659 | WM Scott Schulten<br>Ga. Bar Number 630272<br>wss@swtlaw.com<br>Susan K. Murphey<br>Ga. Bar Number 408498<br>skm@swtlaw.com<br>Dean R Fuchs<br>Ga. Bar Number 279170<br>drf@swtlaw.com<br>Schulten Ward & Turner, LLP<br>260 Peachtree Street NW<br>Suite 2700<br>Atlanta, GA 30303<br>404-688-6800 |

Attorneys for 1400 Northside Drive, Inc. d/b/a Swinging Richards

Dated: October 17, 2014                    /s/ Timothy C. Selander
                                                          Timothy C. Selander