DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

CLINTON HENDERSON and )

ANDREW OLINDE,        )

individually and on  )

behalf of all other  )

similarly situated   )

individuals,         )

                     )

    Plaintiffs,      )   CIVIL ACTION NO.

                     )

vs.                  )   1:13-CV-3767-TWT

                     )

1400 NORTHSIDE DRIVE, )

INC. d/b/a SWINGING  )

RICHARDS, AND C.B.   )

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 2

JONES,                    )

                          )

        Defendants.       )

THIS DEPOSITION CONTAINS INFORMATION DESIGNATED

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF DEMETRIOS "JIMMY" HARALAMBUS

(Taken by Plaintiffs)

September 18, 2014

10:00 a.m.

Suite 2700

260 Peachtree Street

Atlanta, Georgia

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 3

APPEARANCES OF COUNSEL

1

2  On behalf of the Plaintiffs:

3      PAUL J. LUKAS, Esq.
       Nichols Kaster

4      80 South 8th Street, Suite 4600
       Minneapolis, Minnesota  55402

5      (612) 256-3200
       lukas@nka.com

6

7  On behalf of the Defendants:

8      SUSAN KASTAN MURPHEY, Esq.
       HERB SCHLANGER, Esq.

9      Schulten, Ward & Turner
       260 Peachtree Street, Suite 2700

10     Atlanta, Georgia  30303
       (404) 688-6800

11     skm@swtlaw.com

12                     --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 4

INDEX TO EXAMINATION

Witness Name:                                        Page

DEMETRIOS "JIMMY" HARALAMBUS

    By Mr. Lukas                                        4

    By Ms. Murphey                                     89

    By Mr. Lukas                                       92

    By Ms. Murphey                                     94

    By Mr. Lukas                                       97


INDEX TO PLAINTIFF'S EXHIBITS

    No.                   Description              Page

Exhibit 1      SR 2094 thru 2131, 12-31-13,         17
               Income Statement re: 1400
               Northside Drive, with
               handwritten notations by
               witness.

Exhibit 2      Listing of patron/waiter/dancer      99
               line items, with handwritten
               notations by witness.

                        - - -


INDEX TO MARKED QUESTIONS

        Page No.                      Line

          57                           1

          57                          20

          59                           6

          62                           8

          80                          14

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

1          DEMETRIOS "JIMMY" HARALAMBUS,

2    having been first duly sworn, was examined and

3    testified as follows:

4                    EXAMINATION

5    BY MR. LUKAS:

6      Q.   Will you please state your full name,

7    spelling it for the record?

8      A.   Haralambus, Jimmy Haralambus, J-I-M-M-Y,

9    H-A-R-A-L-A-M-B-U-S.

10        MR. LUKAS:  And Herb, you want to put

11      something on the record?

12        MR. SCHLANGER:  Yeah.  Mr. Haralambus is

13      a certified public accountant, and he -- one

14      of his clients is the defendant in this

15      action.

16        He has not been subpoenaed -- he has not

17      been noticed as a 30(b)(6) deposition

18      witness for the club, and attorn -- and

19      accountant-client communications are

20      privileged in Georgia.

21        Rather than doing it question by

22      question, I believe we've agreed that I will

23      not object on attorney-client privilege --

24        MS. MURPHEY:  Accountant-client

25      privilege.

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 11

1    beginning of 2001.

2         Q.    And what is your current title?

3         A.    Just a manager.

4         Q.    How many accountants does Seth Twum &

5    Company have?

6         A.    He's the partner, and we've got one more

7    bookkeeper/accountant.  But he's not qualified as a

8    C.P.A.

9         Q.    So there's two C.P.A.s, you and Seth?

10        A.    That is correct.

11        Q.    And you've been with Seth then ever since

12   you became a C.P.A. in the United States?

13        A.    That is correct.

14        Q.    And are you currently a partner?

15        A.    I am seen as a partner, but officially

16   not.

17        Q.    Do you have an ownership interest?

18        A.    I do not.

19        Q.    And what is the nature of your current

20   practice, your C.P.A. practice?

21        A.    We mainly do write-ups, financial

22   statements, and once in a while we'll do

23   compilation reports, but no auditing.

24        Q.    No aud --

25        A.    No.  Due to the staff limitations.  And

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 16

1    A.    That is correct.

2    Q.    And then was it a C.P.A. that was working

3    with her to do the taxes?

4    A.    No -- yes, it was a C.P.A.  It was Pechter

5    & Company.  He never came to the office.  They sent

6    everything to him.

7    Q.    And all they sent to him was the bank

8    statements and the --

9    A.    And a sales summary for the month.

10    Q.    And then how did you change that?  What

11    did you do to change that?

12    A.    I wasn't happy with that system.  I said

13    to them, you have opened yourself to liability.

14    First of all, you're not recording.  You don't have

15    an audit trail.  You've put yourself at risk.  You

16    are handling so much cash and, if money goes

17    missing, there's no way to trace it to anyone.  And

18    I said, we need to implement procedures.

19         So I started developing a spreadsheet

20    where we recorded -- we split up the revenue into

21    liquor, beer and wine, soda -- so do you want me to

22    slow down or can I just carry on speaking?

23    Q.    Well, why don't we -- let me do this.  So

24    you developed a spreadsheet to capture what you

25    felt needed to be captured?

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 17

1    A.    That is correct.

2    Q.    And let's take -- and maybe I can show you

3    a spreadsheet that I have from them, and maybe

4    that's the spreadsheet you're talking about.

5    A.    That is correct.

6    Q.    Let's see.

7         MR. LUKAS:  So what I've done here,

8         Counsel, is I've basically taken all the

9         financials, which was the last batch of

10        documents you produced to me, which are

11        Bates stamped number SR 02094 through SR

12        002131.

13        Later on during the depo, if it becomes

14        necessary to split them out into separate

15        exhibits, we can.  But I thought we'd just

16        put them all in one exhibit and I'll just

17        refer to the page number.  If that becomes a

18        hassle, you let me know.

19        Go ahead and mark that.

20                      (Whereupon, Plaintiff's

21                      Exhibit 5 was marked.)

22   BY MR. LUKAS:

23    Q.    Mr. Haralambus, I'm showing you what's

24   been marked as Plaintiff's Deposition Exhibit

25   Number 5.  I'd like you to turn to Page 21005

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 18

1    (sic).  It should be the whole back section of that

2    document, where it starts the whole back section of

3    that.

4        A.    I'm sorry.  21?

5        Q.    2105.

6        A.    Yes.  I've got it.

7        Q.    Is this the spreadsheet you developed that

8    you were testifying to?

9        A.    That is correct.

10       Q.    So is this a spreadsheet you developed for

11   Karen to enter things into or for you to enter

12   things into?

13       A.    This was developed for the bookkeeper,

14   whether it was her or someone else, to enter the

15   information into.

16       Q.    Oh, that's right.  Karen wasn't there at

17   the time?

18       A.    That is correct.

19       Q.    So you developed this spreadsheet so that

20   the bookkeeper would keep accurate records of

21   basically the flow of money?

22       A.    That is correct.  For every day.

23       Q.    Do you know what this is called or what

24   the bookkeeper currently calls this?

25       A.    I call this a daily summary sheet.

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 20

1    we're talking about liquor, beer, wine, soda, door

2    and total?

3        A.    That section over there refers to working

4    out sales tax and liquor tax.  Liquor tax, beer,

5    wine, soda and door is subject to sales tax.

6    Liquor tax would be only for liquor and wine.

7            So if you look at the top number, the top

8    line, you'll see 73,062 and 75 cents.  That is a

9    total of the 57,041 and 25 cents and 16,021.50.  If

10   you add them together, it should come to that.

11       Q.    I'm sorry.  I lost you.  Where is the

12   number that that should come to?

13       A.    57,000 plus your 16,000 comes to 73,062

14   and 75 cents.  Okay?

15       Q.    Okay.

16       A.    And I take out the -- then I work out the

17   liquor tax from that, which comes to 2,128 dollars

18   and four cents.

19       Q.    But there's liquor tax only on liquor.

20   You said liquor and wine?

21       A.    Beer and wine, yeah.

22       Q.    Oh, so there's liquor tax on liquor, beer

23   and wine?

24       A.    That is correct.

25       Q.    And if you add the 57,000 for liquor and

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 21

1  the 16 some thousand for beer and wine, that's

2  where we get the 73,062.75?

3      A.   That is correct.

4      Q.   But you don't apply the liquor tax to that

5  74,000 dollar number?

6      A.   I will bring -- what I do, I'll work out

7  the liquor tax at 3 percent, and then I'll take it

8  out.

9      Q.   And that's what the 2,128 dollars and four

10 cents is is the actual tax?

11     A.   That is the actual tax, yeah.

12     Q.   And when you back that out of the

13 liquor --

14     A.   Right.

15     Q.   -- it's --

16     A.   It's 54,000.  Then you've got 16,000.

17 Right?  And from these totals I will back out the

18 sales tax.

19     Q.   And that's where we get the

20 50,845 dollars --

21     A.   That is correct.

22     Q.   -- and 46 cents for liquor, and the 14,834

23 dollars and 72 cents for beer and wine?

24     A.   That is correct.

25          MR. SCHLANGER:  Jimmy, let him finish

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 22

1      his question.  Pause after he asks the

2      question.  Okay?

3           THE WITNESS:  Sorry about that.

4           MR. SCHLANGER:  That's okay.

5  BY MR. LUKAS:

6      Q.    And you do the same equation with soda,

7  because there's a sales tax on that; correct?

8      A.    There is not a sale -- yes, there is a

9  sales tax on soda.

10     Q.    And there's a sales tax on the door

11  charge?

12     A.    That is correct.

13     Q.    And after you back out the taxes for these

14  items, then you put them down in this other ledger

15  down below; is that correct?  Or I'm sorry, the

16  bookkeeper does?

17     A.    That is correct.

18     Q.    And that's why the liquor number down

19  below here is -- first of all, what does DR and

20  what does CR stand for?

21     A.    Debit, credit.

22     Q.    So and that's why in the credit column we

23  have 50,845 dollars and 56 cents for liquor,

24  because that's the liquor after the sales tax is

25  paid?

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 25

1   the sum total for November 2011 of the club's share

2   or the club's room rental for those V.I.P. rooms?

3       A.    That is correct.

4       Q.    Let's talk about the next one, fines.

5   What's that?

6       A.    I'm just -- the way it was explained to me

7   is the dancers had contracted saying that they

8   would be there at a specific time.  And if they

9   were late, they paid monies to the club.  I

10  terminated it fine.  That was my terminology, fine.

11  I said, that's it, okay, it's a fine.

12      Q.    Well, they call it a fine in the agreement

13  with the employee, too, don't they?

14      A.    Yeah.  Well, exactly.  When they came to

15  me and they said this is a fine, I said, okay, we

16  will leave it "fine" then.

17      Q.    So that's not your phrase "fine," that's

18  their phrase "fine"?

19      A.    I'm just trying to recall.  I would say

20  so, yes.

21      Q.    I mean, you didn't make up these -- I

22  mean, you labeled them, but they told you what

23  these monies were for; right?

24      A.    Yes.

25      Q.    They had to explain to you --

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

1    A.   Yes.

2    Q.   -- where these streams of income were

3    coming from; correct?

4    A.   Yeah.  They just -- yes.  I would just say

5    yes.

6    Q.   And is it your understanding that the

7    dollar amount in that for fines was just for being

8    late or were there other fines that were included

9    in that, if you know?

10   A.   From what I understand, only for being

11   late.

12   Q.   So in November of 2011, there was

13   3,575 dollars collected from dancers for being

14   late?

15   A.   Yes.

16   Q.   And then the next one says food.  What's

17   that?

18   A.   I set up a system just in case they were

19   selling food, that would be a -- that would go in

20   that slot.

21   Q.   But they weren't selling food in November

22   of 2011; correct?

23   A.   They do not sell food.

24   Q.   They still don't?

25   A.   They still don't.

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 28

1   was it just Mr. Jones?

2       A.    Just Mr. Jones.

3       Q.    And was he the one that okayed this

4   system?

5       A.    He has looked at it, yes.  And I presume

6   he was happy with it.

7       Q.    You're still their C.P.A.; correct?

8       A.    Yes.

9       Q.    What about tip out, what does "tip out"

10  mean?

11      A.    I'm just going blank for a second.

12      Q.    Maybe I can help you.  Is that the house

13  fee that the dancers pay every night?

14      A.    That is correct.  That is correct.  That's

15  the dancers, yeah.

16      Q.    What's your understanding of what that

17  payment is for?

18      A.    For allowing to dance there.  That's the

19  way I understood it.

20      Q.    Gratuity, what is that line for?

21      A.    That's --

22      Q.    Now, that one, the previous ones we talked

23  about were all in the credit column, now we move

24  over to the debit column.  What is gratuity and why

25  is it in the debit column?

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 34

1    Q.   And that's just credit card V.I.P. room

2    payments; correct?

3    A.   That is correct.

4    Q.   So the cash paid to entertainers for their

5    services in the V.I.P. rooms is not captured

6    anywhere in your system; correct?

7    A.   No, it is not.

8    Q.   And in fact, the cash collected by the

9    employ -- or the dancers for dances they do outside

10   of the V.I.P. room, whether it be on the floor or

11   on the stage, is not captured anywhere in your

12   system either; correct?

13   A.   That is correct.

14   Q.   What's the next line, SVCH?

15   A.   Service charge.

16   Q.   And what is service charge?

17   A.   Service charge comprises of two items.

18   The first item is when the patron gets charged 5 or

19   10 percent for the monies he wants from the A.T.M.

20   that's not there, so the employee will give him

21   cash from the register.  That small percentage will

22   go in that column.

23        The other one is when the patron will be

24   charged an extra 10 percent for the room.

25   Q.   And that 10 percent the customer is

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 35

1   charged for using a credit card, it's just when

2   they use a credit card; correct?

3       A.    That is correct.

4       Q.    And that 10 percent is reflected in -- oh,

5   I'm sorry.  The 2,807 dollars, that's what's

6   captured there in the SVCH line?

7       A.    That is correct.

8       Q.    And is it your understanding it's

9   10 percent for the room rental piece or for the

10  piece that the entertainer gets or both?

11      A.    From what I understand, only for the room.

12      Q.    And is it your understanding that, prior

13  to -- oh, going back to the entertainer money where

14  it's 28,135 --

15      A.    Yes.

16      Q.    -- what is your understanding of how the

17  entertainer receives that money, the credit card --

18      A.    The total amount gets captured in this

19  column here; right?

20      Q.    Right.

21      A.    At the end of the day, at the end of the

22  evening, an IOU slip is attached to the batch

23  report of the night.  A check will then be made out

24  to the entertainment to equalling 90 percent of

25  that amount.

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 36

1    Q.   I see.  So there's 10 percent taken off of
2    that piece as well?
3    A.   It's only that 10 percent that -- yeah.
4    Q.   But that's not -- the customer is not
5    paying that, that's coming out of the --
6    A.   Dancers.
7    Q.   -- the dancers' money that they were
8    getting?
9    A.   That is correct.
10   Q.   So there's sort of two charges, there's a
11   10 percent service charge to the customer for the
12   room piece of the rental; correct?
13   A.   Yes.
14   Q.   And then the customer pays whatever the
15   entertainer amount is; correct?
16   A.   That is correct.
17   Q.   And then when the bookkeeper goes to cut
18   the check the next day, another 10 percent is
19   backed out because the customer paid the
20   entertainer with a credit card?
21   A.   That 10 percent is actually like a
22   processing fee, the way we see it.
23   Q.   I see.  So you're charging 10 percent just
24   for the room piece, and then you're charging
25   10 percent to the dancer on the V.I.P. amount -- or

DEMETRIOS "JIMMY" HARALAMBUS     9/18/2014

Page 45

1    BY MR. LUKAS:

2       Q.   So Karen enters the numbers into the

3    system so that it generates a daily report that

4    resembles this; correct?

5       A.   The spreadsheet has a big -- they've got

6    amounts.  They've got cash registers, bank one,

7    bank two, bank three, bank four.  They've got a

8    section for V.I.P. room, the cash.  They've got for

9    the door.  They've got for the fines and that.

10          Then what happens is the monthly will feed

11   into each of these cells and draw those amounts in.

12      Q.   Just like this monthly draws in the

13   dailies, this one we're looking at to 2119 draws in

14   all the monthlies in these same categories that we

15   discussed?

16      A.   That -- no.  That I created myself for

17   Susan to understand.

18      Q.   Oh, I see.

19      A.   Yeah.

20      Q.   So this document we're looking at, the SR

21   2119, that's something that you created special for

22   this lawsuit?

23      A.   That is correct.

24      Q.   I see.  In your normal system, you don't

25   have an annual summary?

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 46

1       A.    That is correct.

2       Q.    And this is something you did in

3   connection with the lawsuit?

4       A.    That is correct.

5       Q.    I see.  Not something that is normally

6   done?

7       A.    That is correct.

8       Q.    So going back to the cover again so we're

9   talking about the same thing, SR 2105 -- I'm sorry.

10  It's not the cover in the one you're looking at.

11      A.    That's okay.  Yeah.

12      Q.    Going back to that, Karen's spreadsheet

13  from which this pulls is different, it looks

14  different than this because it has drawers and so

15  forth; correct?

16      A.    That is correct.

17      Q.    I don't believe I have that.

18          MS. MURPHEY:  No.  I told you we had

19      daily for the last three years, but it's a

20      huge amount of documents, and I was going to

21      give you the monthly summaries and the

22      annual summaries.  And if you felt you

23      needed more than that --

24          MR. LUKAS:  I think I would like to see

25      the daily, just an example of a daily, maybe

DEMETRIOS "JIMMY" HARALAMBUS   9/18/2014

Page 47

1        that matches with this one probably since we

2        talked about this one, sometime in November

3        of 2011, you give me a daily or two just so

4        that I know what they look like, Susan.

5            MS. MURPHEY:  Okay.

6            MR. LUKAS:  And then if I need more,

7        I'll come dig through your boxes, I guess.

8    BY MR. LUKAS:

9        Q.   Thank you.  I think I understand that.

10           And then as we page through the rest of

11   this document, it appears to be these monthly

12   summaries which are created in the normal course of

13   business?

14       A.   That is correct.

15       Q.   All right.  Let's stay on Exhibit 1 (sic).

16           MR. SCHLANGER:  Four (sic).

17           THE REPORTER:  Five, actually.

18           MR. LUKAS:  Oh, I'm sorry.  Five.  None

19        of us have it right.

20   BY MR. LUKAS:

21       Q.   Sorry.  I'm trying to find my copy where I

22   wrote all over them.  Ah, here we go.

23           Is your cover page or the top page on

24   Plaintiff Deposition Exhibit 5, is it SR 2094?

25       A.   Yes.

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 62

1    Q.   Payroll tax expense, what's that?

2    A.   Payroll tax expense are your W-2

3  employees, the portion of the tax expense, the

4  U.R.F., the -- that's the unemployment, federal,

5  state, the FICA taxes.

6    Q.   And the company -- or the Northside Drive

7  does not pay that on the dancers; correct?

8    A.   That is correct.

9    Q.   So this does not include the dancers?

10   A.   That is correct.

11   Q.   Does it include the general manager, Matt?

12   A.   If he's on the payroll, yes, it does.

13   Q.   Do you know whether that Matt's income is

14 even recorded, or compensation is even recorded in

15 the system anywhere?

16   A.   I don't do day-to-day operations as such.

17 I'm not that -- I don't go that deep into it, so I

18 would have to find out.

19      MR. SCHLANGER:  So the answer is you

20   don't know?

21      THE WITNESS:  I don't know.

22 BY MR. LUKAS:

23   Q.   So who's responsible for payroll?

24   A.   Now, Karen will call in the payroll with

25 A.D.P. (sic), and she will request X amount of

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 74

1    entertainers and waiters for the 479,000 --

2        A.    Yes.

3        Q.    -- the 380,000 or so of that is for the

4    dancers' portion of the credit card V.I.P. room;

5    correct?

6        A.    That is correct.

7        Q.    And 79,000 and some change is -- captures

8    the credit card tips paid out in cash to waiters

9    and bartenders?

10       A.    That is correct.

11       Q.    And the paid-out to waiters is captured on

12   the tax form because it's backed out of the gross

13   receipts, it's not included; correct?

14       A.    That's what I've done.

15       Q.    And the independent contractors, 380,000

16   is captured as an additional expense that's

17   deducted; correct?

18       A.    That is recorded as an expense.

19       Q.    Yes.  On the tax form?

20       A.    That is correct.

21       Q.    And the paid out -- or the waiters and

22   bartenders are W-2 employees, and the independent

23   contractors are treated with a 1099; correct?

24       A.    That is correct.

25       Q.    And the 1099 is issued only for that

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 75

1   amount, for the credit card payments to the V.I.P.

2   rooms; correct?

3       A.    The 1099 is issued for that purpose.

4       Q.    And not for any of the cash they receive

5   as compensation for their dancing?

6       A.    It is not recorded.

7       Q.    Why did you do it that way?

8       A.    Excuse me?  Why did I --

9       Q.    Why did you do it this way?  Why didn't

10  you just back out the 380,000 just like you backed

11  out the 79,000 when you're doing the gross

12  receipts?

13      A.    Because when the I.R.S. looks at this,

14  they're going to say you've got salaries and wages

15  and you've got 79,000.  So they will be asking me

16  for a 1099 for that as well and there won't be one.

17      Q.    I see.  Because it's paid in -- like we

18  talked about earlier, because it's paid in cash,

19  there's no audit trail and you couldn't approve to

20  the I.R.S. where that money went?

21      A.    I can prove to the extent where they've

22  taken it out, that amount.  To exactly who it went,

23  the bookkeeper would have a tough time trying to

24  find it, yeah.

25      Q.    Well, going back to why you do it this

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 87

1     A.   The only time that I would be involved in

2  it, if Karen has a vacation, I would fill in her

3  shoes just accounting for the information.  But I

4  don't take care of the day-to-day operations.  I

5  don't get involved in that.

6     Q.   So --

7     A.   She'll make sure that the payroll gets

8  done.  I don't get involved with any of that.  I'll

9  just help out and just capture that information and

10  that's it.

11     Q.   When you say "capture the information," do

12  you mean physically going into the club and opening

13  the safe and all of that?

14     A.   That is correct.

15     Q.   How often in a year do you do that?

16     A.   I may do that about 20 days a year.

17     Q.   That's unusual, isn't it, for a C.P.A., or

18  at least for your practice?  Do you do that for any

19  other clients?

20     A.   No.  I don't do it for anyone else.

21     Q.   Same with the calling in every day and

22  checking in, that's not something you do?

23     A.   Not something I -- C.B., I've known C.B.

24  for a long time.  And I don't like to do these

25  things, but he's asked me to just call up and just

DEMETRIOS "JIMMY" HARALAMBUS   9/18/2014

Page 88

1    check up and just see if everything is okay.

2        Q.   And you just do it as a favor to him?

3        A.   That is correct.

4        Q.   Do you actually see the IOUs or you just

5    see what's captured on the spreadsheet?

6        A.   I see the IOUs.  Because they're attached

7    to the check stub.  I don't necessarily open them

8    up.  They are attached to the check stub.

9        Q.   And that's part of what you pick up and

10   gather when you make your visits?

11       A.   That is correct.

12       Q.   And if we took a paycheck stub and we took

13   an IOU and compared them, the paycheck stub should

14   be for the amount on the IOU less 10 percent?

15       MR. SCHLANGER:  I object to the

16       characterization as a paycheck.

17       MR. LUKAS:  Paycheck stub, I said.  It's

18       a check stub.  Oh, I see.  I'm sorry.  I

19       meant check.  You're right.  I meant check

20       stub.

21   BY MR. LUKAS:

22       Q.   That's why you looked at me like that.

23       A.   Yes.

24       Q.   So if we took the check stub and compared

25   it to the IOU, the check stub should reflect an

MERRILL CORPORATION

877-489-0367          www.merrillcorp.com/law

DEMETRIOS "JIMMY" HARALAMBUS      9/18/2014

Page 91

1        I think the record will speak for itself.

2        But go ahead.

3    BY MS. MURPHEY:

4        Q.    So we talked about V.I.P. cash and V.I.P.

5    credit.

6        A.    Yes.

7        Q.    And those numbers represented the room

8    rental fee paid by a patron to the club; correct?

9        A.    That is correct.

10        Q.    And is that the 40 dollar figure or the 65

11    dollar figure depending on how long they're in a

12    room?

13        A.    I don't get involved in setting that fee,

14    so I don't know.

15        Q.    But it's your understanding it's a room --

16    a charge paid by the patron to the club?

17        A.    That is correct.

18        Q.    And then the entertainer expense that you

19    indicated was the, and you I think used the word,

20    the term hundred dollars payment for the dancer's

21    time in the room?

22        A.    That is correct.

23        Q.    And then the service charge number

24    underneath that represented the 10 percent charge?

25        A.    Represented what the patron pays the

DEMETRIOS "JIMMY" HARALAMBUS   9/18/2014

Page 92

1    10 percent charge.

2       Q.   On the hundred dollars?

3       A.   On the hundred dollar, yes.

4       Q.   So that's -- and so like there, we have

5    28,135, and then the service charge looks like it's

6    approximately 10 percent of that 28,000 dollar

7    figure for 2,800 dollars?

8       A.   Yes.

9       Q.   So on the income statement, if you go back

10   to 2094, where the service charge is indicated on

11   the revenues line for 52,227.25, that's the

12   10 percent on the dancer's hundred dollars that is

13   charged to the patron?

14      A.   That is correct.

15      Q.   So it's not a 10 percent on the room, it's

16   a 10 percent on the dancer?

17      A.   No, no, no, no.  It is a 10 percent on the

18   room.  Or not.

19           MR. LUKAS:  Room and the dancer.

20           MR. SCHLANGER:  No.

21   BY MS. MURPHEY:

22      Q.   You just testified that it was 10 percent

23   on the hundred dollar fee paid for the dancer.

24      A.   Yes.  Yes.

25      Q.   And so that represents the 10 percent of

DEMETRIOS "JIMMY" HARALAMBUS    9/18/2014

Page 97

1          wanted to make sure we were all on the same

2          page.

3     BY MS. MURPHEY:

4          Q.    Now, a few more questions, Jimmy.  Is

5     there any difference from an accounting standpoint

6     between the credit card payments for that hundred

7     dollar fee for a dancer's time versus cash payments

8     of the hundred dollar fee for credit card time -- I

9     mean, sorry, for entertainer time?

10         A.    Could you just rephrase it for me, please?

11         Q.    Yes.  Is there any difference between the

12    cash payment to -- for 15 minutes of dancer time

13    for a hundred dollars versus a credit card payment

14    of 15 minutes of a dancer's time for a hundred

15    dollars from an accounting standpoint?

16              MR. SCHLANGER:  Or should they be

17         treated the same?

18              THE WITNESS:  They should be treated the

19         same.  They should be treated the same.

20    BY MS. MURPHEY:

21         Q.    And is it your understanding that that has

22    been done in the past at Swinging Richards?

23         A.    The credit card charge has been recorded.

24    The cash has not.

25         Q.    And is there something that's going to be