UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

CLINTON HENDERSON and )
ANDREW OLINDE,        )
individually and on   )
behalf of all other   )
similarly situated    )
individuals,          )
                      )
    Plaintiffs,       )   CIVIL ACTION NO.
                      )
vs.                   )   1:13-CV-3767-TWT
                      )
1400 NORTHSIDE DRIVE, )
INC. d/b/a SWINGING   )
RICHARDS, AND C.B.    )

KAREN R. CAUDLE    9/18/2014

Page 2

JONES,                    )
                          )
    Defendants.           )

DEPOSITION OF KAREN A. CAUDLE

(Taken by Plaintiffs)

September 18, 2014

12:00 p.m.

Suite 2700
260 Peachtree Street
Atlanta, Georgia

MERRILL CORPORATION

877-489-0367                www.merrillcorp.com/law

Page 3

1              APPEARANCES OF COUNSEL
2   On behalf of the Plaintiffs:
3       PAUL J. LUKAS, Esq.
        Nichols Kaster
4       80 South 8th Street, Suite 4600
        Minneapolis, Minnesota  55402
5       (612) 256-3200
        lukas@nka.com
6

7   On behalf of the Defendants:
8       SUSAN KASTAN MURPHEY, Esq.
        HERB SCHLANGER, Esq.
9       Schulten, Ward & Turner
        260 Peachtree Street, Suite 2700
10      Atlanta, Georgia  30303
        (404) 688-6800
11      skm@swtlaw.com
12                      --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25

KAREN R. CAUDLE      9/18/2014

Page 4

1                   INDEX TO EXAMINATION

2    Witness Name:                                         Page

3    KAREN A. CAUDLE

4       By Mr. Lukas                                         6

5

6             INDEX TO PLAINTIFF'S EXHIBITS

7       No.                Description                     Page

8    Exhibit 7     SR 188, 1-22-13, Swinging                 4
                   Richards Sign-In/Out sheet.
9

     Exhibit 8     SR 421, Front Door rules.                 6
10

     Exhibit 9     SR 440, 11-3-13, Guest Check and         12
11                 EMS Restaurant credit card
                   receipt re: New Year's Eve
12                 tickets.

13   Exhibit 10    SR 529 thru 531, 1-1-11,                 14
                   Spreadsheet re: VIP room
14                 charges.

15   Exhibit 11    SR 966, 10-21-11, Photocopy of           18
                   envelope re: Richards: House,
16                 Matt C.

17   Exhibit 12    SR 2037, 4-4-14, Timecard re:            19
                   Mike Crowley.
18

     Exhibit 13    SR 2038, Swinging Richards               21
19                 Weekly Sign-In/Out sheet re:
                   Mike Crowley.
20
                            - - -
21

22              INDEX TO MARKED QUESTIONS

23           Page No.                        Line

24              9                             18

25             11                              6

Page 5

1         KAREN A. CAUDLE,
2  having been first duly sworn, was examined and
3  testified as follows:
4              EXAMINATION
5  BY MR. LUKAS:
6     Q.   Will you please state your full name,
7  spelling your last name for the record?
8     A.   Karen A. Caudle, C-A-U-D-L-E.
9     Q.   Ms. Caudle, we were here a couple weeks
10 back, so you already get the joke on how all this
11 work.  Okay?
12    A.   Uh-huh.
13    Q.   I just have a couple questions.  Now that
14 I have some documents and exhibits, I just want to
15 clarify and confirm some things that we talked
16 about last time and make sure that I understand the
17 documents.
18         Okay?
19    A.   Okay.
20                   (Whereupon, Deposition Exhibit
21                    7 was marked.)
22 BY MR. LUKAS:
23    Q.   I'm showing you what has been marked as
24 Plaintiff's Deposition Exhibit Number 7.  Could you
25 tell me what this document is?

1  that the tally sheet that I started putting in
2  there that just asks them to record -- it does
3  record how many free people come in, but they also
4  have that on the outside of the envelope that we
5  were just discussing also.
6      Q.   Paragraph 11 talks about tip-out.  There's
7  no record kept by the --
8           MR. SCHLANGER:  Keep going.
9           (Whereupon, there was a telephonic
10      interruption.)
11 BY MR. LUKAS:
12      Q.   There's no record kept of how much dancers
13 tip out to the front door person; correct?
14      A.   That's correct.  Not that I know of.
15      Q.   And there's no record kept of how much the
16 dancers tip out the general manager slash D.J.;
17 correct?
18      A.   That's correct.
19      Q.   And there's no record kept of how much the
20 dancers tip out the V.I.P. person; correct?
21      A.   That's correct.
22      Q.   And then the --
23      A.   Excuse me.  I'm sorry.
24      Q.   That's all right.
25      A.   My son kept track of it for a few months

Page 13

1     A.    I would think so, yes.
2     Q.    But you can't be any more specific for me
3  than that?
4     A.    No.
5                    (Whereupon, Deposition Exhibit
6                     9 was marked.)
7  BY MR. LUKAS:
8     Q.    Ms. Caudle, showing you Plaintiff's
9  Exhibit 9.  Could you tell me what this is?
10    A.    This gentleman bought two New Year's Eve
11 tickets.
12    Q.    How can you tell that?
13    A.    It says New Year's Eve tix two on it.  And
14 the price for the New Year's Eve tickets are 55
15 dollars.  So he bought two, 110 dollars, gave
16 whoever sold -- I guess whoever sold them the
17 tickets a ten dollar tip to make a grand total of
18 120.
19    Q.    What is E.M.S. Restaurant?
20    A.    That's what they put on the credit card
21 charges rather than Swinging Richards.
22    Q.    I see.  Is that true for the V.I.P. room
23 charges used -- where they use a credit card, so it
24 says E.M.S. Restaurant on it?
25    A.    As far -- yes.  I don't believe any of

1    them say Swinging Richards, yes.
2        Q.   So when the customer gets their credit
3    card charges back, it just says E.M.S. Restaurant?
4        A.   I've never made a charge.
5        Q.   Well, sure.
6        A.   Yeah.  So I'm assuming it would.
7        Q.   That's for privacy reasons, I assume?
8        A.   Yes.
9        Q.   Does this have anything to do with this
10   lawsuit that you're aware of?
11       A.   The purchase of the New Year's Eve
12   tickets?
13       Q.   Yes.  Is that something dancers were
14   selling?
15       A.   No.
16            MS. MURPHEY:  I think this was one of
17        the samples I gave you of documents that we
18        weren't producing but were in the 35 boxes.
19        This one has New Year's Eve tickets.  But if
20        they bought liquor or drinks, it would have
21        the tab and then the credit card receipt.
22            And that's what I was showing you we
23        weren't producing.  This is just an odd one
24        because it has the New Year's Eve tickets.
25        But it's something that a waitress fills out

```
1      A.   I have no idea.
2      Q.   You don't do anything with it, do you?
3      A.   Other than keep it, no.
4      Q.   You don't use it to audit or to make sure
5   that there's no discrepancies or anything?
6      A.   Oh, yes.  If I feel that the money is
7   short, then yes, I can count the number of people
8   that worked and use that as a, I don't know how to
9   explain it, as a way of making sure that all the
10  money's there.
11     Q.   As I understand it, some dancers pay --
12  don't have to pay if they're the first one there
13  and there are certain rules like that; right?
14     A.   I know the first one there does not pay.
15  I know that they don't -- if they have to leave for
16  an emergency, they pay.  But I'm not certain of the
17  particulars.
18     Q.   So it wouldn't be something you'd be able
19  to use for precision, but you could look at it
20  generally to see if it lines up with what you're
21  holding in your hand for house fees?
22     A.   Yes.
23                    (Whereupon, Deposition Exhibit
24                    12 was marked.)
25  BY MR. LUKAS:
```

1    Q.   Ms. Caudle, showing you exhibit --
2  Plaintiff's Exhibit 12.  Can you tell me what this
3  document is?
4    A.   This is a timecard.
5    Q.   And how long was this -- or is this
6  currently in use?
7    A.   No.
8    Q.   When was it in use?
9    A.   April the 4th.
10   Q.   Of 2014?
11   A.   Yes.
12   Q.   For how long?
13        MR. SCHLANGER:  She may have
14     misunderstood the question.
15        MR. LUKAS:  Sure.
16        MR. SCHLANGER:  She was answering
17     specifically about this document, which is
18     April 4th.  The question is how long has
19     this form been used.
20        MR. LUKAS:  Oh.  Yes.
21        THE WITNESS:  We used it for about a
22     month.  They used timecards for about a
23     month.
24  BY MR. LUKAS:
25   Q.   And apparently that timecard period was

1   around April of 2014?
2       A.   Apparently.
3       Q.   And we know that because the four slash
4   four means April 4th; right?
5       A.   Yes.
6       Q.   And we know it's 2014 because that's your
7   memory?
8       A.   Yes.  2014.
9       Q.   And you used it for about a month?
10      A.   Yes.  Timecards for about a month.
11      Q.   And why was it instituted?  Why did you
12  start using it?
13      A.   So we could keep track of when they
14  worked.
15      Q.   Why?
16      A.   I don't know.
17      Q.   And why was it discontinued?
18      A.   We started timesheets.
19      Q.   And why do you use timesheets instead of
20  these sheets?
21      A.   They were more thorough.
22                       (Whereupon, Deposition Exhibit
23                        13 was marked.)
24  BY MR. LUKAS:
25      Q.   Showing you Plaintiff's 13.  Are these the

1    timesheets you started using in place of the
2    Exhibit 12?
3         A.   Yes.
4         Q.   And I believe we talked about these in
5    your last deposition; correct?
6         A.   Yes, we did.
7         Q.   We were kind of guessing what was on them
8    and wasn't on them?
9         A.   Right.
10        Q.   And these have been in use since now we
11   know probably April, sometime around April or May
12   of 2014?
13        A.   Yes.
14        Q.   And are they still currently being used?
15        A.   Yes.
16        Q.   And what, if anything, do you do with
17   the -- well, first of all, who collects these?
18        A.   I do.
19        Q.   And how do you collect them?
20        A.   They put them underneath the desk at the
21   door.
22        Q.   This is what we were talking about that
23   goes under the desk.  And what do you do with them?
24        A.   I file them.
25        Q.   And that's all you do is file them;

1    correct?
2        A.   Correct.
3        Q.   You don't use them for any bookkeeping or
4    pass it on to Jimmy or anything else like that?
5        A.   No.
6        Q.   Does Swinging Richards collect money for
7    fines for anything other than being late, from
8    entertainers, I should be more precise?
9        A.   They have on a rare occasion, so rare that
10   I could not tell you what it was for.
11       Q.   But the vast, vast majority of these fines
12   are for being late?
13       A.   Yes.
14       Q.   How are the waiters and bartenders paid?
15       A.   On payroll wage, an hourly wage.
16       Q.   And they get to keep their tips?
17       A.   Yes.
18       Q.   Is there any attempt by the club to use a
19   tip credit to reduce their hourly wage paid, or is
20   there no such effort?
21       A.   There's no such effort.
22       Q.   How much are the waiters paid hourly?
23       A.   Waiters are 4.34 an hour.
24       Q.   And how about bartenders?
25       A.   4.37 an hour.

1    Q.   Is there any effort to track the tips
2  bartenders and waiters earn?
3    A.   No.
4    Q.   Although there is a record of credit card
5  tips they receive?
6    A.   I don't keep a record of credit card tips
7  that they receive.  On their timecards they write
8  down the tips they claim, but that is the only
9  record.  I report that to A.D.P.  Excuse me.  There
10 I go again.  Paychex.
11        But no, I don't keep a log or record of
12 what each individual bartender or waiter is tipped.
13   Q.   But you do track how much cash they take
14 out of the till at the end of the night to cover
15 their credit card tips; correct?
16   A.   That would be on the Excel sheet.  But we
17 don't track them per waiter or bartender.
18   Q.   Right.  Just -- oh, I see what you're
19 saying.  You don't do it per employee, but you do
20 do it, you do track how much tips are paid through
21 credit card transactions?
22   A.   Right.
23   Q.   I'm with you.  Is 4.34 and 4.37 a tipped
24 hourly wage, do you know?
25   A.   Yes.

1     Q.   And that's why you have to report to
2  Paychex what they report for their -- they
3  individually report as their tips?
4     A.   Right.  Yes.
5          MS. MURPHEY:  I think she didn't
6     understand your --
7          MR. LUKAS:  Yes.
8          MS. MURPHEY:  -- earlier question about
9     the tip wage.
10         MR. LUKAS:  Yes.
11         MS. MURPHEY:  Obviously they do tip
12    wage.
13         MR. LUKAS:  I get it.
14         THE WITNESS:  I thought there was
15    something more to it.
16 BY MR. LUKAS:
17    Q.   No.  And the general manager slash D.J.,
18 in other words, Matt and August, they're not
19 included in the payroll; correct?
20    A.   Correct.
21    Q.   Are they issued 1099s?
22    A.   No.
23    Q.   They're paid exclusively by the
24 entertainers tipping them out at the end of the
25 night; correct?

Page 27

1    A.    Yes.
2    Q.    And there's no record kept, again,
3    formally of how much they make?
4    A.    No.  Although August does work V.I.P.
5    door, too.  So he gets an hourly wage and tips --
6    Q.    I see.
7    A.    -- when he does that position.
8    Q.    I should -- that's a good point.  The
9    front door and the V.I.P. door people are also paid
10   hourly?
11   A.    Yes.
12   Q.    And what's their hourly wage?
13   A.    12 dollars.
14   Q.    And they're allowed to keep their tips as
15   well; right?
16   A.    Yes.
17   Q.    But you don't track those tips?
18   A.    No.
19   Q.    If a V.I.P. door, I think I remember this
20   from last time, if a V.I.P. door person receives a
21   tip on a credit card, that gets paid out through
22   the bartenders' drawer, and that's where that could
23   be captured; right?
24   A.    Yes.
25         MR. LUKAS:  Thank you, ma'am.